IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BINH HOA LE,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:15-CV-3839-L** |
| | § | |
| **EXETER FINANCE CORP. and** | § | |
| **ENZO PARENT, LLC,** | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are Defendants' Motion for Summary Judgment (Doc. 27), filed December 16, 2016; Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert (Doc. 28), filed December 16, 2016; Plaintiff's Objection to Defendants' Summary Judgment Evidence and Motion to Strike (Doc. 31), filed January 6, 2017; Plaintiff's Motion for Continuance (Doc. 35), filed January 6, 2017; Defendants' Objections to Plaintiff's Summary Judgment Evidence (Doc. 39), filed January 20, 2017; Plaintiff's Motion for Clarification on Discovery Deadline, or in the Alternative, Motion for Extension of the Same (Doc. 57), filed March 13, 2017; Plaintiff's Motion to De-Designate "Highly Confidential" Documents in Defendants' Productions (Doc. 63), filed August 2, 2017; Plaintiff's Second Motion to Compel (Doc. 83), filed April 13, 2018; and Plaintiff's Motion to Set Trial Date and Enter Scheduling Order (Doc. 86), filed April 17, 2018.[1]

After considering the motions, responses, replies, briefs, admissible summary judgment evidence, and applicable legal standard, the court **denies** Defendants' Motion for Summary

---

[1] Plaintiff's attorney incorrectly designated this motion as a "Brief/Memorandum in Support filed by Binh Hoa Le re 51 Order" when it was filed electronically. It, therefore, appears on the docket sheet as a brief rather than a motion, and it was not apparent to the court until reviewing the document that it was actually a motion. *See* Doc. 86.

Judgment (Doc. 27) with respect to Plaintiff's quantum meruit claim, **grants** the motion in all other respects, and **dismisses with prejudice** all claims asserted by Plaintiff in this action, except for his quantum meruit claim; **grants** Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert (Doc. 28); **overrules as moot**, except to the extent specifically addressed and ruled upon in this opinion, Plaintiff's Objection to Defendants' Summary Judgment Evidence and Motion to Strike (Doc. 31); **denies** Plaintiff's Motion for Continuance (Doc. 35); **overrules as moot**, except to the extent specifically addressed and ruled upon in this opinion, Defendants' Objections to Plaintiff's Summary Judgment Evidence (Doc. 39); **grants in part and denies in part** Plaintiff's Motion for Clarification on Discovery Deadline, or in the Alternative, Motion for Extension of the Same (Doc. 57); **denies as moot** Plaintiff's Motion to De-Designate "Highly Confidential" Documents in Defendants' Productions (Doc. 63); **denies as moot** Plaintiff's Second Motion to Compel (Doc. 83); and **denies as moot** Plaintiff's Motion to Set Trial Date and Enter Scheduling Order (Doc. 86).

The court also **strikes** all amended or supplemental submissions (Docs. 64, 64-1, 68-1, 78, 82, 82-1, 32, 77) that were filed by Plaintiff without leave of court in violation of the court's scheduling order, this district's Local Civil Rules, or both. Additionally, the court **strikes** the parties' submissions, arguments, or evidence (Docs. 72, 72-1, 72-2, 75) that were filed or made in response to or in support of Plaintiff's supplemental submissions.

## I.     Factual and Procedural Background

Plaintiff Binh Hoa Le ("Plaintiff" or "Le"), the former Chief Human Resources Officer ("CHRO") and Executive Vice President of Defendant Exeter Finance Corp. ("Exeter"), originally brought this action against his former employer Exeter and Exeter's parent company Enzo Parent, LLC ("Enzo") (collectively, "Defendants") on October 2, 2015, in the 191st Judicial District Court, Dallas County, Texas, after his employment was terminated on February 23, 2015. Le asserts claims

for breaches of a July 25, 2013 agreement and a May 2014 Management Profits Interest Unit Agreement ("PIU Agreement"). In his First Amended Petition, dated October 16, 2015, Plaintiff asserts claims against Defendants for (1) breach of contract; (2) fraud, fraudulent inducement, and fraud by nondisclosure or omission; and (3) alleged violations of the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code Ann. §§ 21.001, *et seq.* Plaintiff also seeks relief under the equitable theories of quantum meruit, unjust enrichment, and money had and received.

On December 1, 2015, Defendants removed the action to federal court after Plaintiff filed his Second Amended Petition ("Complaint"), the live pleading, which includes his previously asserted claims and requests for relief under state law, in addition to new federal employment law claims for retaliation under Title VII of the Civil Rights Act of 1964, *et seq.* ("Title VII"), which are also brought pursuant to 42 U.S.C. § 1981; the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"); the Americans with Disabilities Act, 41 U.S.C. § 12111, *et. seq.* ("ADA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"). Plaintiff's employment law claims are based on his contention that he engaged in protected activity in opposing unlawful employment practices by Exeter involving other Exeter employees, and Exeter retaliated by firing him.

Plaintiff seeks to recover actual damages in an amount determined to have been sustained by him; exemplary damages, attorney's fees, prejudgment and postjudgment interest, and costs. Plaintiff alleges entitlement to exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code and Texas Labor Code § 21.2585, "as well as under 29 U.S.C. § 621, et seq., 42 U.S.C. § 12111, et seq., among others." Pl.'s Compl. ¶ 62. Plaintiff's request for attorney's fees is made pursuant to section 38.00 of the Texas Civil Practice and Remedies Code; section 21.259 of the Texas Labor Code or TCHRA; section 2000e-5(k) of Title VII; section 216(b) of the ADEA;

section 2617(a)(3) of the FMLA; "and 42 U.S.C. § 2000e, et seq., among others." Pl.'s Compl. ¶ 63.

In accordance with the deadline set by the court for filing dispositive motions, Defendants moved for summary judgment on all of Plaintiff's claims on December 16, 2016 (Doc. 27). Defendants also moved for summary judgment on Plaintiff's Category I damages for losses allegedly sustained by him as a result of his leaving Lennox to join Exeter. On the same date, Defendants moved to exclude the opinions of Plaintiff's damages expert Karl Weisheit ("Weisheit") regarding the two categories of damages identified in Weisheit's report (Doc. 28). Regarding Plaintiff's Category I or Lennox losses, Weisheit expresses the opinion, based on Plaintiff's fraudulent inducement allegations, that Exeter's conduct in inducing Le to leave Lennox, his former employer, to work for Exeter caused Le to forgo or lose wages and the value of his Lennox equity portfolio. Weisheit opines that Plaintiff is entitled to recover as damages these Category I losses, which he concludes total $5,268,182. Regarding Category II or Exeter losses, Weisheit expresses the opinion, based on Plaintiff's wrongful termination and breach of contract allegations, that Le suffered damages totaling $6,199,344 for unpaid severance, lost wages (past and future), the unpaid value of his Enzo profits interest units ("PIUs"), and Cobra health insurance payments. Weisheit states in his report that "[a]dditional facts and data are needed to be produced by Defendants in order to complete my analysis of Mr. Le's losses" but does not specify whether additional facts or data are needed with respect to Category I or II losses or both. Defs.' App. 28 (Doc. 28-2). He also states with respect to PIUs losses that "[a]dditional information is needed and has been requested of Exeter . . . to calculate the actual PIU Mr. Le should have received." Defs.' App. 35.

Defendants contend that Weisheit's opinion regarding Plaintiff's damages should be excluded and Weisheit should not be allowed to testify regarding damages because he relies on

inaccurate facts and flawed methodology. Defendants assert that Weisheit's opinion regarding Plaintiff's Category I losses should be excluded, as the evidence establishes that Le could not have been fraudulently induced to leaving Lennox to join Exeter because he was fired for cause by Lennox in April 2013 before learning of the job opportunity at Exeter in June 2013. In this regard, Defendants contend that Plaintiff testified untruthfully while under oath in his deposition that he left Lennox because he was recruited by Exeter, and Weisheit's expert report, the contents of which were verified by Le, relies on Plaintiff's false allegations regarding his fraudulent inducement claim.

On January 6, 2017, the deadline to respond to Defendants' motions for summary judgment and to exclude the expert opinion of Weisheit, Plaintiff filed: (1) his response to Defendants' summary judgment and expert motions, which included a request for continuance under Federal Rule of Civil Procedure Rule 56(d) (Docs. 33, 34); (2) objections and a motion to strike Defendants' summary judgment evidence (Doc. 31); (3) a motion under Rule 56(d) to extend his deadline to respond to Defendants' summary judgment and expert motions to April 17, 2017, to give him an opportunity to conduct additional discovery, obtain a ruling on a previously filed motion to compel, and supplement or amend his expert report before responding to Defendants' summary judgment and expert motions (Doc. 35); and (4) a First Amended and Supplemental Designation of Expert Witness Pursuant to Fed. R. Civ. P. 26, without leave of court long after expiration of his September 6, 2016 deadline to designate experts (Doc. 32).[2] Defendants opposed the requested continuance.

Thereafter, on March 13, 2017, Plaintiff filed an opposed motion (Doc. 57), requesting that the court enter an order clarifying that the discovery deadline was unexpired as of March 2, 2018, when it stayed all unexpired scheduling order deadlines. Alternatively, Plaintiff requested an

---

[2] Although filed on January 6, 2017, these documents were not docketed until January 9, 2017, because they were filed by Plaintiff using the court's ECF emergency filing e-mail.

extension of the discovery deadline "until 21-days prior to trial," so that he could depose three witnesses before trial.

On August 2, 2017, Plaintiff moved to change the "highly confidential attorney's eyes only" designation on documents produced by Defendants in response to the magistrate judge's ruling that granted in part Plaintiff's Motion to Compel. Plaintiff contended that the documents should have been designated as "confidential," and Defendants' use of the "highly confidential attorney's eyes only" designation violated the parties' agreed-upon protective order (Doc. 63). On April 16, 2018, approximately eight months after filing his original Motion to De-designate "Highly Confidential" Documents in Defendants' Productions, Plaintiff filed, without leave of court, a "First Supplemental Brief" (Doc. 85) in support of his Motion to De-designate.

On August 18, 2017, approximately six months after briefing on Plaintiff's Motion for Continuance and seven months after Defendants' summary judgment motion was complete and without leave of court, Plaintiff filed a "Supplemental Submission in Further Support of [His] Motion for Continuance [Related to Docket Nos. 27, 28, 35, 37 & 46]"[3] (Doc. 64) that includes additional argument and attached evidence in support of Plaintiff's response to Defendants' summary judgment motion and motion to exclude expert testimony. On August 24, 2017, Plaintiff filed a "Second Supplemental Submission in Opposition to Defendants' Motion for Summary Judgment [Related to Docket Nos. 27, 33, & 41]" (Doc. 68) that includes additional argument and attached evidence in support of his response to Defendants' summary judgment motion. The August 18, 2017

---

[3] Document Nos. 27 and 28 referenced in the title of this supplemental submissions are Defendants' summary judgment motion and motion to exclude Plaintiff's expert testimony. Document No. 35 is Plaintiff's Motion for Continuance. Document No. 37 is Defendants' January 20, 2017 response to the Motion for Continuance, and Document No. 46 is Plaintiff's February 3, 2017 reply in support of his Motion for Continuance.

"Supplemental Submission" was filed and appears as a motion on the docket sheet. Both of these supplemental submissions by Plaintiff resulted in a new round of briefing. *See* Docs. 72, 75.

On December 15, 2017, without leave of court and more than one year after expiration of his September 6, 2016 deadline to designate experts, Plaintiff filed a Second Amended and Supplemental Designation of Expert Witnesses Pursuant to Fed. R. Civ. P. 26, which indicates that a copy of Weishert's Second Amended and Supplemental expert report was served on Defendants on the same date. Based on this amended and supplemental report, Plaintiff filed a Supplemental Submission in Opposition to Defendants' Motion to Exclude Plaintiff's Expert.

On April 4, 2018, without leave of court and more than one year after permissible briefing on the summary judgment under this district's Local Civil Rules was complete, Plaintiff filed a twelve-page "Second Supplemental Submission to Defendants' Motion for Summary Judgment [Related to Docket Nos. 27, 33, 41, 68, and 69]" (Doc. 82) to which Plaintiff attaches 121 pages consisting of declarations by Plaintiff and Plaintiff's counsel and other evidence in support of Plaintiff's response to Defendants' summary judgment motion.

On April 13, 2018, Plaintiff filed a Second Motion to Compel (Doc. 83) documents that Plaintiff contends should have been produced by Defendants after the court overruled their objections to the magistrate judge's discovery order several months earlier on September 27, 2017. On April 23, 2018, the court entered an order directing the parties to not file any further motions or documents, except for those related to Plaintiff's Second Motion to Compel, as the constant filing of documents was delaying and interfering with the court's ability to manage the case and rule on pending motions:

> The court is currently reviewing the pending motions filed in this case. The court, however, cannot rule on the pending motions if Plaintiff continues to file motions and materials related to the pending motions. Accordingly, the court **directs** the

parties to not file any further motions, briefs, documents, or materials without first obtaining leave of court until the court rules on the pending motions. The only exception to this order is Plaintiff's Second Motion to Compel (Doc. 83), filed April 13, 2018. Any response to this motion by Defendants and related materials must be filed by **April 30, 2018**, and any reply by Plaintiff must be filed by **May 4, 2018. Sanctions will be assessed against any party, attorney, or both who violate this order.**

Order (Doc. 88). At the time the court entered this order, it had recently become aware that Plaintiff had filed a number of supplemental and amended submissions without leave of court, but it did not know Plaintiff had filed two additional supplemental submissions (Docs. 82, 85) without leave of court two weeks before entry of this order. Because of the court's order staying the filing of all documents, except those pertaining to Plaintiff's Second Motion to Compel, Defendants were unable to respond to these new supplemental submissions by Plaintiff that were filed in support of his original summary judgment response and motion to dedesignate or redesignate documents. Defendants, however, were able to respond to Plaintiff's Second Motion to Compel, to which Plaintiff did not file a reply.

Before reaching Plaintiff's discovery motions (Docs. 63, 83) and Defendants' summary judgment and expert motions, the court addresses Plaintiff's requests to continue the discovery deadline and his deadline to respond to Defendants' summary judgment and expert motions, and the effect, if any, *of Plaintiff's numerous unauthorized supplemental and amended submissions that were filed without obtaining leave of court, as resolution of these matters affects the evidence and arguments that the court considers in ruling on Defendants' summary judgment and expert motions*.

## II. Unauthorized Supplemental Submissions and Materials Filed by Plaintiff

As noted, Plaintiff filed a number of "supplemental submissions" and briefs, without first seeking *and obtaining* leave of court, in support of his Motion for Continuance, responses to Defendants' summary judgment and expert motions, and Motion to De-designate "Highly

Confidential" Documents. Le also amended and supplemented his expert designation and report two times after Defendants moved for summary judgment and long after expiration of the expert deadlines in the Scheduling Order without first seeking *and obtaining* the court's permission in an attempt to cure Plaintiff's deficiencies, as noted by Defendants' summary judgment and expert motions.[4]

Plaintiff's Motion for Continuance (Doc. 35), which was filed January 6, 2017, became ripe on February 3, 2017, when Le filed his reply (Doc. 46) in support of the motion. Although Le's Motion for Continuance included a request to continue his summary judgment deadline under Rule 56(d), he filed a response to Defendants' summary judgment motion on the same date he filed his Motion for Continuance, and the summary judgment motion became ripe when Defendants filed their reply in support of the motion on January 20, 2017. After these motions became ripe, but before the court could rule on Plaintiff's requested continuance, Plaintiff filed three supplemental submissions, without leave of court, in support of his Motion for Continuance and response to

---

[4] Le sought leave in his Motion for Continuance to extend his deadline to respond to Defendants' summary judgment and expert motions. Le, however, never requested leave to file supplemental materials in support of his Motion for Continuance. Regardless, allowing him to do so merely because new evidence supporting his summary judgment response was later uncovered would defeat the requirement that a movant, to obtain a continuance under Rule 56(d), must first identify the specific discovery needed, show how the additional discovery would demonstrate that a genuine dispute of material fact exists to rebut the movant's grounds for summary judgment, and show that discovery was diligently pursued. *Stults v. Conoco, Inc.*, 76 F.3d 651, 657-58 (5th Cir. 1996) (citation omitted); *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992). Le also failed to request leave to amend or supplement his expert designations or Weisheit's expert report after expiration of the September 6, 2016 deadline in the Scheduling Order. Le, instead, filed, served, and relied upon the supplemental and amended expert documents presumably on the misunderstanding that such supplementation was permitted without leave of court because he reserved the right to do so in each of his expert designations. *See* Docs. 17, 32, 77 ("Plaintiff reserves the right to supplement his expert designations pursuant to Rule 26(a)(2)(E) of the Federal Rule of Civil Procedure."). Rule 26(a)(2)(E) requires parties to supplement their expert disclosures when required under Rule 26(e), but Rule 26(a)(2)(D) sets forth the time for parties to identify their experts and provide expert reports within the deadlines set by the district court's scheduling order. Fed. R. Civ. P. 26(a)(2)(D) (*"Time to Disclose Expert Testimony*. A party must make these disclosures at the time and in the sequence that the court orders" or "at least 90 days before the date set for trial" in the absence of a court order.). A district court may grant a party leave to supplement an expert's report after the deadline in the scheduling order has expired, but only if good cause is shown under Rule 16(b). Likewise, leave was not sought to file a supplemental brief and materials in support of his discovery Motion to De-designate after the motion was ripe, and leave was not granted by the court to file any of the supplemental materials before they were filed.

Defendants' summary judgment motion. These supplemental submissions were filed on August 18, 2017, August 24, 2017, and April 4, 2018, between six and fourteen months after Plaintiff's and Defendants' motions became ripe. Plaintiff's August 18 and 24, 2017 "Supplemental Submission[s]" (Docs. 64, 68) resulted in an entirely new round of summary judgment briefing by the parties that was not complete until September 28, 2017, when Le filed a reply in support of his "Supplemental Submission[s]," and approximately 800 additional pages of briefing and appendices. As noted, no additional briefing or evidence was filed by Defendants in response to Plaintiff's third supplemental submission that was filed on April 4, 2018 (Doc. 82), because the court directed the parties to not file any further materials, other than those related to Plaintiff's Second Motion to Compel, without first seeking and obtaining leave of court.

As these "Supplemental Submission[s]" by Le contain additional argument and evidence in support of his Motion for Continuance and in opposition to Defendants' summary judgment motion, both of which became ripe long before the "Supplemental Submission[s]" were filed, the court construes them as unauthorized surreplies or supplemental filings. For similar reasons, the court construes the "First Supplemental Brief" (Doc. 85) filed by Plaintiff on April 16, 2018, in support of his previously filed Motion to De-designate "Highly Confidential" Documents in Defendants' Productions, as an improper surreply or supplement to his prior motion that was filed without leave of court, as it was filed approximately eight months after the original motion and approximately seven months after the original motion became ripe on September 6, 2017. The only stated reason for filing this surreply or amendment is that Defendants' alleged abuse of the parties' Protective Order has "gotten worse" since Plaintiff first complained about Defendants' document production designations.

Surreplies are "appropriate only when the movant raises new legal theories or attempts to present new evidence at the reply stage." *Brackens v. Dallas Ind. Sch. Dist.*, No. 3:09-CV-06420-D, 2010 WL 5464823, at *5 (N.D. Tex. Sept. 20, 2010) . The scheduling order entered in this case on February 26, 2016, states as follows regarding motion practice and the filing of surreplies, and filings that have the effect of a surreply after briefing on a motion is complete:

> Once a motion is filed, the Local Civil Rules permit a response by the nonmovant and a reply by the movant. *See* Local Civil Rule 7.1. Thus, the movant is entitled to file the last pleading. Surreplies, and any other filing that serves the purpose or has the effect of a surreply, are highly disfavored, as they usually are a strategic effort by the nonmovant to have the last word on a matter. The court has found that surreplies usually are not that helpful in resolving pending matters, and only permits pleadings beyond Local Civil Rule 7.1 in exceptional or extraordinary circumstances. Consequently, a party must not seek leave to file a surreply as a routine matter.

Scheduling Order ¶ 4 (Doc. 118). Based on this same reasoning, the court has previously stricken surreplies filed without leave of court and denied requests for leave to file surreplies when the movant fails to show that exceptional circumstances exist. *See, e.g., Lacher v. West*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001). Local Civil Rule 56.1, which applies to summary judgment motions, provides that, "[e]xcept as expressly modified, the motion practice prescribed by LR 7.1-7.3 is not affected by LR 56.2-56.7." Thus, Local Rule 7.1 applies to summary judgment practice. Local Civil Rule 56.7, which also applies to summary judgment motions, further provides that, "[e]xcept for the motions, responses, replies, briefs, and appendices required by these rules, a party may not, without the permission of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence." Local Rule 56.7 was meant to "address [ ] the former practice of filing supplemental materials, without leave of court, at any time while the motion was pending" because "[s]uch filings often prompted requests . . . to respond to the new materials, thereby delaying a decision based on a supplemental filing (and response) that may have had no bearing on the court's ruling, or that

otherwise created uncertainty about whether the summary judgment motion was ripe for a decision."

*Home Depot U.S.A., Inc. v. National Fire Ins. Co. of Hartford*, No. 3:06-CV-0073-D, 2007 WL 1969752, at *2 (N.D. Tex. June 27, 2007).

Regardless of whether Le's filings are viewed as surreplies or supplements, none was authorized, as leave was not sought *and obtained* by Le before they were filed. Moreover, Le has not demonstrated exceptional circumstances, and the court determines that exceptional circumstances do not exist to warrant granting leave to allow the filing of these materials, which have only served to unnecessarily complicate, confuse, and delay the proceedings in this case by creating a continually moving target and motions that never become ripe long enough for the court to rule on them.

One example of the moving target created by Le's unauthorized supplemental submissions is his First and Second Amended Supplemental Expert Reports and designations and related materials filed in connection with Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert ("Motion to Exclude") (Doc. 28). The court's Scheduling Order set a deadline of September 6, 2016, for Plaintiff's designation of experts and compliance with Rule 26(a)(2)'s requirement for disclosure of expert testimony and reports. Although his Motion to Compel (Doc. 13), filed August 24, 2016, was pending as of September 6, 2016, Plaintiff did not seek a continuance to designate his expert Weisheit or disclose his expert report before expiration of the September 6, 2016 expert deadline on the ground that Defendants had not produced information requested by Plaintiff that was needed by Weisheit to prepare his expert report and damages calculation. Plaintiff, instead, filed timely his Designation of Experts on September 6, 2016, in accordance with the court's Scheduling Order, and waited until after Defendants moved on December 16, 2016,[5] to exclude his expert's testimony regarding damages and pointed out various deficiencies in Weisheit's report before

---

[5] December 16, 2016, is the deadline in the Scheduling Order for challenging experts.

seeking a continuance to supplement or amend the report after conducting additional outstanding discovery.

Before the court could rule on the requested continuance, which would require reviving the previously expired expert designation deadline in the Scheduling Order, Plaintiff filed a First Amended and Supplemental Designation of Expert Witnesses (Doc. 32) on January 6, 2017, and relied upon the First Amended and Supplemental Expert Report of Weisheit (Docs. 34, 34-1, 34-2) in responding to Defendants' Motion to Exclude, which was based on the original Weisheit report previously disclosed by Plaintiff. Plaintiff notes in response to the Motion to Exclude that the court had not ruled on his Motion to Compel. He fails, however, to explain why the new information or analysis in Weisheit's First Amended and Supplemental Expert Report could not, with the exercise of reasonable diligence, have been included in Weisheit's original expert report by the September 6, 2016 expert deadline or before Defendants filed their Motion to Exclude on December 16, 2016. Plaintiff, instead, simply notes in his response to the Motion to Exclude as follows regarding the First Amended and Supplemental Expert Report:

> Simultaneously with the filing of this Response, Plaintiff is serving a First Amended and Supplemental Designation of Expert Witnesses along with a First Amended and Supplemental Expert Report of Karl D. Weisheit. *See* App. 32-59. Mr. Weisheit's Supplemental and Amended Report updates his calculation of Plaintiff's lost wages to reflect Plaintiff's actual compensation since the initial report was prepared in September.

Pl.'s Resp. to Mot. to Exclude 3. Because Plaintiff's Motion to Compel was pending at this time, the new or revised lost wages calculation in Weisheit's January 6, 2017 report *could not* have been based on discovery that was the subject of the pending Motion to Compel as contended by Plaintiff, and Plaintiff never sought leave on any other basis to amend or supplement Weisheit's expert report. On January 20, 2017, Defendants filed a reply in support of their Motion to Exclude, contending that

Plaintiff's attempt at salvaging his expert's damages opinion by supplementing or amending that opinion was unavailing.

In an attempt to get the last word and cure the deficiencies noted regarding Weisheit's original and subsequent First Amended and Supplemental Expert Report, Plaintiff filed a Second Amended and Supplemental Expert Report on December 15, 2017, more than a year after expiration of the expert designation deadline without leave of court, indicating that Weisheit's Second Amended and Supplemental Expert Report was served on Defendants. In addition, Plaintiff filed an unauthorized Supplemental Submission in Opposition to Defendants' Motion to Exclude on the same date based on Weisheit's Second Amended and Supplemental Expert Report, asserting:

> Defendants' Motion to Exclude is premised entirely on the argument that Mr. Weisheit had no reliable factual basis on which to value the PIUs. Now, he does. The Defendants have produced reports prepared by their own auditors that assign unit-level values to the PIUs, and Mr. Weisheit has used those reports to calculate[] accurate and reliable valuations for the PIUs awarded to Mr. Le. Those calculations show: (1) Mr. Le had a reasonable expectancy interest of $5,013,517.00; (2) Exeter was unjustly enriched by $383,904.00 when it rescinded his unvested equity; and (3) Plaintiff's Supplemental Submission in Opposition to Defendants' Motion to Exclude [shows that] Exeter breached its contract with Mr. Le when it called his vested equity at $0.00, knowing it to be worth $38,859.00. As such, the Defendants' Motion to Exclude is moot, and should be denied.

Pl.'s Supp. Submission (Doc. 78, 78-1). Le's supplemental expert filings, however, fail to address or cure the deficiencies originally noted by Defendants in their Motion to Exclude, and, as herein explained, Le's repeated contentions regarding alleged discovery abuse by Defendants do not entitle him to an extension under Rule 56(d) or 16(b) to continue his summary judgment response deadline or his expert designation and report deadline.

Plaintiff maintains, based on First and Tenth Circuit case authority, that there is no fixed time limit for seeking a continuance under Rule 56(d)(2) and supporting affidavits or declarations, as long

as the continuance is sought within a "reasonable time" after receiving the summary judgment motion and not later than the deadline for responding to the summary judgment motion. Notwithstanding this acknowledgment, his observance of this district's Local Civil Rules and the court's Scheduling Order in other respects[6] suggests that he simply elected to abide by some Local Civil Rules and Scheduling Order requirements, but he disregarded others applicable to discovery, court-ordered deadlines, and the prohibition against filing surreplies and supplemental materials regarding pending and ripe motions. Instead of satisfying and explaining why he was entitled to a continuance under Rule 56(d) when he filed his Motion for Continuance on January 6, 2017, Plaintiff contended that discovery relevant to his claims was ongoing or incomplete and continued to file supplements in support of the requested continuance every time Defendants produced additional documents or Plaintiff deposed a new witness pursuant to the parties' discovery agreement to extend the discovery deadline to March 13, 2017, in an attempt to show that evidence obtained via ongoing discovery supported his requested continuance and rebutted Defendants' summary judgment and expert motions.

The parties' discovery agreement, however, and Plaintiff's request to continue discovery until 21 days before the original March 3, 2017 trial setting, if granted, would have allowed the parties to conduct discovery until approximately three months after the dispositive motion deadline and expert challenge deadlines, one week after the pretrial materials deadline, and only two to three weeks before the trial of this case was originally set in violation of the court's Scheduling Order, which "requires that discovery be completed at least four months before the trial setting."

---

[6] For example, Plaintiff's Motion for Continuance is signed by Le and his attorney in accordance with Local Rule 40.1 and paragraph 13 of the Scheduling Order.

Scheduling Order ¶ 6. The agreement also violates paragraph 6 of the Scheduling Order, which states that "[t]he parties may agree to extend this discovery deadline, **provided (1) the extension does not affect the trial setting, dispositive motions deadline, or pretrial submission dates**, and (2) written notice of the extension is given to the court."  The Notice of Extension of Discovery Cutoff (Doc. 21), which the parties filed on November 1, 2016, less than one month before the dispositive motion deadline, provides notice of the parties' agreement to continue discovery to March 13, 2017, "[i]n accordance with paragraph 6 of the Scheduling Order (Doc. #9)," yet Plaintiff's Motion for Continuance to extend his deadline to respond to Defendants' summary judgment and expert motions under Rule 56(d) is based in large part on the parties' agreement to continue discovery past the December 2, 2016 deadline in the Scheduling Order and schedule depositions in February, after briefing on any summary judgment motion would be complete, although the Scheduling Order expressly prohibits agreements to extend the discovery deadline without leave when doing so will affect the dispositive motion deadline, trial setting, and pretrial materials deadline.

Rather than providing clarification, the numerous supplemental filings totaling approximately 820 pages have unnecessarily delayed the resolution of all the pending motions in this case and the trial, which the court had no choice but to vacate in light of the morass and confusion created by the filings.  Because of the multiple unauthorized filings by Plaintiff, resolution of the Motion to Exclude, for example, will require the court to consider three different versions of Plaintiff's expert report totaling 80 pages and the parties' arguments regarding each damages report.  Similarly, because Plaintiff filed numerous other supplemental filings without first obtaining leave, the court, instead of considering a motion and supporting evidence, a response and supporting evidence, and a reply as contemplated by this district's Local Civil Rules and the Scheduling Order in this case,

was faced with the difficult task of first identifying all of the supplemental filings that pertain to Defendants' summary judgment motion, Defendants' Motion to Exclude, Plaintiff's Motion for Continuance, and Plaintiff's Motion to Dedesignate, and then reviewing the hundreds of additional pages of documents filed before ruling on the motions. The last of the supplemental submissions by Plaintiff was filed as late as April 4, 2018,[7] and April 16, 2018, together with a Second Motion to Compel by Plaintiff that was filed on April 13, 2018, only days before Plaintiff moved, on April 17, 2018, for the court to set a trial and pretrial deadlines. If the court had allowed the parties to file

---

[7] In an attempt to justify this supplemental submission (Doc. 82), filed April 4, 2018, which deals exclusively with Le's employment law claims, Le notes the additional discovery that took place after Defendants moved for summary judgment, including documents produced by Defendants after their objections to the magistrate judge's ruling on his first motion to compel were overruled and asserts that production of his work e-mail accounts "**stix is not complete**." Pl.'s Supp. Summ. J. Resp. 2. He also indicates that depositions were taken by him, albeit, after the court-ordered discovery deadline pursuant to the parties' discovery agreement. In addition, Le notes that he discovered that Exeter is a party to a class action despite Defendants' failure to produce this information and contends that this corroborates his FLSA retaliation claim and indicates "Exeter's apparent attempt to conceal the lawsuit." *Id.* at 6. Plaintiff asserts that his supplemental brief and evidence consisting of approximately 133 pages total is "based on additional evidence *newly* discovered since [he] supplemented his Response to the Defendants' Motion for Summary Judgment" the last time. *Id.* at 3 (emphasis added). This assertion and Le's references to ongoing discovery are misleading and do not justify this untimely supplemental submission, as they do not accurately reflect the lack of diligence on Le's part. Most of the evidence cited in this supplemental response is evidence previously included in Le's appendix to his initial response to Defendants' summary judgment motion on January 6, 2017, including Le's own affidavit or evidence that could have been easily obtained by Le. According to an affidavit by Le's attorney, the "new" information regarding the class action consist of publicly available documents that were filed July 15, 2017, and obtained by his attorney by conducting a simple search on PACER (the acronym for Public Access to Court Electronic Records), which is an electronic public access service that allows users to obtain case and docket information online. Neither Le nor his attorney indicates why this information could not have been obtained long before April 2018. In any event, the 2017 lawsuit is entirely irrelevant as to whether Le reasonably relied in December 2013, four years earlier, that he was opposing conduct by Exeter that was unlawful under the FLSA, whether his concerns were sufficient to put Exeter on notice that he was opposing employment practices prohibited by the FLSA, and whether he "stepped outside" of his role as CHRO in doing so. Likewise, Le's inclusion in his appendix of form letters from Thomas & Solomon to Exeter soliciting legal work on April 22, 2015, after Le was fired, are not relevant to any claims asserted by him and only used as an attempt to discredit the deposition testimony of Tom Anderson who was deposed after the December 2, 2016 deadline in the Scheduling Order for completing discovery. This and other evidence and arguments by Le far exceed the stated need and scope of the continuance sought by him with respect to his employment law claims. Further, while Le makes a number of arguments based on evidence produced by Defendants in response to his motion to compel, including the December 2013 Power Point presentation that he gave to the Board of Directors, virtually all of his arguments consist merely of him contending that this evidence *further corroborates* his prior arguments and affidavit testimony. In other words, these arguments are clearly improper surreply arguments, as they are an attempt by Le to "get the last word" on Defendants' summary judgment motion in violation of the district's Local Civil Rules and the court's Scheduling Order.

responses to and replies in support of these motions and supplemental submissions, the earliest date the trial could have been scheduled was September 21, 2018, as the court's Scheduling Order "requires that discovery be completed at least four months before the trial setting and that any dispositive motions be filed at least three and one-half months before the trial setting." Scheduling Order ¶ 13. This assumes, however, that the court could have waded through all of the materials filed within this short period of time.

For all of these reasons, as well as the reasons discussed in the next section regarding Plaintiff's Motion for Continuance, the court **strikes** all amended or supplemental submissions that were filed by Plaintiff without leave of court in violation of the court's Scheduling Order, this district's Local Civil Rules, and Federal Rules of Civil Procedure, as well as the parties' submissions, arguments, and evidence that were filed or made in response to or in support of Plaintiff's supplemental submissions (Docs. 32, 64, 64-1, 68, 68-1, 72, 72-1, 72-2, 75, 77, 78, 78-1, 82, 82-1, 85, 85-1).

### III.    Plaintiff's Motion for Continuance (Doc. 35)

On January 6, 2017, although Le filed responses to Defendants' summary judgment and expert motions on his required deadline, he also moved for a continuance to April 17, 2017, to extend his deadlines, pursuant to Federal Rule of Civil Procedure 56(d), to respond to Defendants' summary judgment and expert motions and incorporated his Motion for Continuance into his summary judgment response. Buried within the Motion for Continuance is also a request by Plaintiff to revive the expert designation deadline that expired four months earlier on September 6, 2016, to allow his expert Weisheit to supplement his expert report with a calculation of the value of his PIUs "based on the evidence wrongfully withheld to date," including "Duff & Phelps' calculations of the

fair market value of the company and its PIUs" to cure the deficiencies noted in Defendants' Motion to Exclude.  Pl.'s Mot. for Continuance 10.

## A.     The Parties' Contentions

Plaintiff contends that he needs an extension to conduct "necessary discovery" in the form of four oral depositions and "obtain . . . necessary rulings" on the Motion to Compel he filed on August 24, 2016, before he responds to Defendants' summary judgment and expert motions and before the court rules on Defendants' summary judgment and expert motions.  Plaintiff asserts that the parties scheduled depositions for Anderson, Samantha Montalbano ("Montalbano"), Mark Floyd ("Floyd"), and Gena Evertson ("Everston") between January 13 and February 9, 2017, to take place before the parties' agreed-upon discovery deadline of March 13, 2017.  Plaintiff asserts that a continuance under Rule 56(d) is warranted because the "additional discovery" he seeks to conduct is "germane" to both of Defendants' motions, which seek dismissal of all of his claims and exclusion of his expert's opinions.  Pl.'s Mot. 1, 5.  Plaintiff asserts that "the lack of ruling on [his] Motion to Compel has come up in oral depositions" and has been used as a basis by defense counsel to instruct at least one witness, Walter Evans, to not respond to questions posed during a December 8, 2016 deposition.[8]  *Id.* (quoting Dec. 8, 2016 Dep. of Walter Evans).  For support, Plaintiff quotes from Walter Evans's ("Evans") deposition testimony during which Evans was instructed to not respond to  a question as to why the employment of the wife of Robert McWhorter, a former Exeter employee, was terminated.  Exeter's counsel took the position that the reasoning for Exeter's

---

[8] Plaintiff asserts that this issue "has come up in oral depositions to date" but only cites to evidence that establishes that the issue has arisen in one deposition, the December 8, 2016 deposition of Walter Evans.

decisions to terminate former employees was the subject of a pending discovery dispute. In response, Plaintiff's counsel argued:

> The most relevant thing in this whole case, the furthest thing from irrelevant, is why people were let go and what [Plaintiff] had to say about it and if the reason [Plaintiff] was let go is because he objected to their unlawful termination. That's one of our claims. So you want to say it's irrelevant, that fine. We'll just go have a hearing on it, but we're just going to have to redo this depo.

*Id.*

Regarding his employment law claims, Plaintiff contends that an extension of his summary judgment response deadline is necessary because Defendants have moved for summary judgment on all of his employment claims that involve Exeter's allegedly retaliatory termination of his employment but have refused to allow or respond to discovery regarding the reasons certain former employees were fired by Exeter. Plaintiff asserts that, although he alleges in his Complaint that he was fired because of matters he reported to Exeter, Defendants have declined to produce information regarding "[his] reports to [Exeter's] Board of Directors on FLSA issues" before Plaintiff's Motion to Compel is resolved. Pl.'s Mot. for Continuance 6.

Plaintiff asserts that a continuance is also needed to respond to Defendants' summary judgment arguments regarding his fraud claim because his "fraud-related claims involve certain representations made to [him] by Exeter's previous CEO, Mark Floyd, prior to [his] employment," and the parties have agreed to a date for Plaintiff to depose Floyd, but the deposition is not scheduled under February 7, 2017. Plaintiff contends that "Floyd's testimony is relevant to at least Plaintiff's fraud claims, which Defendants seek to dismiss in their dispositive motion." *Id.* at 6-7. Plaintiff maintains that "diligence and delay [are] not an issue" because this deposition will take place within the [parties'] agreed[-]upon discovery period (which ends March 13, 2017)." *Id.* at 7.

Regarding his claim for breach of the PIU Agreement, Plaintiff asserts as follows:

> Plaintiff alleges Enzo violated the terms of the PIU Agreement, specifically, section 4.3, which requires "Fair market value" of Plaintiff's profit interest units ("PIUs") to be determined "on a going basis as if the Company and its Subsidiaries were sold as an entirety in an arm's length transaction." *See* PIU Agreement, attached as D. App. 30 to Defendant's Motion for Summary Judgment Appendix. According to the Board's March 9, 2015 Resolution (the "Resolution"), the Enzo Board assigned $0.00 as the fair market value of Plaintiff's PIUs. A true and correct copy of the "Resolution" is attached hereto as Exhibit "B" and incorporated herein by reference. The Board arrived at this finding, despite testimony that an independent audit was performed by Duff & Phelps on Exeter, at least annually, to value those same PIUs and Exeter's General Counsel testified that he recalls some value being assigned to the PIUs. *See* Exhibit "A" at 66:16-68:25 [Dec. 8, 2016 Dep. of Walter Evans]. Brad Nall, a Senior VP of Finance at Exeter, also corroborated this independent annual audit by Duff & Phelps. *See* Exhibit "C" for relevant portions of Brad Nall's [Dec. 7, 2017] oral deposition, which are attached hereto and incorporated herein at 11:3-6, 29:12-32:6.

Pl.'s Mot. for Continuance 7. Plaintiff contends that additional time is needed to respond to Defendants' summary judgment motion regarding this contract claim because Defendants have not produced the Duff & Phelps audit reports of the PIUs, "[he] is asking for such documentation in connection with [his] Motion to Compel," and "[s]uch documentation is relevant to whether or not Defendant Enzo violated its contract with [him]." *Id.* According to Plaintiff, "[t]hese are just examples of the issues that need to be addressed through discovery prior to a ruling on the Motion for Summary Judgment," which he contends is "premature due to the additional discovery needed by [him] prior to the [parties' agreed-upon] Discovery Deadline." *Id.* at 7-8.

Defendants respond that Plaintiff is not entitled to a continuance of his summary judgment response deadline because he has failed to meet the standard for obtaining a continuance under Rule 56(d). Defendants contend that "Plaintiff's motion for continuance states, in a conclusory manner,

[that] he has not obtained discovery on general matters from Defendants[,]" but "[Plaintiff] has not specified how the evidence he seeks will create a genuine issue of material fact to defeat summary judgment. He also fails to identify specifically what relevant evidence his designated expert requires to complete his analysis under any methodology." Defs.' Resp. 1. Defendants contend that, while Plaintiff's counsel submitted an affidavit in support of the motion for continuance, the affidavit fails to show how the discovery Plaintiff seeks will create a genuine dispute of material fact as to any summary judgment ground relied upon. Defendants contend that the unsworn arguments in Plaintiff's motion are similarly conclusory, and Plaintiff incorrectly focuses on the relevance of the discovery sought instead of explaining how specific discovery will create a genuine dispute of material fact as required under Rule 56(d). Defendants argue that, even if relevance was the test for obtaining a continuance under Rule 56(d), the reason for another person's employment being terminated is not an element of his employment claims that require him to show "he opposed an act that he 'reasonably believed' was unlawful, not that it was actually unlawful." *Id.* at 5 (quoting *Heggemeier v. Caldwell Cty.*, 826 F.3d 861, 869 (5th Cir. 2016)). Defendants maintain that this information regarding Plaintiff's employment law opposition claims is uniquely within his knowledge and possession.

Defendants assert that Plaintiff's fraud-related claims likewise involve information that is uniquely within his possession because, "[a]lthough Plaintiff refused to properly respond to interrogatories requesting the representations allegedly made to him (*See* Doc. 25-1), the representations would [have been] made to [him], so he is in possession of the evidence." Defs.' Resp. to Mot. for Continuance 6. In addition, Defendants note that their summary judgment motion

"does not argue whether representations were made, but, instead establish[es] [that the alleged representations] are not actionable fraud." *Id.*

Le notes in his reply that a hearing on his Motion to Compel (Doc. 13) was conducted on January 31, 2017, and the magistrate judge "ruled overwhelmingly in [his] favor," requiring Defendants to produce: "Plaintiff's work laptop, Plaintiff's work email, documents reflecting Exeter's internal valuation of the equity awarded to Plaintiff, documents reflecting the reasons for employee terminations that [he] has alleged were unlawful, and other critical evidence by no later than Friday, March 3, 2017." Pl.'s Reply 1-2 (Doc. 46). In light of this ruling, Le "reiterates his request for an extension for time to respond to Defendants' motions." *Id.* at 2. Plaintiff asserts that the requested extension is necessary because the court "cannot determine whether genuine issues of material fact preclude summary judgment when the evidentiary record in this case is about to change . . . drastically" as a result of the ruling on his Motion to Compel. *Id.* Plaintiff contends that the requested extension will also give the parties time to depose Floyd, Anderson, and Montalbano before the end of the parties's agreed-upon March 13, 2017 discovery deadline. Plaintiff notes that "Montalbano has yet to be served with the deposition subpoena as she continues to evade service of process," but that "Plaintiff hopes to serve [her] a reasonable time [before] the noticed deposition . . . to avoid multiple trips to Park City, Utah" where she and Anderson are both located. *Id.*

Plaintiff disagrees that he has not identified with specificity the evidence needed to respond to Defendants' summary judgment and expert motions and notes that his Motion for Continuance references two interrogatories and eight requests for production that are the subject of his Motion to Compel as being necessary to respond to Defendants' motions. Plaintiff contends that he also specifically identified the independent audit performed by Duff & Phelps, which has been discussed

in multiple depositions but has not been produced to date. Plaintiff asserts that his motion describes how Enzo violated the PIU Agreement by failing to value PIUs in accordance with that agreement, and how Enzo's $0 valuation of the PIUs contradicts the audits by Duff & Phelps that Defendants have been ordered to produce. Plaintiff further asserts that Defendants have been ordered to produce his computer and other documents that they contend have been uniquely in his possession or knowledge all along. Plaintiff contends that he did not take his work-issued computer or related communications with him when he left Exeter and, thus, Exeter "has always been 'uniquely in possession' of those communications," not him. *Id.* at 5.

Plaintiff contends that, as a result of the magistrate judge's ruling, he "will soon have those communications [by March 3, 2017], as well as evidence to support his opposition to certain protected activities in support of his wrongful termination claims." *Id*. Plaintiff requests an extension to April 17, 2017, to respond to Defendants' motions, arguing that Defendants should not be rewarded for their discovery abuse by striking Plaintiff's expert and dismissing his claims. In addition, for the first time in his February 3, 2017 reply brief, Plaintiff requests a continuance of the April 3, 2017 trial setting, and presumably the March 6, 2017 pretrial materials deadlines, that were in place when Defendants filed their dispositive and expert motions.

### B. Discussion

Plaintiff's request to continue the trial, which was raised for the first time in his reply brief, is **moot** in light of the court's decision on March 2, 2017, to vacate the trial setting and pretrial deadlines pending resolution of the numerous outstanding motions (Doc. 51). The court, therefore, focuses on Plaintiff's requests for a continuance to April 17, 2017, to: (1) respond to Defendants' summary judgment; (2) respond to Defendants' Motion to Exclude Weisheit's expert opinion

regarding certain damages; and (3) supplement his expert report after Defendants produce documents that are the subject of his Motion to Compel.

### 1.    Rule 56(d) and 16(b) Legal Standards

Although Le seeks a continuance under Rule 56(d) to extend his deadlines to respond to both of Defendants' motions, this rule applies only to his request to continue his summary judgment response deadline. Rule 56(d) provides that, when facts are unavailable to the summary judgment nonmovant and the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Rule 56(d) is "usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party." *Union City Barge Line, Inc. v. Union Carbide Corp*., 823 F.2d 129, 136 (5th Cir. 1987).[9] The purpose of Rule 56(d), however, is not to permit the opponent of a summary judgment to complete discovery, as "Rule 56 does not require that discovery take place before granting summary judgment." *See McCarty v. United States*, 929 F.2d 1085, 1088 (5th Cir. 1991) (citation omitted). Thus, "[i]t not sufficient [for a summary judgment nonmovant] to allege that discovery is incomplete or that [discovery] will produce needed but unspecified facts." *Id.* at 1088. Rule 56(d), instead, provides a mechanism for relief when the nonmovant has diligently pursued discovery but has not had a full opportunity to conduct discovery needed to raise a genuine dispute of material fact in

---

[9]  *Union City Barge Line, Incorporated* dealt with a continuance under prior Rule 56(f). The Advisory Committee Notes to the 2010 Amendment to Rule 56 indicate that subdivision (d) of Rule 56 "carries forward without substantial changes the provisions of former subdivision (f)."

response to a summary judgment motion. *See Wichita Falls Office Assocs.*, 978 F.2d at 919. The party moving for a continuance under Rule 56(d) must, therefore, show why he needs the additional discovery and how the additional discovery will demonstrate that a genuine dispute of material fact exists to rebut the movant's grounds for summary judgment. *Stults v. Conoco, Inc.*, 76 F.3d 651, 657-58 (5th Cir. 1996) (citation omitted). In doing so, a party may not "rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 162 (5th Cir. 2006) (citation and quotation marks omitted). The party requesting the extension must also show that relevant discovery has been diligently pursued, as it is not incumbent on the district court to "aid non-movants who have occasioned their own predicament on sloth." *Wichita Falls Office Assocs.*, 978 F.2d at 919.

Le's request to continue his summary judgment response deadline until after the parties conduct additional discovery is also governed by Federal Rule of Civil Procedure 16(b), as this requested continuance will require modification of the court's Scheduling Order and revival of the December 2, 2016 discovery deadline. Likewise, Le's request to continue his deadline to respond to Defendants' Motion to Exclude is governed by Rule 16(b) because he seeks to conduct additional discovery and supplement his expert report after the deadlines in Scheduling Order for completion of discovery (December 2, 2016) and for Plaintiff to designate experts and provide expert reports (September 6, 2016) before responding to the Motion to Exclude.

Before the court can modify a scheduling order, the movant must first show "good cause" for failure to meet the scheduling order deadline under Rule 16(b). *S & W Enters., L.L.C. v. Southwest Bank of Alabama*, 315 F.3d 533, 536 (5th Cir. 2003). A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good

cause standard requires the "party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension." *S & W Enters.*, 315 F.3d at 535 (citation omitted). In deciding whether to allow an amendment to the scheduling order, a court considers: "(1) the explanation for the party's failure to meet the deadline; (2) the importance of the amendment to the scheduling order; (3) potential prejudice if the court allows the amendment; and (4) the availability of a continuance to remedy such prejudice." *Id*. (internal quotation marks, brackets, and citations omitted). These same factors apply to the failure to make required expert disclosures under Rule 26(a) or the failure to make such disclosures timely.

### 2.     Motion to Continue Summary Judgment Response Deadline

In support of his Motion for Continuance, Plaintiff submitted the affidavit of his attorney, Matthew S. Muckleroy, who states in pertinent part as follows:

> 2.  I am attorney of record for Plaintiff Binh Hoa Le in the above referenced matter. The parties agreed to conduct discovery in this matter until **March 13, 2017**. *See* Docket No. 21. Plaintiff also has a pending Motion to Compel that was filed in this matter on August 24, 2016. *See* Docket No. 13. Plaintiff seeks a continuance of the Court's ruling on Defendants' Motion for Summary Judgment Motion [Docket No. 27] and Motion to Exclude Certain Opinions of Plaintiff's Expert [Docket No. 28] as well as an extension of time to respond to these motions. Opposing counsel relies upon the Court's (lack of) ruling on the Motion to Compel as a basis to prevent discovery of certain subjects germane to the dispositive motion and expert motions, as referenced in the Motion for Continuance. The request for an extension of time is not for purpose of delay, but simply to conduct additional discovery during the discovery period agreed[-]upon by the parties.

> 3.  Both parties have also noticed several oral depositions during the next month. These oral deposition are also germane to the issues raised in Defendants' dispositive motion. For instance, Plaintiffs' fraud-related claims involve allegations regarding certain representations made to Plaintiff by Exeter's previous CEO, Mark Floyd, prior to Plaintiff's employment. Plaintiff and Defendants agreed to take Mr. Floyd's oral deposition on February 7, 2017. Mr. Floyd's testimony is relevant to at least Plaintiff's fraud claims, which Defendants seek to dismiss in their dispositive motions.

4.  Plaintiff also seeks certain written documentation prior to responding to these motions, including, but not limited to the Duff & Phelps audit(s) referenced in Mr. Nall's oral deposition.

5.  Plaintiff files this Motion, seeking a continuance of the Motion for Summary Judgment and the Motion to Exclude[] to a date after the [parties' agreed-upon] Discovery Deadline, so that Plaintiff can (hopefully) receive a ruling on the Motion to Compel and conduct the outstanding depositions prior to responding to the aforementioned motions.

Further Affiant Sayeth Not.

Pl.'s Mot. for Continuance App. Ex. G (Doc. 35-1 at PageID 1240-41).  Counsel's statement, that a continuance is needed until after "discovery of certain subjects" in Plaintiff's Motion to Compel is produced and "oral depositions" are taken because such discovery is "relevant" and "germane" to Defendants' summary judgment motion and Plaintiff's claims, is far too vague. *Id.* Counsel's affidavit neither identifies specific discovery nor states how the discovery sought will create a genuine dispute of material dispute in response to Defendants' request for summary judgment.  As correctly noted by Defendants, relevancy is the standard under Rule 26 for conducting and compelling discovery, but relevancy alone is insufficient for purposes of obtaining a continuance under Rule 56(d), unless the discovery sought will also create a genuine dispute of material fact in response to the movant's summary judgment motion. The only discovery specifically identified in counsel's affidavit is the deposition of Floyd, Exeter's former CEO, but again, no explanation is provided as to why Floyd's deposition will provide facts necessary to create a genuine dispute of material fact.  Counsel, instead, merely states that  Floyd's deposition "is relevant to at least Plaintiff's fraud claims." *Id.*

Plaintiff's Motion for Continuance fares no better even if the court considers the assertions in the motion and reply. Plaintiff contends that depositions are scheduled for Anderson, Montalbano,

and Everstson in January and February 2017, but he does not explain what information he expects to obtain through these depositions or how that information will create a genuine dispute of material fact in response to any of the grounds on which Defendants have moved for summary judgment. Plaintiff asserts that his fraud claim is based on representations that Floyd made to him prior to his employment regarding the value of the PIUs, and that his "testimony is relevant to at least Plaintiff's fraud claims, which Defendants seek to dismiss in their dispositive motion."  Pl.'s Mot. for Continuance 6-7; Pl.'s Reply 4.  Plaintiff, however, fails to explain why he believes Floyd's testimony will create a genuine dispute of material fact regarding his fraud claim in response to Defendants' summary judgment motion.

Moreover, Defendants moved for summary judgment on Plaintiff's fraud claim on the grounds that: (1) Floyd's representations regarding the projected value of the PIUs were opinions or proposals that do not constitute actionable fraud under Texas law, and Le did not rely on such statements; (2) Floyd's representations and the offer letter provided to Le regarding a severance payment are not actionable fraud, as terms of the offer letter clearly state that his eligibility for the severance payment was subject to certain terms and conditions; and (3) there is no evidence that Floyd or Exeter's statements were false or made to Le with the intent to deceive him.  Plaintiff acknowledges that his fraud claim is based on alleged misrepresentations that were made to him. Thus, facts regarding these alleged misrepresentations are within Le's knowledge and  possession and can be set forth in an affidavit by him. Likewise, whether Le relied on the representations and whether his reliance on the representations were justified or whether the representations are actionable under Texas law are matters that do not require discovery and are not an appropriate basis for seeking a continuance under Rule 56(d), which usually comes into play when a party contends

that "relevant facts are in the exclusive control of the opposing party." *Union City Barge Line, Inc.*, 823 F.2d at 136.  Moreover, if Plaintiff seeks to depose Floyd regarding the third ground raised by Defendants, this is not clear from his Motion for Continuance.

Regardless, Le has not shown that he exercised diligence for purposes of Rule 56(d) or Rule 16(b) in attempting to schedule any of the four depositions before the December 2, 2016 deadline in the Scheduling Order for completing discovery.  As noted, while the Scheduling Order permits parties to agree to discovery extensions, it expressly states that any such extension must not affect the trial, dispositive motions deadline, or pretrial submissions date, and the "court will not entertain any discovery dispute that is a result of an agreed extension."  Scheduling Order ¶ 6.  The parties were aware of this when they filed their Notice of Extension of Discovery Cut-off on November 1, 2016, setting forth their agreement to extend the discovery period to March 13, 2017, as their Notice states that their agreement was made "[i]n accordance with paragraph 6 of the Scheduling Order."  Notice (Doc. 21).  Le's Motion for Continuance, however, seeks to extend his summary judgment response deadline and the trial in light of the parties' discovery agreement in direct contravention of the Scheduling Order's prohibition against such extensions.  Le's opposed motion for clarification regarding the discovery deadline also asks the court to resolve a discovery dispute between the parties that has arisen because of their discovery agreement, even though the Scheduling Order states that the court will not entertain such disputes.

With respect to his request to continue his summary judgment response deadline until after resolution of his Motion to Compel, the court determines that Plaintiff was diligent in filing his Motion to Compel before the December 9, 2016 deadline in the Scheduling Order for doing so. Plaintiff has also identified some discovery that he contends is necessary to respond to Defendants'

summary judgment motion; however, he has not demonstrated how this discovery will raise a genuine dispute of material fact in response to the summary judgment grounds raised by Defendants. He, instead, asserts in conclusory fashion that the discovery sought in his Motion to Compel is "germane" or "relevant" to his claims that are the subject of Defendants' summary judgment motion.

Plaintiff contends that he needs information regarding "[his] reports to [Exeter's] Board of Directors on FLSA issues" because Defendants have moved for summary judgment on all of his employment law claims, which are based on his allegation that he was fired because of matters he reported to Exeter. Pl.'s Mot. for Continuance 6. Le also contends that he needs access to his work computer and e-mails and other documents to establish the reasons for Exeter's decision to terminate the employment of other employees that he contends he opposed. The court disagrees.

To file this action, Le had to have known the bases for his employment law claims, that is, his belief that he was fired for opposing unlawful employment practices by Exeter. With respect to each of Le's employment law retaliation claims, Defendants moved for summary judgment on the ground that Le cannot establish a prima facie case of retaliation because he cannot show that he engaged in protected activity and that a causal connection exists between the protected activity and discharge, the adverse employment action. To show that he engaged in protected activity, Le need not demonstrate that the conduct he opposed rose to the level of a violation of one of the employment law statutes at issue; rather, he must show he reasonably believed or perceived that Defendants' conduct violated the employment statutes at issue. *See E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 242-44 (5th Cir. 2016) (discussing reasonable belief standard for Title VII retaliation cases). Le should not need discovery to come forward with evidence in an affidavit, declaration, or otherwise to show why he reasonably believed that Defendants' conduct violated Title VII, the

FMLA, FLSA, ADA, or ADEA; nor should he need discovery to establish a causal connection, for example, based on the temporal proximity between his opposition and termination. Thus, whether Plaintiff's work computer or e-mails will substantiate his claims that Defendants' conduct in firing certain employees violated various employment statutes is of no moment. Further, the issue of whether, as argued by Defendants, the "manager rule" bars his employment law claims is a legal issue for the court to decide.

Finally, as noted, Plaintiff contends that additional time is needed to respond to Defendants' summary judgment motion regarding this contract claim because Defendants have not produced the Duff & Phelps reports of the PIUs, and "[he] is asking for such documentation in connection with [his] Motion to Compel," and that "[s]uch documentation is relevant to whether or not Defendant Enzo violated its contract with [him]." *Id.* at 7. Whether Defendants should be required to produce the Duff & Phelps reports appears to have been raised by Plaintiff the first time during the January 31, 2017 hearing on his Motion to Compel based on information obtained during the December 7, 2017 deposition of Brad Nall ("Nall"), Exeter's Senior Vice President of Finance. *See* Pl.'s Mot. for Continuance 7; *see also* Jan. 31, 2017 Hearing Tr. 11, 14, 41-56, 89. Whether the Duff & Phelps reports were responsive to any of Plaintiff's discovery requests was hotly disputed during the hearing on Plaintiff's Motion to Compel. Plaintiff took the position that the Duff & Phelps reports were responsive to his Interrogatory No. 7 and Requests for Production Nos. 45, 47, and 48. *Id.* at 14, 42, 43, 54. The magistrate judge ultimately agreed that the Duff & Phelps reports were relevant and fell within Plaintiff's Requests for Production Nos. 45, 47, and 48 and ordered Defendants to produce them by March 3, 2017.

Because the dispute over the Duff & Phelps reports first came to light during a December 7, 2016 deposition, after the December 2, 2016 discovery deadline, and was not brought to the court's attention until the January 31, 2017 hearing on Plaintiff's Motion to Compel, long after Le's response to Defendants' summary judgment motion was due on January 6, 2017, the court concludes that the discovery dispute regarding these reports falls outside of the discovery deadline in the Scheduling Order. Additionally, Plaintiff's request for a continuance based on this discovery would require the court to decide a dispute that arose as a result of the parties' discovery agreement. Thus, while Plaintiff may have exercised diligence in serving Defendants with written discovery requests and seeking to compel production of documents pertaining to his discovery requests, his request to continue his summary judgment response deadline based on a discovery dispute regarding the Duff & Phelps reports that arose after the court-ordered discovery deadline as a result of the parties' discovery agreement violates the court's prohibition against such continuances and court intervention in resolving such disputes.

Moreover, Plaintiff's explanation that the Duff & Phelps reports will create a genuine dispute of material fact in response to Defendants' motion for summary judgment on his contract claim based on the PIUs valuation is inadequate. Plaintiff contends that the Duff & Phelps reports are proof that Enzo violated the PIU Agreement because Enzo's $0 valuation of the PIUs contradicts the value of PIUs in the Duff & Phelps reports. For support that the valuations differ, Plaintiff relies on pages 21 through 27 of Nall's December 7, 2016 deposition testimony. The two pages of Nall's deposition testimony attached to Plaintiff's Motion for Continuance, however, do not address the Duff & Phelps reports. They only include Nall's testimony regarding his job title. *See* Pl.'s Mot. for Continuance App., Ex. C. The appendices to Plaintiff's responses to Defendants' summary

judgment and expert motions include pages 26 through 41 of Nall's deposition testimony. After reviewing this portion of Nall's testimony, it is unclear why Plaintiff believes that the Duff & Phelps reports would create a genuine dispute of material fact that Enzo violated the parties' PIU Agreement by valuing the Plaintiff's PIUs at $0.

Plaintiff acknowledges that his contract claim is based on his contention that Enzo violated the terms of the PIU Agreement by failing to value his PIUs *in accordance with the PIU Agreement*. According to that express terms of that agreement, Le was issued Time-Based PIUs and IRR-Based PIUs. Pl.'s Summ. J. Resp. App. 56 (Doc. 33-2). Section 4.3 of the agreement states that, within ten days of a "Call Notice" or "Put Notice," Enzo shall provide management with "its good faith calculation of [the] fair market value of the [PIUs] to be purchased." *Id.* at 61. Section 4.3 further provides that "[f]air market value shall be determined on a going concern basis as if [Enzo] and its Subsidiaries were sold as an entirety in an arm' s length transaction with neither the buyer nor the seller under a compulsion to buy or sell, and distribution were made on such sale pursuant to the distribution provisions of the LLC Agreement." *Id.* In a letter dated March 10, 2015, Anderson, as Enzo's President and Chief Executive Officer ("CEO"), provided notice that Enzo was exercising its Call Option under section 4.3 of the PIU Agreement dated May 27, 2014, and valued Le's earned PIUs at $0. Anderson indicated that Le had forfeited his unearned PIUs under section 4.5 of the agreement.

Nall did not testify regarding the value under the PIU Agreement of Le's PIUs as of March 10, 2015. Nall testified in very general terms regarding the perceived value of his own PIUs and stated more than once that he did not believe his own PIUs had any value because the company was losing money, he anticipated business to be "tough" in the next few years, and any value for his PIUs

would be determined after Blackstone "cashe[d] out." Pl.'s Summ. J. App. 115. Nall stated that Duff & Phelps performed an annual valuation of the company's PIUs as part of the company's audited financial statements but did not say that the method for valuing the PIUs for audited financial statements purposes was the same as that used to value PIUs under the PIU Agreement. Evans, instead, testified the valuation done by Duff & Phelps was for "GAAP"[10] or "financial purposes" and clarified that this involved a different type of valuation than that used to calculate the March 10, 2015 fair market value of the PIUs called under section 4.3. Pl.'s Mot. for Continuance App., Ex. A. Evans also testified that he believed that the fair market value of the units called on that date would have been zero. *Id.* Moreover, Nall could not recall if a positive value was ever assigned to the PIUs by Duff & Phelps and said, if any value was assigned, "it was small." *Id.* at 116. Nall never indicated when a positive, albeit small, value may have been assigned in the past to the PIUs by Duff & Phelps, and there was no discussion regarding Enzo's March 10, 2015 valuation. Thus, in sum, Plaintiff has not shown how a valuation of Enzo's PIUs on a date other than March 10, 2015 for GAAP or financial purposes by Duff & Phelps using a valuation method different from the fair market valuation in the PIU Agreement could create a genuine dispute of material fact that Enzo breached the parties' PIU Agreement in valuing Le's earned PIUs as of March 20, 2015. For all of these reasons, Le has not satisfied his burden under Rule 56(d) and Rule 16(b) and is not entitled to the requested continuance of his summary judgment response deadline or the discovery deadline.

---

[10] Generally accepted accounting principles or "GAAP" are "principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time." *Markman v. Whole Foods Mkt., Inc*., 1:15-CV-681-LY, 2016 WL 10567194, at *2 (W.D. Tex. Aug. 19, 2016). They are "[t]he measurement and disclosure principles that apply to all financial statements (except those prepared on another comprehensive basis of accounting). GAAP governs the recognition and measurement of transactions and dictates the amounts and other information that must be presented in financial statements." *KLLM Transp. Servs., LLC v. JBS Carriers, Inc*., 3:12-CV-116-HTW-LRA, 2017 WL 6614813, at *4 (S.D. Miss. Dec. 22, 2017) (citing Steven Lindsey & Marilyn Rutledge, PPC'S GUIDE TO GAAP (12th ed. 2014)).

Further, even if the court were to grant Le a continuance and consider the supplemental evidence offered by him in the form of the three Duff & Phelps reports, the court would conclude that they are insufficient to create a genuine dispute of material fact for similar reasons, as these reports did not value Le's PIUs as of March 10, 2015; the reports indicate that Duff & Phelps's analyses were conducted "solely for financial reporting purposes, in connection with the granting of the Profit Interest Units for stock based compensation, on a minority, non-marketable basis"; the PIU valuation in these reports is based on "Fair Value," not "fair market value" or "FMV." Additionally, the valuations in these reports are entirely hypothetical in nature in that they are based on a "Monte Carlo simulation" of "1,000,000 paths, which represents the possible future values of the equity of the Company." *See* Pl.'s Supp. Summ. J. Resp. App. 8, 66 (Doc. 68-1).

Accordingly, for all of these reasons, Plaintiff has failed to satisfy the requirements for a continuance of his summary judgment response deadline under Rule 56(d) and his motion for extension in this regard will be denied.

### 3. Requests to Continue Deadline to Respond to Defendants' Motion to Exclude Expert Testimony and Extend Plaintiff's Expert Deadline

Plaintiff seeks a continuance of his deadline to respond to Defendants' Motion to Exclude essentially for the same reasons he requested a continuance of his summary judgment response deadline under Rule 56(d). The only difference is that he contends that he should be granted a continuance, not only so he can get a ruling on his Motion to Compel and obtain production of the Duff & Phelps reports before responding to the Motion to Exclude, but also to supplement his expert's report with a calculation of the value of his PIUs based on evidence that he contends Defendants have wrongfully withheld. Even setting aside that the discovery dispute regarding the

Duff & Phelps reports arose after the discovery deadline in the Scheduling Order, consideration of Rule 16(b)'s factors does not weigh in favor of granting Plaintiff a continuance to supplement his expert report to include a new damages calculation for PIUs.

Le attempts to blame the shortcomings in his expert's PIU damages calculation on Defendants' failure to produce requested documents. This, however, does not explain his delay in seeking a continuance to supplement or amend his expert report. By July 2016, when Defendants responded and objected to Plaintiff's written discovery requests, Le was aware that Defendants would not be providing certain information or producing documents he believed was responsive to his discovery requests. Le filed his Motion to Compel on August 24, 2016, shortly before his expert disclosure deadline. This is not to say Le was not diligent in conducting and seeking to compel enforcement of these written discovery requests. Rather, because Le contends that he is entitled to a continuance of his expert deadline in light of his Motion to Compel documents and information not produced by Defendants, this shows that Le knew or should have known before his September 5, 2016 deadline to designate experts and provide expert reports under Rule 26 that he did not have all the information his expert needed to calculate the fair market value of his PIUs in accordance with the PIU Agreement. Le, nevertheless, waited approximately four months, until after expiration of the September 6, 2016 expert deadline in the scheduling order to seek a continuance, and, he did so only after Defendants filed their Motion to Exclude and pointed out the deficiencies in his expert's PIU damages calculation and methodology that Le sought a continuance to supplement or amend his expert's report.

More telling, though, is the complete absence in his expert's report of any discussion regarding the appropriate method for calculating the fair market value of PIUs in accordance with

the PIU Agreement. Weisheit's report indicates that he considered the PIU Agreement in preparing his report and calculating Le's damages and acknowledges that the PIUs are subject to vesting, performance, terms, and other conditions in the PIU Agreement. Without explanation, however, Weisheit ignored the method in the PIU Agreement for calculating the fair market value of Le's PIUs and, instead, used the projected values that Exeter provided Le when he was recruited to calculate the "prospective" value of Le's PIUs. *See* Pl.'s Resp. App. to Mot. to Exclude 14 (Doc. 34-1). Weisheit states in conclusory fashion in his original report that "[a]dditional information is needed and has been requested of Exeter in order to calculate the actual PIU Mr. Le should have received," and "[a]dditional facts and data are needed to be produced by the Defendants in order to complete my analysis of Mr. Le's losses," but he does not identify the type of data or information he would need to calculate the PIUs in accordance with the PIU Agreement or another method. Thus, while Le contends that Defendants are to blame for the shortfalls in his expert's PIU damages calculation, there is no indication from Weisheit's original expert report that Weisheit ever contemplated a need to calculate the value of Le's PIUs using any information other than the projected estimated value that Exeter provided to Le in 2013 during his recruitment.

Likewise, in his First Amended and Supplemental Expert Report, dated January 6, 2017, Weisheit continues to calculate the prospective or "promised" value of Le's PIUs using the projected PIU value provided to Le in 2013 rather than the fair market value on March 10, 2015, as required by the PIU Agreement. *Id.* at 38, 42. Although Le had known about the Duff & Phelps reports for approximately one month when the First Amended and Supplemental Expert Report was prepared, Weisheit continues to conclude, without explanation or reference to the method in the PIU Agreement for calculating the fair market value of Le's PIUs, that the "Profit Interest Example" that

Exeter provided to Le before he was hired is a "reasonable approximation of the actual PIU Mr. Le should have received." *Id.* at 43. He also continues to state, albeit in vague terms and without explanation, that "[a]dditional facts and data are needed to be produced by the Defendants in order to complete my analysis of Mr. Le's losses, specifically as they relate to the Enzo Parent Equity Loss," and [a]dditional information is needed and has been requested of Exeter in order to calculate the actual PIU Mr. Le should have received." *Id.* at 38, 42, 43.

Finally, in a Second Amended and Supplemental Expert Report dated December 15, 2017, Weisheit again notes that Le's PIUs are subject to vesting, performance, terms, and other conditions in the PIU Agreement. Pl.'s Supp. Resp. App. to Motion to Exclude 4 (Doc. 78-1). Based on a April 28, 2015 Duff & Phelps report that included an "Estimation of the Fair Value of Certain [PIUs] of Enzo Parent, LLC as of December 31, 2014," Weisheit concludes for the first time, without explanation, that, although Enzo valued Le's PIUs at $0, the value of Le's PIUs when he was fired in February 2015 was between "$383,904 (100% vested) and $38,858 (20% vested)." *Id.* at 3, 7. Weisheit fails to distinguish between fair value and fair market value or explain why he believes it is appropriate to use a "**Fair Value**" estimate of Enzo's PIUs as of December 31, 2014, to calculate the **fair market value** of Le's PIUs as of the March 10, 2015 call date as required by section 4.3 of the PIU Agreement and states only in conclusory fashion that the "Estimation of the Fair Value" as of December 31, 2014 "can be relied on to reasonably approximate the value of Mr. Le's PIUs as of the date of his termination [on February 23, 2015]."[11] *Id.* at 9. Without explanation, Weisheit

---

[11] Le similarly conflates the estimated "Fair Value" analysis performed by Duff & Phelps for GAAP financial purposes with the "fair market value" in the PIU Agreement and makes no attempt to discern between the two or explain why one is an appropriate substitute for the other in calculating the value of his PIUs at the time of the PIU call date as required by the PIU Agreement. See Pl.'s Supp. Summ. J. Resp. ¶¶ 9, 12, 13 (Doc. 68).

continues to maintain that the PIU "[e]xample" that Exeter provided to Le in 2013 is also a "reasonable approximation of the actual PIU Mr. Le should have received," and that Le is not only entitled to damages of $5,013,517 based on an estimated future PIU valuation example that Exeter provided to Le in 2013, but also damages totaling $383,904 and $38,859 for the actual value of Le's PIUs as of the date of his termination. *See id.* at 8. As with his other reports, Weisheit includes the following vague statement: "Additional facts and data are needed to be produced by the Defendants in order to complete my analysis of Mr. Le's losses, specifically as they relate to the Profits Interest Units Loss." *Id.*

These and Weisheit's other vague and conclusory statements regarding the need for additional information or facts do not adequately explain Le's failure to meet the expert deadline in the Scheduling Order; nor has Le explained why it took approximately nine months after the deadline for Defendants to produce the Duff & Phelps reports for Weisheit to prepare his Second Amended and Supplemental Expert Report. Le, instead, relies on his same argument that a continuance is warranted to permit his expert's December 15, 2017 Second Amended and Supplemental report because the magistrate judge ruled "overwhelmingly" in his favor on his Motion to Compel and ordered Defendants to produce the reports by March 3, 2017. *See* Pl.'s Supp. Resp. to Mot. to Exclude 2 (Doc. 78). The lack of explanation or inadequate explanation provided by Le for failing to meet the expert deadlines in the Scheduling Order and delaying for a long period of time before seeking a continuance and doing so only after Defendants pointed out the flaws in their Motion to Exclude weigh against granting his request to continue his deadline to respond to Defendants' Motion to Exclude or continue the expert deadlines in the Scheduling Order to allow him to amend or supplement his original expert report.

Although the value of his PIUs constitutes one of the components of his damages calculation, Le acknowledges that it is not the only component and maintains that, even if Weisheit's opinion regarding the PIU valuation is stricken, the remaining damages calculated by him survive because Defendants only moved to strike Weisheit's opinion regarding PIU damages and Category I or Lennox damages that he no longer seeks to recover. Because Le's damages model has never been limited to PIU damages, and his expert's new method of calculating the actual value of his PIUs using the Duff & Phelps report appears to simply provide an additional means of calculating the PIU value that, if accepted, would permit Le to recover approximately $400,000 in addition to the approximate $5 million previously calculated by his expert using a projected, estimated PIU damages model, the court determines that the new testimony is not so critical to support amending the Scheduling Order at this late juncture.

Moreover, the importance of the new proposed testimony by Plaintiff's expert does not outweigh and "cannot singularly override the enforcement of local rules and scheduling orders," and any claimed importance underscores the need for Le to have complied with the court's deadlines or to have moved for a continuance before expiration of the discovery and expert deadlines if he believed that the deadlines could not reasonably have been met despite diligence on his part. *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004) (internal quotation marks omitted); *S & W Enters., L.L.C. v. Southwest Bank of Alabama*, 315 F.3d 533, 535 (5th Cir. 2003) (citation omitted); *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990). Additionally, for the reasons herein explained, even if the court were to consider Weisheit's most recent amended and supplemental report, the court agrees with Defendants that his expert opinion regarding Le's PIU

damages is inadmissible under Rule 702. Thus, any claimed importance regarding his amended and supplemental report to Plaintiff's case does not support the requested continuance.

Further, the court determines that Defendants not only would be prejudiced but have been materially prejudiced by Plaintiff's dilatory conduct in seeking a continuance and having to respond to the numerous unauthorized supplemental submissions that were filed in violation of this district's Local Civil Rules without first obtaining leave of court have unnecessarily, as this delayed the resolution of the pending motions and trial of this case and likely caused Defendants to incur additional expense. It would also be patently unfair to allow Plaintiff to supplement and amend his expert report this late in the case without: (1) allowing Defendants to amend their expert designations and provide an expert report to address the matters in Plaintiff's amended and supplemental expert reports; (2) giving Defendants an opportunity to depose Plaintiff's expert regarding his most recent opinion; and (3) permitting Defendants to respond to Plaintiff's December 15, 2017 supplemental submission or surreply (Doc. 78) to Defendants' Motion to Exclude and any other supplemental submissions by Plaintiff that address Weisheit's amended and supplemental reports. A further continuance of the proceedings in this case to cure any such prejudice would not be appropriate. The court had no choice but to continue the trial and the parties' pretrial deadlines in light of the morass created by Plaintiff's numerous unauthorized supplemental filings and requests for the court to decide discovery disputes stemming from the parties' discovery agreement in violation of the Scheduling Order. Ordering another continuance would only serve to reward Plaintiff for his dilatory conduct and failure to comply with court-ordered deadlines and this district's Local Civil Rules and result in additional delay and expense. Regardless, it is not incumbent on the court to award litigants for failing to develop their cases. *See Reliance Ins. Co. v. Louisiana Land and Exploration Co.*, 110

F.3d 253, 258 (5th Cir. 1997) ("affirming denial of request to modify scheduling order to cure deficiencies in expert's report and noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case.") (citing *Turnage v. General Electric Co.*, 953 F.2d 206, 208-09 (5th Cir. 1992)).

For all of these reasons, the court concludes that Plaintiff has not established good cause for failing to meet his September 6, 2016 expert deadline. The court will, therefore, deny Plaintiff's Motion for Continuance with respect to his request to allow his damages expert to supplement or amend his expert report after the September 6, 2016 expert deadline in the Scheduling Order, whether for purposes of amending or supplementing Weisheit's analysis regarding his PIU damages or his lost wages. For the same reason, the court will deny his request to extend his deadline to respond to Defendants' Motion to Exclude until after supplementing or amending his expert report.

## IV.    Plaintiff's Motion for Clarification Regarding Discovery Deadline and Alternative Request to Continue Discovery Deadline (Doc. 57)

Le's Motion for Clarification on Discovery Deadline, or in the Alternative, Motion for Extension of the Same was filed March 13, 2017. Le seeks clarification regarding the discovery deadline in light of the court's March 2, 2017 orders: (1) staying the deadlines set by the magistrate judge pending resolution of Defendants' objections to the order granting in part Plaintiff's Motion to Compel; and (2) staying all unexpired deadlines in the Scheduling Order and vacating the trial. Specifically, Le requests that the court enter an order "clarify[ing] that the [court's March 2, 2017] order stayed the unexpired discovery deadline" of March 13, 2017, agreed to by the parties. Pl.'s Mot. Clarification 3. Alternatively, Le requests an extension of the discovery deadline, pursuant to Federal Rule of Civil Procedure 6(b)(1), "until 21-days prior to the new trial setting." *Id.* at 4.

Plaintiff asserts that the requested continuance is reasonable in light of the parties' discovery agreement to continue discovery until March 13, 2017, twenty-one days before the April 2017 trial setting vacated by the court, and notes that his requested continuance will not require the court to continue the trial, as the court has already vacated the original April 2017 trial setting. Plaintiff contends that his alternative request for a continuance is timely as it was made "before expiration of the current [agreed-upon March 13, 2017 discovery] deadline and not as a result of any neglect or delay tactic, as [he] has diligently worked to obtain the relevant discovery." *Id*. at 5. Plaintiff explains that he "seeks to continue with discovery during the pendency of the stay and until a reasonable time prior to trial" to depose: (1) Montalbano, Exeter's former Chief of Staff; (2) unidentified "Duff & Phelps auditors"; and (3) Enzo's Chairman of the Board, Martin Brand ("Brand"). *Id.* at 6. Plaintiff maintains that Defendants will not be prejudiced by the requested extension because all unexpired deadlines in the Scheduling Order are stayed, and Defendants should not be allowed to benefit from their own discovery abuse.

The court will grant Plaintiff's request for clarification, *but only to the extent that it clarifies* that its March 2, 2017 orders stayed Defendants' deadline to comply with the deadline(s) set by the magistrate judge pending resolution of their objections to the order granting in part Plaintiff's Motion to Compel; stayed all *unexpired* deadlines in the Scheduling Order; and vacated the trial and pretrial conference. The Scheduling Order deadline for completion of discovery expired December 2, 2016, not March 13, 2017. Thus, the court's March 2, 2017 orders staying *unexpired* deadlines in the Scheduling Order did not stay the December 2, 2016 discovery deadline, which expired three months before the court's March 2, 2017 orders were entered.

While the parties extended the December 2, 2016 deadline in the Scheduling Order for completion of discovery by agreement to March 13, 2017, this agreed deadline is not a deadline that was imposed by the court either in the original Scheduling Order or any amended order. Because the March 13, 2017 deadline came about pursuant to the parties' discovery agreement and is not a deadline imposed by the court, it is not a Scheduling Order deadline. That the Scheduling Order allows the parties to extend discovery by agreement under certain conditions does not make any discovery deadline that is extended by agreement of the parties a Scheduling Order deadline, which can only be ordered, enforced, and modified by the court upon leave of court pursuant to Federal Rules of Civil Procedure 15(a) and 16(b).

Moreover, paragraph six of the Scheduling Order makes clear that the court will not entertain any disputes that arise as a result of an agreement by the parties to extend discovery past the deadline set by the court for completing discovery. Plaintiff, nevertheless, requests, over Defendants' opposition, that the court provide him with an additional open-ended extension of discovery until twenty-one days before any new trial setting in light of the parties' discovery agreement to extend discovery to March 13, 2017, twenty-one days before the prior trial setting. In other words, in violation of paragraph six of the Scheduling Order, Plaintiff is asking the court, based on the parties' agreement to extend discovery, to resolve a discovery dispute in his favor to allow him to conduct additional depositions past the parties' agreed March 13, 2017 discovery deadline.

While paragraph six of the Scheduling Order allows parties to extend discovery by agreement, it prohibits discovery agreements that will delay dispositive motions, the filing of pretrial materials, or the trial setting. Extensions of discovery or modifications to the Scheduling Order that will delay the filing of dispositive motions, necessitate extension of a response or reply to a

dispositive motion, or reduce the time in the Scheduling Order set aside for the court to rule on dispositive motions before the trial setting cannot be done by agreement. Rather, such extensions and modifications are governed by paragraph 13 of the Scheduling Order[12] and Federal Rules of Civil Procedure 15(a) and 16(b), and any request for an extension of this kind or modification of the Scheduling Order under paragraph 13 must be made by motion, not agreement.

The parties' November 1, 2016 Notice to the court assured that their discovery agreement was made in accordance with paragraph 6 of the Scheduling Order, yet Plaintiff's requests to continue his summary judgment response deadline, his expert deadline, and the trial on two separate occasions to conduct further discovery in accordance with the parties' discovery agreement violate the prohibition in paragraph six of the Scheduling Order against such extensions and makes the court question whether, at the time of entering the agreement, Plaintiff even intended to comply with paragraph six of the Scheduling Order.

---

[12] Paragraph 13 of the Scheduling Order provides:

**Modification of Scheduling Order:** *A motion for an extension of any deadline set herein must be made prior to its expiration*. This order shall control the disposition of this case unless it is modified by the court upon a showing of good cause and by leave of court. Fed. R. Civ. P. 16(b). Any request that the trial date of this case be modified must be made (I) in writing to the court, (ii) *before* the deadline for completion of discovery, and (iii) **in accordance with the United States District Court for the Northern District of Texas Civil Justice Expense and Delay Reduction Plan and Local Rule 40.1** (motions for continuance must be signed by the party as well as by the attorney of record). The court requires that discovery be completed **at least four months** before the trial setting and that any dispositive motions be filed **at least three and one-half months** before the trial setting. Any proposed modifications to the deadlines for discovery or the filing of dispositive motions that would conflict with these requirements **must include a request that the trial setting be revised as well.** Likewise, if a party seeks to extend the time to file a response or reply related to a dispositive motion, such party **must also include a request to reset the trial**. These requirements are necessary to allow the court sufficient time to rule on the dispositive motion prior to the date pretrial submissions are due. When a revised trial setting is requested, based on the status of the court's docket, it may be necessary to schedule trial a month or so later than that requested. By requesting a revised trial setting, the parties acknowledge and accept this possibility. Further, any request to extend the deadline for filing a motion, response, or reply for more than seven days involving a summary judgment, or requests used in combination that total more than one week, **will** result in a continuance of the trial date.

Specifically, the deadlines for filing dispositive motions and motions challenging experts was December 16, 2016. The parties' agreement to extend discovery to March 13, 2017, was reached on November 1, 2016, approximately six weeks before the dispositive motion deadline. At this time, Plaintiff knew that the Motion to Compel he filed on August 26, 2016, had been ripe for only six weeks and had not been ruled on yet. Thus, Plaintiff knew or should have known by November 1, 2016, whether his need or desire to conduct discovery, whether prior to or after the December 2, 2016 court-ordered discovery deadline, would affect his ability to respond to a dispositive motion or motion to exclude his expert, and he should not have waited until the last possible minute on January 6, 2017, the date his responses to Defendants' summary judgment and expert motions were due, to file his requests for continuance using the court's emergency ECF e-mail. *See* Docket Sheet Entries 31-35.

The court's decision to vacate the trial and pretrial deadlines on March 2, 2017, does not absolve Plaintiff from violating the court's Scheduling Order because it was his conduct in seeking last minute extensions and filing supplemental materials in violation of the Scheduling Order and this district's Local Civil Rules that delayed and prevented the court from ruling on Defendants' summary judgment and expert motions in the timeframe contemplated in the Scheduling Order before the trial setting and pretrial deadlines. It was for this same reason that the court ultimately entered its order on April 18, 2018, admonishing Plaintiff and directing the parties to not file any further motions, briefs, documents, or materials without first obtaining leave of court until the court ruled on the pending motions.

Plaintiff's alternative request to continue discovery also fails for another reason. Federal Rule of Civil Procedure 16(b) governs the requested continuance, not Rule 6(b) as argued by

Plaintiff. Rule 6(b) generally applies to extensions of filing deadlines, not requests for continuance filed after expiration of a Scheduling Order deadline that will necessitate a modification of the scheduling order deadline. Plaintiff's request to continue discovery falls under Rule 16(b) because it was filed approximately three and one-half months after the December 2, 2016 deadline in the Scheduling Order for completing discovery expired. That the motion was filed before expiration of the parties' agreed-upon March 13, 2017 discovery deadline is irrelevant and does not relieve Plaintiff from establishing good cause under Rule 16(b) to revive and continue the December 2, 2016 discovery deadline for purposes of taking additional depositions.

Plaintiff acknowledges that he waited until January 4, 2017, before noticing the deposition of Montalbano for the first time to take place on January 16, 2017, more than one month after expiration of the December 2, 2016 discovery deadline in the Scheduling Order. Plaintiff asserts that he has made a number of attempts to subpoena Montalbano to appear for a deposition on this and subsequent dates without luck. Plaintiff, however, provides no explanation as to why he could not have deposed Montalbano before expiration of the December 2, 2016 discovery deadline and acknowledges that he did not attempt to depose her before this time. He has, therefore, failed to establish good cause by showing that the December 2, 2016 discovery deadline reasonably could not have been met despite the exercise of diligence, and he is not entitled to a continuance for purposes of deposing Montalbano. The court notes that Plaintiff also fails to explain why he needs to depose Montalbano. He, instead, simply asserts in conclusory fashion, as before, that this and the other depositions he seeks to take are "relevant." Pl.'s Mot. Clarification 1.

Plaintiff also asserts that, in light of Defendants' production of the Duff & Phelps reports on March 3, 2017, he "would like to take the oral depositions" of Brand and unnamed "Duff & Phelps

auditors, now that [he] finally knows the identi[t]y of those individuals." *Id.* at 6. Plaintiff contends

that he seeks unspecified testimony related to the three Duff & Phelps reports because he has alleged

a breach of contract claim against Enzo for breaching the PIU Agreement in undervaluing his earned

PIUs. Plaintiff asserts that, in light of the Duff & Phelps report(s), he would also like also to depose

Brand regarding Enzo's or the Board of Director's decision to assign a $0 fair market value to his

earned PIUs. Plaintiff contends that, in correspondence between February 24, 2017, and March 6,

2017, he requested to depose Brand within the agreed-upon extended discovery period, but

Defendants refused to cooperate in scheduling his deposition, in part, because he is "a high-level

Blackstone employee who resides in NY."[13] *Id.* at 6. In addition, Plaintiff maintains that, in light

of Defendants' "recent document production [that included the Duff & Phelps reports], as well as

additional documents that are expected in the future, [he] may need additional depositions." *Id.*

 Plaintiff implies that Defendants are to blame for his failure to exercise diligence in seeking

to depose Montalbano, Brand, and others, but Le does not explain why he could not have taken the

depositions he now seeks to take or other depositions before the court-ordered discovery deadline

and before his Motion to Compel was decided. As noted, it is entirely unclear from Plaintiff's

current motion or Plaintiff's prior Motion for Continuance why he wants to depose Montalbano.

---

[13] In response to Plaintiff's e-mail request to depose Brand, Defendants' counsel responded as follows on March 6, 2016:

> We have reached out to him, but do not have any dates. As you may know, he is a high-level Blackstone employee who resides in NY. With [agreed-upon] discovery closing in a week (we cannot agree to extend the deadline), the last-minute request, the issue [of] whether Exeter can assert control over him [as a nonparty], and the problems with any party resolving any dispute that may arise, numerous issues exist. Also, you deposed both former [Exeter] CEOs who, if I recall correctly, were on board at relevant times, so it is unclear how a high-level person must be deposed at the last minute. Regardless, I will be in touch if I hear back.

Pl.'s Mot. Clarification App. 139.

There is also no indication that the timing of Montalbano's deposition is in any way tied to Plaintiff's Motion to Compel or Defendants' discovery responses and production of documents. It is true that, on January 31, 2017, Defendants were ordered to produce the Duff & Phelps reports by March 3, 2017. Plaintiff, however, first learned about the Duff & Phelps reports and obtained other information in deposing witnesses such as Nall and former Exeter CEO Evans approximately two months *before* Defendants were ordered to produce certain documents and information as a result of the Motion to Compel. According to the correspondence relied on by Plaintiff, he also deposed another former CEO of Exeter. This undermines any contention by Plaintiff that he could not depose the persons he now seeks to depose or other witnesses until after obtaining a ruling on his Motion to Compel and all documents by Defendants were produced.

The court also disagrees that Defendants will not be prejudiced by the requested discovery extension in light of the court's stay of all unexpired deadlines in the Scheduling Order. For the reasons already explained in connection with Plaintiff January 6, 2017 Motion for Continuance, it was Plaintiff's conduct in filing numerous unauthorized supplemental filings and requests for continuance based on the parties' discovery agreement in violation of the Scheduling Order and Local Civil Rules that necessitated the court's vacating the trial setting and staying the unexpired deadlines in the Scheduling Order. Additionally, Plaintiff did not meet his burden under Rule 56(d) of establishing that he was entitled to a continuance based on discovery that was the subject of his Motion to Compel. Thus, Plaintiff, not Defendants, created the delays and predicament he now faces, and Plaintiff's contentions of discovery abuse by Defendants, no matter how often repeated, are simply insufficient to justify the various continuances sought by him to date, whether under Rules 56(d), 6(b), or 16(b).

Finally, it is unclear why Plaintiff seeks to depose Brand or others regarding the three Duff & Phelps reports attached to his Motion for Clarification, as only one of these reports was relied on by his expert in calculating his breach of contract damages. Regardless, as previously discussed and herein explained in the next section dealing with Defendants' Motion to Exclude, Le's argument and Weisheit's expert opinion regarding Le's PIU damages based on the Duff & Phelps report(s) are fundamentally flawed, unsupported, and inadmissible. For all of these reasons, the court will deny Plaintiff's alternative request for an extension of the discovery deadline to depose Montalbano, Brand, unnamed Duff & Phelps auditors, or persons who have yet to be identified by Plaintiff as possibly possessing information relevant to his claims.

## V.     Defendants' Motion to Exclude Certain Expert Testimony (Doc. 28)

Defendants have moved to exclude certain opinions expressed by Plaintiff's expert Weisheit regarding the two categories of damages sought by Plaintiff. Specifically, Defendants request that the court: "exclude any opinion testimony regarding the alleged value of certain management [PIUs] and damages related to [Le] being terminated for cause from his former employer [Lennox]" on the grounds that these "opinions rely on undisclosed or faulty facts and methodology, are impermissible speculation, or are not relevant to the issues in this matter." Defs.' Mot. to Exclude 1.

### A.     Category I or Lennox Damages

Plaintiff's Category I or Lennox losses pertain to the damages Le allegedly sustained as a result of Exeter fraudulently inducing him to resign his position at Lennox to join Exeter. Regarding these damages, Weisheit expresses the opinion, based on the fraudulent inducement allegations in Le's Complaint, that Exeter's conduct in inducing Le to leave his former employer Lennox to work for Exeter caused Le to forgo or lose wages and the value of his Lennox equity portfolio. Weisheit

opines that Plaintiff is entitled to recover as damages these Category I losses, which he concludes total $5,268,182. Defendants contend that Weisheit's opinion regarding Plaintiff's Category I losses should be excluded, as it is based on the inaccurate assumption that Plaintiff was fraudulently induced by Exeter to leave Lennox to join Exeter. Defendants contend that this assumption is flawed because the evidence establishes that Le could not have been fraudulently induced to resign his position at Lennox to join Exeter, as his employment was terminated for cause by Lennon in April 2013 before he learned of the job opportunity at Exeter in June 2013. Based on the deposition testimony of David Moon, Plaintiff's former supervisor at Lennox, Defendants contend that Plaintiff testified untruthfully while under oath in his deposition that he left Lennox because he was recruited by Exeter. Defendants further assert that Weisheit's expert report and damages calculation, the contents of which were verified by Le, must be excluded as it relies on Plaintiff's false allegations that he was fraudulently induced to resign his position at Lennox to join Exeter.

In response Plaintiff indicates, without explanation, that he is no longer seeking Category I or Lennox damages and that Weisheit's expert report has been amended to remove these damages:

> Simultaneously with the filing of this Response, Plaintiff is serving a First Amended and Supplemental Designation of Expert Witnesses along with a First Amended and Supplemental Expert Report of Karl D. Weisheit. . . . Mr. Weisheit's Supplemental and Amended Report also removes what was referred to as "Category I" damages in his initial report (*i.e.*, damages based on Mr. Le's compensation at his prior employer, Lennox International, Inc.), as Plaintiff no longer intends to present evidence of "Category I" damages at trial.

Pl.'s Resp. to Mot. to Exclude 3.

Defendants contend that, while Plaintiff's response frames his election to abandon or no longer pursue these damages as "his decision," he ignores that he "lied in his pleadings and under oath regarding his entitlement to any Lennox compensation," and that "[h]is position until he was

caught (and in his summary judgment brief, in part) was different." Defs.' Reply to Mot. to Exclude

1. Defendants maintain that, before he was caught in a lie, Plaintiff took the following positions:

> "Plaintiff executed the Employment Agreement and walked away from a multi-million dollar equity plan with his prior employer." Pl.'s 2d Am. Pet. p. 4.

> Plaintiff left behind "about 2 million" in equity to work for Exeter. Pl.'s Dep. 177:24-178:5.

> Plaintiff negotiated another $20,000.00 to his sign-on bonus at Exeter BECAUSE "Lennox was on track to hit 2x its bonus, and Exeter was not. And so the sign-on bonus was an attempt to make up the difference" and "was under what I would have been paid had I stayed at Lennox." Pl.'s Dep. 272:10-273:12.

> "At Lennox, the opportunity to advance to a more senior position was not available to Le due to an entrenched senior HR person holding that position, so Plaintiff interviewed with several other companies, including Exeter." Pl.'s Resp. Summ. J. Br. p. 1.

> "Le told Floyd that he was leaving Lennox, a publically-traded company, and going to Exeter, a private company, which inherently contains a certain degree of 'risk involved.'" *Id*. at 4.

Defs.' Reply to Mot. to Exclude 2. Defendants assert that, "[a]fter causing Defendants to engage in

discovery regarding the 'Lennox money' he [claimed to have] walked away from to join Exeter,

Plaintiff was forced to abandon the claim because Lennox had previously fired him for cause and

he did not quit his job at Lennox to go to work for Exeter" as he previously alleged and testified.

*Id.*

Federal Rule of Civil Procedure 11 generally prohibits parties and attorneys from filing or

making deliberately false pleadings or arguments to a court. In this regard, Rule 11(b) provides:

> **(b) Representations to the Court**. By presenting to the court a pleading, written motion, or other paper    whether by signing, filing, submitting, or later advocating it    an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

**(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needless increase in the cost of litigation;

**(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for the extending, modifying, or reversing of existing law or for establishing new law;

**(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

**(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Civ. P. 11(b) (1)-(4). Rule 11 is intended to make lawyers "'stop-and-think' before . . . making legal or factual contentions." *Jenkins v. Methodist Hosps.*, 478 F.3d 255, 265 (5th Cir. 2007) (citation omitted). "'[T]he standard under which [an] attorney is measured [under Rule 11] is an *objective, not subjective,* standard of reasonableness under the circumstances. Accordingly, an attorney's good faith will not, by itself, protect against the imposition of Rule 11 sanctions." *Id.* at 264 (internal citation omitted). The imposition of sanctions under Rule 11, however, is not limited to attorneys, as Rule 11(c) permits courts to impose "an appropriate sanction on any attorney, law firm, or party" whose submission to the court of any pleading, motion, or other paper violates Rule 11(b)'s requirements. Fed. R. Civ. P. 11(c)(1); *see also Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001) (citing *Topalian v. Ehrman*, 3 F.3d 931, 935 (5th Cir. 1993), which quoted the Advisory Committee Note to Rule 11 as follows: "If the duty imposed by the rule is violated . . . it may be appropriate under the circumstances of the case to impose a sanction on the client."); and *Devine v. Wal Mart Stores, Inc.*, 52 F. Supp. 2d 741 (S.D. Miss.1999), in which the court imposed Rule 11 sanctions on a client who brought a lawsuit in bad faith)). An attorney may

also be held personally liable under 28 U.S.C. § 1927 for any "excess costs, expenses, and attorney's fees" resulting from his unreasonable and vexatious multiplication of the proceedings. 28 U.S.C. § 1927. Such a finding requires "evidence of bad faith, improper motive, or reckless disregard for the duty owed to the court." *Mercury Air Grp. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001) (quoting *Edwards v. General Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998)) (internal quotations omitted) (given deposition testimony revealing improper purpose for suit, as well as lack of evidence to support response to summary judgment motion, district court did not abuse its discretion in determining that counsel unreasonably and vexatiously multiplied proceedings).

The court is particularly troubled by Plaintiff's and his attorney's decision to abandon his Lennox fraud damages at this late stage of the case without attempting to respond to Defendants' evidence that Plaintiff knowingly testified falsely and asserted factual contentions that he knew lacked evidentiary support, and, as a result, unnecessarily delayed the proceedings in this case and and needlessly increased the cost of the litigation. Accordingly, the court agrees with Defendants that Plaintiff's withdrawal of his fraudulent inducement claim based on Lennox damages after-the-fact does not necessarily moot Defendants' motion and contentions or absolve Plaintiff from the matters asserted by Defendants. As Defendants have not sought sanctions against Le or his counsel in the form of attorney's fees or other sanctions, and the court has determined that Plaintiff's untimely supplemental and amended expert reports in which the Lennox damages were omitted were unauthorized, the court will grant Defendants' Motion to Exclude Weisheit's expert testimony regarding Plaintiff's Category I or Lennox damages without commenting further on whether sanctions are appropriate, except to say that the decision to disregard the Lennox fraud damages, at a minimum, raises serious concerns.

### B.    Category II or Exeter Equity Damages for PIUs

Based on Plaintiff's wrongful termination and breach of contract allegations, Weisheit concludes in his expert report, dated September 6, 2016, that Le suffered damages totaling $6,199,344 for unpaid severance, lost wages (past and future), the unpaid value of his Enzo PIUs, and Cobra health insurance payments.  Weisheit opines that Le's PIUs are worth $5,013,517 based on a chart that Le received from former Exeter CEO Floyd when he was recruited to join Exeter in June 2013.

Defendants contend that Weisheit's testimony regarding the value of Le's PIUs is unreliable and should be excluded under Federal Rule of Civil Procedure 702 because: (1) Weisheit fails to provide the factual bases or methodology for calculating the PIU value; (2) his calculation is based on a number of hypothetical and contingent events and terms that are not defined by the chart he relies upon, including a "'current financial model' (which is not defined)," a "value which 'assumes IRR hurdles are met' (which are not defined or analyzed)" in the chart, and "multiple Blackstone exit values (all of which are hypothetical and without any bases in fact)"; and (3) his valuation, which is based on hypothetical values as of 2013, is not a proper measure of damages, as it is not based on the method in the PIU Agreement for valuing earned PIUs, that is, that earned PIUs be valued as of the PIU call date (in this case 2015), taking into account "a sale of Exeter in an amount that returns significant capital to Enzo, and then distributes the remainder."  Defs.' Mot. to Exclude Br. 8. Defendants contend that there is no evidence of a potential sale of Exeter, and "Plaintiff's expert has not taken any steps (based on his report) to determine what, if anything, a third-party [might] pay for Exeter, or even if that is possible. He has not identified a methodology for providing an opinion on Exeter's fair market value, or on the PIUs' values." *Id.*; Defs.' Reply 6.  Defendants, therefore,

contend that Weisheit's valuation of $5,013,517 based on information provided to Le in 2013 is not based on sound methodology, amounts to speculation, is not relevant to any legal damages, and would not assist the trier of fact.

In responding to the Motion to Exclude,[14] Plaintiff acknowledges that the PIU Agreement governs and "spells exactly how [] Defendants must calculation the value of [his] PIUs they call," and that "Defendants had the right to exercise a call option on [his] awarded [earned] equity at the time of his separation from Exeter (as they did)." Pl.'s Resp. Br. to Mot. to Exclude 5. Plaintiff, nevertheless, contends that Defendants violated the PIU Agreement when they called or valued his PIUs at $0 and "provid[ed] no explanation as to how that $0 value was reached." *Id.* He further asserts that "there is nothing unreasonable or unreliable" about his expert's reliance on the "projected PIU value [that was] presented to [him] by Exeter's CEO during his recruitment by Exeter" because:

> that is the amount that Mr. Le reasonably expected to earn by accepting Exeter's offer of employment. "Expectancy damages, similar to benefit-of-the-bargain recoveries, award damages for the reasonably expected value of the contract." *Mays v. Pierce*, 203 S.W.3d 564, 577-78 (Tex. App.   Houston [14th Dist.] 2006, pet. denied). "The most common interest protected in breach of contract cases is the expectation, or benefit of the bargain, interest. Protecting this interest seeks to restore the non-breaching party to the same economic position in which it would have been had the contract not been breached   thus giving the party the benefit of its bargain." *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888-89 (Tex. App.   Dallas 2004, pet. denied).

---

[14] In response to the Motion to Exclude, Plaintiff includes a copy of Weisheit's original expert report, September 6, 2016, and he relies on his First Amended and Supplemental Expert Report, dated January 6, 2017. For the reasons explained, the court only considers Weisheit's original report in ruling on Defendants' Motion to Exclude and summary judgment motion, but notes in some instances why the outcome of these motions would be the same even if the court considered Weisheit's amended and supplemental reports. Plaintiff also dedicates a large portion of his response to the Motion to Exclude to his contention that Defendants should not be allowed to benefit from their alleged discovery abuse in not producing the Duff & Phelps reports that are responsive to his discovery requests and the subject of his Motion to Compel. The court has already addressed at length Plaintiff's requested continuance to amend or supplement his expert report under Rule 16(b) and, therefore, does not repeat the parties' contentions or all of the court's analysis regarding this issue in addressing Defendants' Motion to Exclude Weisheit's testimony regarding the value of Le's PIUs, unless it believes that doing so is necessary to explain the court's ruling on the Motion to Exclude.

Pl.'s Resp. Br. to Mot. to Exclude 8. In support of his contention that he is entitled to expectancy damages for Exeter's breach of the PIU Agreement, Le relies on his own deposition testimony as follows:

> As Mr. Le testified during his deposition, while in pre-employment discussions with Exeter, Exeter's former CEO reinforced and reiterated to Mr. Le that the company was on track to meet certain financial targets and projected that Mr. Le would be entitled to profits interest units worth anywhere between $2 million to $5 million, should he accept employment with Exeter. *See* App. 91-93 (Deposition of B. Le). As evidence of Exeter's financials and PIU value, Exeter's CEO provided Mr. Le with a financial spreadsheet indicating the projected value of the units would be between $2 million and $5 million. *See* App. 91-93; *see also* Motion to Exclude App. 25. Based on these promises and representations, Mr. Le accepted employment with Exeter and, he is entitled to present evidence of what he reasonably expected to receive pursuant to the promises Exeter made.

*Id.*

Defendants reiterate that Weisheit's valuation of Le's PIUs fails to account for the method in the PIU Agreement for calculating PIUs:

> [T]he value of the units depends on the value and sale of the business. The analysis requires, simply, someone to determine how much is Enzo worth, and then determine whether that amount exceeds the Capital Contributions into Exeter. More specifically, once the amount for which the business may be sold is determined, then a complicated series of waterfalls occurs starting first with the return of Capital Contributions, which are "Common Units." Defs.' Mot. Summ. J. App. 45, § 4.1(a) (capital contributions); *Id.* at 56-57, § 4.6(a)(i) (Common Units paid first). At the time of a sale, until the Capital Contributions are returned, no value exists for the PIUs under the agreement. *See id.* at 57-58 (PIUs are third in line, to receive Distributable Amounts, and then on a "pari passu" basis). Any calculation requires an understanding of the market for the sale of the entire business. Until the value of the sale of the business as an entirety far exceeds the Capital Contributions, the PIUs are worth $0 under the agreements. *Id.*

Defs.' Reply 5-6. In addition, Defendants assert that, because "Plaintiff's breach of contract claim on the PIU Agreement is solely for the March 10, 2015[] call[,]which valued some of his interests at $0[,] [t]he Board's determination is conclusive and binding   [because the PIU Agreement] does

not provide for appraisal or a referee in case of disagreement." *Id.* at 5. Defendants continue to maintain that Weisheit's opinion is unreliable because it is based on projected, hypothetical 2013 values.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* District courts are assigned a gatekeeping role to determine the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-98 (1993). The court must find that the evidence is both relevant and reliable before it may be admitted. *Id.* To do so, the court must evaluate whether the reasoning and methodology underlying the expert's testimony is valid and can be reliably applied to the facts of the case. *Id.*; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) ("Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."). This requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See Daubert*, 509 U.S. at 590. The court must also determine whether the expert's reasoning or

methodology is relevant in that it "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See id.* at 591.

Factors to consider when evaluating reliability include: (1) whether a theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) general acceptance of the theory in the scientific or expert community. *Daubert*, 509 U.S. at 593-95. The reliability inquiry is flexible, and the judge has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Id.* at 594-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). In assessing whether an expert's testimony is reliable, the trial court must, nevertheless, strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The relevance and reliability of expert testimony turn upon its nature and the purpose for which its proponent offers it. *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The Advisory Committee's Notes explain that when a "witness relies solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes (2000 amendments). This is because the "trial court's gatekeeping function requires more than simply taking the expert's word for it" that the claimed basis supports the opinion. *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d

1311, 1319 (9th Cir. 1994) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")). According to the Advisory Committee's Notes, "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 Advisory Committee's Notes (citing *Kumho Tire Co.*, 526 U.S. at 152) ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.")).

The court determines that the opinion expressed by Weisheit in his September 6, 2016 expert report regarding the value of Le's PIUs is not reliable or relevant and, therefore, not admissible. An "expert's testimony must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 354. Thus, if an expert does not specifically elucidate the methodology and basis he used in formulating his opinions, his opinions are unreliable and inadmissible because, under *Daubert*, an expert's qualifications, conclusions, and assurances of reliability are not enough. *Daubert*, 43 F.3d at 1319. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (citation omitted).

Weisheit's September 6, 2016 opinion that the value of Le's PIUs is $5,013,517 is not based on any particular methodology and is not grounded in relevant facts or data. According to the Curriculum Vitae attached to his expert report, Weisheit is a certified public accountant ("CPA") and is qualified to provide testimony as a CPA expert witness in federal and state court based on his experience or expertise in "investigative accounting, litigation support, and business valuation."

Pl.'s Resp. App. 46. As noted by Le, Defendants do not seek to exclude Weisheit's testimony based on his qualifications. Regardless, Weisheit does not indicate in his report that his conclusion regarding the $5,013,517 value of Le's PIUs is based on his experience; nor does he explain the methodology he used in reaching this conclusion or any accounting practices or standards recognized in his industry. Weisheit indicates that he relied on the "calculation of Le's *prospective* PIU" that was "done by Exeter at the time of [ ] Le's recruitment in 2013" in calculating the value of the PIUs. *Id.* at 14. Weisheit, however, fails to explain why his use of the 2013 *prospective* figures is appropriate in calculating the *actual* value of the PIUs as of the 2015 call date, even though he acknowledges that the PIUs are subject to vesting, performance, and other conditions in the PIU Agreement, *id.* at 12, which he considered in preparing his September 6, 2016 report. *See id.* at 31 (Attachment to 4 to Weisheit expert report, "Facts & Data Considered" includes the May 27, 2014 PIU Agreement). Weisheit, instead, states in conclusory fashion as follows regarding the assumptions he relied on: "Mr. Le's historical earnings and equity positions are reasonable benchmarks for his future earnings and equity positions." *Id.* at 15. For these reasons, the court concludes that his expert opinion regarding the value of Le's PIUs or PIU damages is unreliable and inadmissible.

Defendants contend, and the court agrees for the reasons previously explained, that Plaintiff should not be allowed to offer new expert testimony or otherwise "fix" his prior designations under the guise of supplementing his expert's report or opinion. Even if the court were to allow Plaintiff to supplement or amend his designations and his expert's report, Weisheit's opinions regarding the value of Le's PIUs or Le's PIU damages in his First and Second Supplemental and Amended Reports, dated January 6, 2017, and December 15, 2017, are similarly inadmissible. Weisheit's

January 6, 2017 and December 15, 2017 opinions regarding the $5,013,517 value of Le's PIUs are inadmissible for the exact same reason his September 6, 2016 opinion regarding Le's PIUs is inadmissible. The only difference between these two opinions is that Weisheit states in his January 6, 2017 and December 15, 2017 reports regarding "Assumptions Relied On" that "[t]he Profits Interest Example, as prepared by Exeter, is a reasonable approximation of the actual PIU Mr. Le should have received." *Id.* at 43; Pl.'s Supp. Summ. J. Resp. App. 9. This conclusory statement, however, adds nothing, as it does not explain why Exeter's 2013 projection regarding the value of Le's PIUs is a reasonable approximation of the actual value of the PIUs as of the 2015 call date, under the PIU Agreement and provides no information regarding Weisheit's methodology. Moreover, if no methodology was actually used and Weisheit did not actually calculate the value of Le's PIUs and, instead, is simply relying on a $5,013,517 projected value that was included in a hypothetical "Profits Interest Example" calculated by Exeter in 2013[15] and opining that this value is a reasonable approximation of Le's actual PIU damages, no expert testimony is needed, and any testimony by him would not assist the trier of fact since he makes no attempt to explain why $5,013,517 is a reasonable approximation for the actual value of the PIUs as of the 2015 call date, despite his continued acknowledgment that the PIUs are subject to vesting, performance, and other conditions in the PIU Agreement that are not addressed in his report. *Id.* at 39.

---

[15] *See* Defs.' Mot. to Exclude App. 25, which includes a copy of the Profits Interest Example that Le says Exeter's CEO gave to him in 2013 during his recruitment. The figures in this Profits Interest Example are identical to those included in a chart in all three of Weisheit's reports. Thus, Weisheit's opinion in this regard merely adopts what Exeter told Le in 2013 regarding the projected PIU value in the Profits Interest Example. As noted, Weisheit's original report says nothing about why this is an appropriate valuation under the PIU Agreement, and Weisheit provides no explanation for his conclusion in his first and second supplemental and amended reports that this value is a "reasonable approximation of the actual PIU [] Le should have received." Pl.'s Summ. J. Resp. App. at 43; Pl.'s Supp. Summ. J. Resp. App. 9. Consequently, Weisheit's opinion in this regard would not assist a "trier of fact to understand or determine a[ny] fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

Le's argument that his expert's opinion and reliance on the "projected PIU value" calculated by Exeter in June 2013 are reasonable and reliable because he is entitled to recover expectancy damages under Texas law and reasonably expected to earn this projected PIU value when he accepted Exeter's offer of employment does not salvage Weisheit's opinion. The universal rule under Texas law in measuring damages for a breach of contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App. Dallas 2012, no pet.). Under this rule, a party generally should be awarded neither less nor more than his actual damages. *Stamp Ad, Inc. v. Barton Raben, Inc.*, 915 S.W.2d 932, 936 (Tex. App. Houston [1st Dist.] 1996, no writ) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). Courts determine the proper measure of damages from the facts of the case. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 n.1 (Tex. 1984); *Sharifi*, 370 S.W.3d at 148.

Breach of contract damages are generally designed to protect three interests: a restitution interest, a reliance interest, and an expectation interest. *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex. App. San Antonio 1998, pet. denied). Expectancy damages are similar to benefit-of-the-bargain damages. *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888-89 (Tex. App. Dallas 2004, pet. denied). Expectancy damages are similar to benefit-of-the-bargain damages in that they award damages "for the reasonably expected value of the contract." *Sharifi*, 370 S.W.3d at 148 (citation omitted). The purpose of benefit-of-the-bargain damages is to restore the non-breaching party to the same economic position it would have been in had the contract been performed. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Sci., Inc.*, 128 S.W.3d 304, 317 n.6 (Tex. App. Dallas 2004, no pet.).

As Defendants correctly note, Le's contract claim is based on his contention that Defendants violated and breached the PIU Agreement in attributing a value of $0 to his PIUs on the call date, not some promise made by Exeter in 2013 when he was recruited. Le also acknowledges that Defendants were entitled to call the PIUs, and the valuation of those PIUs is governed by the PIU Agreement's method for calculating the fair market value of his PIUs. Accordingly, the projected PIU value communicated to Le in 2013 is entirely irrelevant, as any expectancy damages for breach of the PIU Agreement would be limited to those necessary to put him back in the same economic position had Defendants performed as required under the PIU Agreement in valuing his PIUs in accordance with the method in the PIU Agreement. Le acknowledges as much, but he continues to assert that he is entitled to recover the projected PIU value included in the Profits Interest Example that Exeter's CEO provided to him in 2013, two years before his employment with Exeter was terminated and before his PIUs were called pursuant to the PIU Agreement in 2015. Again, however, neither Le nor his expert explains why the 2013 calculation based on hypothetical projected values is a reasonable approximation of the fair market value of Le's PIUs and damages necessary to put him back in the same economic position *as if Defendants had performed as required under the PIU Agreement in valuing his PIUs in accordance with the method in the PIU Agreement as of the 2015 call date.*

Le also contends in an unauthorized supplemental submission or surreply (Doc. 78) that Defendants' Motion to Exclude is moot in light of Weisheit's Second Supplemental and Amended Expert Report, dated December 15, 2017, as it takes into account information in the Duff & Phelps reports produced by Defendants in placing a value on his PIUs and sets forth his "opinions as to the equity value, and the basis therefore." Pl.'s Supp. Resp. to Mot. to Exclude 2. Regarding this value,

Weisheit's report includes two charts. In one chart (Table 9 in Weisheit's report), he concludes that Le's PIU is worth $38,859, which is based on the assumption that "[a]t the time of his termination, Le was 20% vested in his Time-Based PIU," and his calculation that the PIU(s) had a total value of $383,904 at 100% vested. Pl.'s Supp. Summ. J. Resp. App. 7. Weisheit also indicates that the figures used to calculation these PIU values are based on the "April 28, 2015 Duff & Phelps report regarding, Estimation of the Fair Value of Certain Profits Interest Units of Enzo Parent, LLC as of December 31, 2014." *Id.* Based on his calculations that Le's PIUs had a value of $383,904 at 100% vested and $38,859 at 20% vested, Weisheit further concludes or summarizes Le's "Profits Interest Units Loss" in the second chart (Table 11 in Weisheit's report) as follows:

| Description | Reference | Amount |
|---|---|---|
| Expectancy Loss | Table 8 | $5,013,517 |
| Unjust Enrichment Loss | Table 9 | $383,904 |
| Breach of Contract Loss | Table 9 | $38,859 |

*Id.* at 9. Regarding these amounts, Weisheit concludes that "Le sustained a range of Profit Interest Units losses" as set forth in this chart and states: (1) "During the process of recruiting Mr. Le in 2013, Defendants indicated to Mr. Le that Enzo would have an 'Exit Value' of $2.261 billion at a time when its valuators concluded its value range to be between $220 and $240 million"; and (2) "During the process of terminating Mr. Le in 2015, Defendants indicated to Mr. Le that his PIU had $0 value at a time when its valuators concluded his value range to be between $383,904 (100% vested) and $38,858 (20% vested)." *Id.* In addition to the prior assumptions relied upon, Weisheit indicates, without explanation, that "[t]he April 28, 2015 Duff & Phelps report regarding, Estimation of the Fair Value of Certain Profits Interest Units of Enzo Parent, LLC as of December 31, 2014 can

be relied on to reasonably approximate the value of Mr. Le's PIU as of the date of his termination." *Id.* at 9.

Defendants did not respond to Le's unauthorized December 15, 2017 surreply to their Motion to Exclude or comment on Weisheit's Second Supplemental and Amended Expert Report. Regardless, the new opinion expressed by Weisheit regarding the value of Le's PIUs as of the date of his termination and the amount of his "Breach of Contract Loss" is unreliable and inadmissible. The foregoing information is the *sum total* of Weisheit's new opinion and analysis. As with his prior reports, Weisheit does not explain his methodology for reaching his conclusions, leaving the court to guess at how he applied the newly produced Duff & Phelps reports in forming his new opinion. Further, as explained, his assumption that the December 31, 2014 fair value estimation in the April 28, 2015 Duff & Phelps report can be relied upon "to reasonably approximate the value of [] Le's PIU as of the date of his termination" is conclusory and fails to take into account the PIU's Agreement's method for calculating the fair market value of Le's PIUs. *Id.* at 9. Weisheit's conclusion that Le sustained an "Expectancy Loss" of $5,013,517 based on the hypothetical PIU value projected by Exeter in 2013 is also at odds with Texas law dealing with expectancy damages and, thus, legally flawed for the reasons already discussed. Finally, to the extent Weisheit concludes that Le can recover "expectancy damages" of $5,013,517, in addition to damages for a "Breach of Contract Loss" in the amount of $38,859, such conclusion would result in an impermissible double recovery, as any recoverable expectancy damages under Texas law and the "Breach of Contract Loss" calculated by Weisheit would compensate Le for the same alleged injury resulting from Defendants' failure to comply with the PIU Agreement in calculating the fair market value of his PIUs as of the 2015 call date.

For all of these reasons, the court will grant Defendants' Motion to Exclude, and Weisheit will not be allowed to testify regarding Le's Category I or Lennox Damages or his Category II or Exeter Damages that pertain to the value of Le's PIUs or related damages. The court will also disregard Plaintiff's evidence regarding this testimony in ruling on Defendants' summary judgment motion.

## VI.      Defendants' Summary Judgment Motion

Defendants have moved for summary judgment on all of Plaintiff's claims.

### A.      Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### B.      Analysis

#### 1.      Retaliation Opposition Employment Law Claims

Defendants move for summary judgment on all of Plaintiff's retaliation claims under Title VII, TCHRA, 42 U.S.C. § 1981, FLSA, FMLA, ADA, and ADEA on the ground that such claims are barred by the "manager rule" because Le did not "step outside of his role" as Exeter's CHRO in taking any of the action that he contends was protected under these statutes. *See* Defs.' Summ. J. Br. 9. Defendants also contend that Plaintiff cannot establish the first prong (protected activity) and third prong (causation) of a *prima facie* case of retaliation under these statutes. For the reasons that follow, the court agrees that Plaintiff's FLSA claim is barred by the manager rule. The court's analysis regarding Plaintiff's remaining employment law claims, on the other hand, focuses on whether Plaintiff engaged in protected activity as required to establish a *prima facie* case of retaliation under the various statutes and concludes that Plaintiff cannot establish a prima facie case of retaliation under any of the foregoing statutes. The court, therefore, need not address the parties' legal argument whether Plaintiff's retaliation claims under statutes, other than the FLSA, are barred by the manager rule in light of the lack of Fifth Circuit authority directly on point.

##### a.      Claims under Title VII, 42 U.S.C. § 1981, and TCHRA

Le asserts that Defendants retaliated against him in violation of Title VII, 42 U.S.C. § 1981 and the TCHRA when they terminated his employment. The *McDonnell Douglas* framework applies to retaliation claims under Title VII when direct evidence of discriminatory or retaliatory intent is lacking. *Long v. Eastfield Coll.*, 88 F.3d 300, 304  05 (5th Cir. 1996). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation under Title VII by showing that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the

protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (footnote and citation omitted); *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). "If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy*, 492 F.3d at 557 The burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination." *Id.*; *Montemayor,* 276 F.3d at 692.

"Under Title VII's antiretaliation provision, protected activity can consist of either: (1) 'oppos[ing] any practice made an unlawful employment practice by this subchapter' or (2) 'ma[king] a charge, testif[ying], assist [ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Rite Way Serv., Inc*., 819 F.3d at 239 (quoting 42 U.S.C. § 2000e 3(a)). "The first of these is known as the 'opposition clause;' the second as the 'participation clause.'" *Id.* at 239. Plaintiff's Title VII claim is an opposition claim, as he contends that his employment was termination because he opposed discriminatory conduct by Exeter and refused to carry out Exeter's discriminatory policies and commands. Under the opposition clause of § 2000e 3(a), an employee must establish that he opposed an employment practice or conduct that he reasonably believed was unlawful under Title VII. *Rite Way Serv., Inc*., 819 F.3d at 240-42; *Long*, 88 F.3d at 304. "[T]he reasonable belief standard recognizes there is some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *Rite Way Serv., Inc*., 819 F.3d at 242. In *Rite Way Services, Incorporated*, the Fifth Circuit concluded that the following factors were relevant in determining whether an employee had a reasonable belief that

Title VII was being violated: (1) whether an employee is an expert in employment law; (2) "the context in which [an employee] opposed [his] employer's conduct"; (3) the context in which a comment was made or conduct occurred, including information known by the complaining employee in evaluating the seriousness of the comment or conduct; and (4) whether the conduct was directed at a specific employee and came from a person in a supervisory position over the plaintiff. *Id.* at 242-244 & n.5.

The TCHRA was "modeled after federal civil rights law," and its express purpose is to execute the policies of Title VII. *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). The TCHRA "purports to correlate state law with federal law in the area of discrimination in employment," so Texas courts "look to analogous federal precedent for guidance when interpreting" the TCHRA. *Id.* (citations and quotation marks omitted). Retaliation claims under § 1981 and Title VII also require proof of the same elements. *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 340 n.8 (5th Cir. 2003). Accordingly, the court will analyze Le's retaliation claims under Title VII, TCHRA, and § 1981 under the same standard.

Defendants contend that they are entitled to summary judgment on Le's retaliation claims under Title VII, TCHRA, and section 1981 claims because Le cannot satisfy the first and third elements of a *prima facie* retaliation claim under Title VII, as: (1) there is no evidence Le engaged in "protected activity" by opposing a practice made unlawful under Title VII; and (2) there is no causal connection between his alleged opposition and the termination of his employment.

Regarding the first element, Plaintiff responds as follows:

> It is undisputed that Exeter's management disparaged TS due to her minority ethnicity and questioned her ethno-centric attire. P. App. 104, 119 (Le 225:6-226:4). It is undisputed that Plaintiff outright refused to terminate TS, when asked by

Exeter's Chief of Staff ("CoS"), which caused Exeter's CEO to wait until shortly after Plaintiff's own termination before terminating TS. P. App. 119. Plaintiff raised these objections to Mr. Anderson and Ms. Montalbano. *Id.* It is undisputed that Plaintiff's opposition of these events occurred shortly before Plaintiff's termination (late 2014 through February 2015). *Id.* Plaintiff's opposition falls squarely within the gambit of communication that the Supreme Court has confirmed constitute "opposition" to Defendant Exeter's discriminatory activity. Because of the overlapping case law, each of these actions are protected from retaliatory termination under Title VII, TCHRA, and 42 U.S.C. § 1981.

Pl.'s Summ. J. Resp. 12. For support, Plaintiff cites to paragraph 8 of his affidavit, in which he states:

> In February 2015, Mr. Anderson and Ms. Montalbano disparaged Taralynn Siliuta, Exeter's HR Recruiter stationed in Salt Lake City, UT, due to her medical disability that caused her seizures. Both Mr. Anderson and Ms. Montalbano also openly criticized the way she dressed, given her minority background. Mr. Anderson and Ms. Montalbano decided to terminate Ms. Siliuta, claiming she did not project a "professional image" for Exeter. I opposed these actions to both Mr. Anderson and Ms. Montalbano. I also refused to carry out the termination. As such, Exeter waited until shortly after my termination to terminate Ms. Siliuta.

Pl.'s Summ. J. Resp. App. 120.[16] Plaintiff also relies on pages 225:6-25 to 226:1-4 of his deposition testimony where he discussed Taralynn Siliuta ("Siliuta"):

> Q. Okay. And at any point, did you make Mr. Anderson aware that you were opposing alleged discrimination or retaliation?
> . . .
> A. There were a few examples that come to mind. I mean, the the Taralynn situation. . . . She was in the process of scheduling a . . . job fair and was then hit by a couple of seizures that required us to take her to the hospital. . . . And Tom Anderson was very quick on having me fire her. And I pointed out to Tom Tom, we just had an employee go through a seizure here, we need to giver her some time to recover, et cetera, et cetera. And he initially backed off on his desire to have me terminate her, but it was probably a few weeks later, maybe a month later, whe[n] he insisted [on] it again. And I just, Tom, we . . . can't do it. We've got too much risk in this particular situation.

*Id.* at 104.

---

[16] Plaintiff cites page 119 of his appendix, but the only statements by him regarding Siliuta are on page 120 of his appendix.

Defendants reply that Plaintiff's evidence does not raise a genuine dispute of material fact that he engaged in protected activity, as his evidence does not establish that he opposed conduct that he reasonably believed violated Title VII, because, among other things, Plaintiff's evidence fails to identify Siliuta's ethnicity, and the cited portion of his deposition testimony is misleading and irrelevant because it does not support his contention that Exeter's management disparaged Siliuta due to her minority ethnicity and questioned her ethno-centric attire.

The court agrees that Plaintiff's evidence does not establish that he engaged in protected activity by opposing conduct that he reasonably believed violated Title VII. Plaintiff testified in his deposition that he opposed Anderson's request to fire Siliuta after she had two seizures at work. Given Le's position as the head of Exeter's Human Resources department, he had more knowledge and expertise in employment law than an average employee and could not have reasonably believed that Anderson's conduct in asking him to fire Siliuta because of a perceived medical disability was unlawful under Title VII, which prohibits discrimination in the workplace because of racial, ethnic, color, religious, or gender-based status.[17] *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 at 63 (citing *McDonnell Douglas Corp.*, 411 U.S. at 800-801). Le does not dispute Defendants' contention that it was his job as CHRO to ensure compliance with the state and federal employment law statutes under which his retaliation claims were brought, and he expressly acknowledges that, "[i]n his capacity as CHRO, [h]e was tasked with implementing company policy and monitoring the

---

[17] The basis for this determination is not related to the parties' argument whether Le was required to show that he "stepped outside of his role" as CHRO. The court's focus, instead, is whether someone with Le's knowledge and experience as a CHRO and Human Resources department head could have reasonably believed that discrimination based on an employee's medical disability was unlawful under Title VII as opposed to the ADA. *See Rite Way Serv., Inc.*, 819 F.3d at 238, 242 & n.5 (considering whether "an employee like Tennort, [who was employed as a general cleaner for the defendant, a janitorial services contractor for a high school and] not instructed on Title VII as a jury would be, reasonably believed that she was providing information about a Title VII violation" and citing *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 290 (4th Cir. 2015) (en banc) (Wilkinson, J., concurring in part and dissenting in part), for the proposition that employees are generally not experts in employment law).

company's compliance with the state and federal laws regulating its activity." Pl.'s Summ. J. Resp. Br. 18 & App. 118 (Le Aff. ¶ 4). Le's deposition testimony also indicates that his job involved investigating whether the termination of employees violated various employment statutes that prohibit, for example, racial discrimination. Thus, although the court does not hold him to a standard of what a lawyer would reasonably know and believe, the undisputed evidence establishes that he was more knowledgeable regarding state and federal employment laws in his capacity as Exeter's CHRO than the average employee would have been. Le also conceded that "you don't have to be a lawyer" to know that terminating an employee because of their race is illegal. *See* Defs.' Summ. J. App. 197-98, 213-16.

Moreover, the affidavit that Plaintiff submitted in response to Defendants' summary judgment motion on January 6, 2017, directly contradicts, without explanation, his earlier November 14, 2016 deposition testimony and, therefore, is not competent summary judgment evidence.[18] Specifically, Plaintiff states in his affidavit that he opposed Anderson's and Montalbano's decision to terminate Siliuta because, although they claimed that Siliuta should be fired because she did not project a "professional image" for Exeter, he believed their request for him to fire her pertained to their prior criticism regarding the "the way she dressed, given her minority background." *Id.* at 104. In his deposition, on the other hand, Plaintiff testified that he opposed unlawful discrimination when Exeter CEO Anderson requested him to fire Siliuta immediately after she had a couple of seizures

---

[18] An affidavit or declaration that contradicts prior deposition testimony of the affiant for the purposes of creating a fact issue is not competent summary judgment evidence and cannot be considered by a court. *Crowe v. Henry*, 115 F.3d 294, 298 n.4 (5th Cir. 1997) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.") (quoting *S.W.S. Erectors, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)). "Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists." *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984) (citation omitted). Thus, a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit [that] directly contradicts, without explanation, his previous testimony." *Id.*

that required her to be hospitalized. Plaintiff said nothing in his deposition about Anderson or Montalbano asking him to fire Siliuta for a perceived discriminatory purpose pertaining to her minority ethnicity, and he offers no explanation for this inconsistent testimony. Accordingly, the court cannot consider Plaintiff's affidavit testimony in determining whether he opposed conduct by Exeter that he reasonably believed was unlawful under Title VII. *See S.W.S. Erectors, Inc.*, 72 F.3d at 495 ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.") (footnote and citations omitted).

Because the deposition testimony relied on by Plaintiff does not create a genuine dispute of material fact that he opposed conduct that he reasonably believed violated Title VII, he has failed to raise a genuine dispute of material fact with respect to the first prong necessary to establish a *prima facie* case of retaliation under Title VII, and Defendants are entitled to judgment as a matter of law on Plaintiff's retaliation claim, whether brought under Title VI, the TCHRA, or § 1981. Having determined that Plaintiff has failed to raise a genuine dispute of material fact with respect to the first prong to establish a *prima facie* case, the court need not address the parties' contentions regarding the third prong (causation) or whether Plaintiff's retaliation claim under Title VI, the TCHRA, or § 1981 is barred by the manager rule.

### b.    ADA

Defendants contend that Plaintiff's ADA retaliation claim fails because there is no evidence he engaged in activity protected under the ADA, and there is no causal connection between any such activity and an adverse employment law action. Plaintiff disagrees and contends in response that it is undisputed that:

Exeter's management disparaged TS due to her medical disability that caused her seizures. P. App. 104, 119 (Le 225:6-226:4). It is undisputed that Plaintiff outright refused to terminate TS, when asked by Exeter's management, which caused Exeter's CEO to wait until shortly after Plaintiff's own termination before terminating TS. P. App.119. Plaintiff raised these concerns to Mr. Anderson and Ms. Montalbano. *Id.* It is also undisputed that Ms. Hoffman was terminated shortly after reporting a sexual harassment complaint. *Id.* Plaintiff opposed the termination to both Mr. Frunzi and Mr. Evans. Plaintiff's actions under both cases are protected under the ADA. In the context of ADA, "[A] close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can besufficient to establish causation." It is undisputed that Plaintiff's opposition set forth herein occurred shortly before his termination from Exeter. *Id*.

Pl.'s Summ. J. Resp. 15 (footnote omitted).

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines a disability as: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." § 12102(1)(A)-(C). "Major life activities include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" *Kemp v. Holder*, 610 F.3d 231, 235 (5th Cir. 2010) (quoting § 12102(2)(A)). An individual is "regarded as having such an impairment" if the individual has been subjected to action prohibited by the ADA "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," but not if the impairments that are merely "transitory and minor." § 12102(3)(A)-(B).

To establish a claim for unlawful retaliation under the ADA, based on circumstantial evidence, a plaintiff must establish a *prima facie* case of retaliation by showing that he: (1) engaged "in an activity protected by the ADA"; (2) suffered "an adverse employment action," and (3) the existence of "a causal connection between the protected act and the adverse action." *Seaman v.*

*CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (citation and footnote omitted). If the plaintiff establishes a *prima facie* case, "the defendant must come forward with a legitimate, non-[retaliatiory] reason for the adverse employment action." *Id.* (citation and footnote omitted). If the defendant advances such a reason, the burden shifts to the plaintiff to establish that "the proffered reason is a pretext for retaliation," and the adverse employment action would not have occurred "but for" the protected activity. *Id.*

As noted, Defendants' motion focuses on the first and third elements of a *prima facie* case of retaliation under the ADA. In response, Plaintiff relies on paragraph eight of his affidavit and pages 225:6 through 226:4 of his deposition, which include some of the same evidence he used to support his claim that he was retaliated against in violation of Title VII and TCHRA for refusing to fire Siliuta. *See* Pl.'s Summ. J. Resp. 15 (citing Pl.'s Summ. J. App. 104, 119).[19]

The ADA retaliation provision protects any individual who has "opposed any act or practice made unlawful by" the ADA or who has made a charge under the ADA. 42 U.S.C. § 12203(a). To qualify as protected activity, the employee must have had a "reasonable belief that the employer was engaged in unlawful employment practices." *St. John v. Sirius Solutions, LLLP*, 299 F. App'x 308, 308 (5th Cir. 2008) (per curiam) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)). An informal, internal complaint may be considered activity protected under the ADA's anti-retaliation provision, as long as the complaint asserts a violation of the ADA, as opposed to "abstract grumblings" or "vague expressions of discontent," which are not protected under the ADA. *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 626 (5th Cir. 2008); *see also Yount v. S & A Restaurant Corp.*, 226 F.3d 641, 2000 WL 1029010, at *3 (5th Cir. 2000) ("[T]he relevant

_____

[19] As previously noted, Plaintiff cites page 119 of his appendix, but the only statements by him regarding Siliuta appear in paragraph eight on page 120 of his appendix.

question . . . [is] whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.") (citation and internal quotation marks omitted). Refusal to follow a manager's order to fire an employee for "*discriminatory reasons*" is considered protected activity. *Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009). Thus, Le's opposition to Anderson's request to fire Siliuta could qualify as protected activity if Le reasonably believed that firing Siliuta amounted to unlawful disability discrimination under the ADA, and he conveyed that concern to Anderson.

The court determines that Le's contentions and the evidence relied on by him regarding "TS" or Siliuta and "Ms. Hoffman" are insufficient to establish the first element of a *prima facie* case of ADA retaliation. Le's argument regarding Danielle Hoffman ("Hoffman") is baffling. It is unclear why he contends that the termination of Hoffman's employment, shortly after she reported a sexual harassment complaint, supports his ADA retaliation claim, as sexual harassment is clearly not covered by the ADA. This argument by him is entirely without merit and, to use the baseball metaphor, "came out of left field." As a result, the court, frankly, does not quite know what to make of it. While Title VII prohibits sexual harassment, Le does not argue that Hoffman's discharge for reporting sexual harassment violates Title VII, or that he opposed any such employment practice with respect to Hoffman. The court, therefore, does not address whether the statements in Le's affidavit regarding Hoffman are sufficient to state a retaliation claim under Title VII, as he does not contend in response to Defendants' summary judgment or indicate in his affidavit that he opposed Hoffman's termination because he believed it was done in violation of Title VII or any statute other than the ADA. Moreover, Le has not come forward with any evidence to show that he opposed Hoffman's

termination because he reasonably believed that Exeter violated the ADA for terminating her employment for reporting sexual harassment, and he acknowledges in his affidavit that the ADA applies to medical disabilities.

Le's ADA retaliation claim based on Siliuta fares no better. Le testified that, after Siliuta experienced a seizure or seizures, Anderson requested him to fire her shortly thereafter, but Le "pointed out to Tom    Tom, we just had an employee go through a seizure here, we need to giver her some time to recover, et cetera, et cetera." *Id.* at 104. Le further testified that Anderson "initially backed off on his desire to have me terminate her, but it was probably a few weeks later, maybe a month later, whe[n] he insisted it again," and Le responded, "Tom, we . . . can't do it. We've got too much risk in this particular situation." *Id.*

Le's stated opposition to firing Siliuta on the grounds that we need to give Siliuta "some time to recover, et cetera, et cetera" and [w]e've got too much risk" does not indicate that Le reasonably believed that firing Siliuta amounted to unlawful disability discrimination under the ADA and is far too vague to have put Anderson or Exeter on notice that his opposition to firing Siliuta was based on perceived disability discrimination. *See Gordon v. Acosta Sales and Marketing, Inc.*, 622 F. App'x 426, 431 (5th Cir. 2015) (affirming summary judgment in favor of employer on employee's ADA retaliation claim) (citing *Harris  Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006), for the proposition that "the Appellant had not engaged in a protected activity, even though she complained of unfair treatment/harassment, because she did not demonstrate that she 'put the employer on notice that her complaint was based on racial or sexual discrimination.'").

Likewise, Le's statement approximately one month later that firing Siliuta involved "too much risk in this particular situation," does not show that he reasonably believed or communicated

to Anderson that firing Siliuta would subject Exeter to liability because doing was unlawful disability discrimination. Without evidence regarding the context in which this later discussion arose, for example, whether Anderson asked Le to fire Siliuta because of her seizures or whether Le conveyed the message that he believed firing Siliuta because of her seizures was unlawful disability discrimination, Le's statement regarding potential risk in this situation is similarly too vague.

In his affidavit, Le attempts to bridge this gap by stating that Anderson and Montalbano "disparaged" Siliuta "due to her medical disability that caused seizures," "criticized the way she dressed given her minority background," and "decided to terminate [her], claiming she did not project a 'professional image' for Exeter." Pl.'s Summ. J. App. 104. Le goes on to state that he "opposed these actions to both" Anderson and Montalbano. *Id.*

There is no evidence, however, that Montalbana, as "Exeter's HR Recruiter stationed in Salt Lake City, UT," had authority to fire Siliuta. Le also does not explain why he did not previously disclose information regarding Montalbano's involvement or what he now refers to loosely as Anderson's and Montalbano's disparagement of Siliuta "due to her medical disability that caused seizures," although he was asked a number of times in his deposition to identify the instances when he made Anderson or others at Exeter aware that he was opposing unlawful discriminatory practices. *Id.* Moreover, Le's statement that Anderson and Montalbano "disparaged" Siliuta is conclusory. Regardless, Le's evidence that he opposed terminating Siliuta's employment, which according to his summary judgment response is the protected activity he engaged in under the ADA, is insufficient for the reasons already explained.

Although "magic words are not required," to qualify as protected opposition, the opposition "must at least alert an employer to the employee's reasonable belief that unlawful discrimination is

at issue." *Brown v. United Parcel Service, Inc.*, 406 F. App'x 837, 840, 2010 WL 5348552, at *3 (5th Cir. Dec. 28, 2010) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348-49 (5th Cir. 2007); *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); and *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)). At most, Le's statement that we need to give Siliuta some time to recover conveyed the message that he may have believed that firing Siliuta immediately after her seizure would violate Siliuta's entitlement under the FMLA to take "reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), which does not constitute opposition to any act or practice made unlawful under the ADA based on disability. Le's statement regarding potential risk could be interpreted as meaning any number of things that are unrelated to disability discrimination prohibited by the ADA. As Le has not established that he engaged in protected activity under the ADA, Defendants are entitled to judgment as a matter of law on his ADA retaliation claim.

### c.     FLSA

Plaintiff's FLSA retaliation claim is based on his contention that he opposed Exeter's misclassification of more than 100 underwriters for years as exempt employees and decision to eliminate all underwriting positions to resolve the issue. Defendants contend that they are entitled to summary judgment on Plaintiff's FLSA retaliation claim because Le did not engage in protected activity, that is, he did not step outside of his role as Exeter's CHRO in taking action he claims is protected because "[e]nsuring compliance with the FLSA, reporting potential FLSA violations to management, raising misclassification issues, and working with management to address these issues *is his job*." Defs.' Summ. J. Br. 9. For support that Le must show that he stepped outside of his role as CHRO, Defendants rely on the Fifth Circuit's reasoning in *Hagan v. Echostar Satellite, L.L.C.*,

529 F.3d 617, 628 (5th Cir. 2008). Defendants contend that, because Le cannot meet this standard

for protected activity, he cannot establish *a prima facie* case of retaliation under the FLSA.

Le contends that *Hagan* is factually distinguishable because:

> *Hagan* required an "employee [to] step outside his or her role in the company by filing
> (or threatening to file) an action adverse to the employer" in order to engage in
> "protected activity." *Hagan*, 529 F.3d at 627. However, that holding was limited to
> a case brought under the FLSA, in which the plaintiff "as a field service manager
> sought help [from the company's Human Resources Officer] for his own perceived
> sense of inability to correctly answer questions" was tasked with answering on behalf
> of the company in response to employee questions. *Id.* at 628-29. In *Hagan*, this
> holding was never extended to circumstances under which, as here, the plaintiff is a
> human resources officer who has (1) expressed outright opposition to and (2) refused
> to implement his employer's discriminatory practices.

Pl.'s Summ. J. Resp. Br. 16 n.32. Based on *Hagan* and other cases, Plaintiff further asserts that

human resources managers or employees like him should not be held to a heightened standard in

reporting FLSA violations:

> The language of § 215(a)(3) has been interpreted so broadly, by the majority of courts,
> as to include even informal, verbal complaints by employees within the scope of its
> protection. Thus, in the context of third-party retaliation claims brought by employees
> in human resources, or some other position that requires advising their employer on
> discriminatory practices, imposing the heightened standard for "protected activity"
> would also be improper under the FLSA.

*Id.* (citing *Hagan*, 529 F.3d at 626; *Dearmon v. Tex. Migrant Council, Inc.*, 252 F. Supp. 2d 367,

367 68 (S.D. Tex. 2003); *Lambert v. Ackerley*, 180 F.3d 997, 1003-05 (9th Cir. 1999) (en banc);

*Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44-45 (1st Cir. 1999); and *EEOC v. Romeo Cmty.*

*Schs.*, 976 F.2d 985, 989-90 (6th Cir. 1992)).

Plaintiff, nevertheless, contends that any argument he failed to step outside of his role as

CHRO is unfounded because the evidence establishes that he "went above his supervisors/managers'

head to the Board when things were not getting done at the operation[al] level." Pl.'s Summ. J. Resp. Br. 17. In this regard, Plaintiff contends:

> It is undisputed that [he] presented to Exeter's Board an analysis of how Exeter needed to correct its misclassification of non-exempt employees/underwriters. P. App. 102, 117-18 (Le 188:4-22). It is undisputed that[,] when no changes were made, [he] continued to escalate his complaints to Exeter's management, including Mark Floyd (also a Board Member), Tom Anderson (also a Board Member) and Walt Evans. P. App. 117-18. Mr. Evans recalled conversations with Plaintiff regarding this matter. It is undisputed that [he] raised such complaints as recently as February 2015, prior to his termination from Exeter. *Id.*; P. App. 108 (Le 241:9-242:24). So any argument made by Defendants that [he] failed to step "outside his role" is unfounded, as the evidence clearly shows that [he] went above his supervisors/managers' head to the Board when things were not getting done at the operation level.

*Id.* For support, Plaintiff relies on his affidavit and deposition testimony.

Defendant takes issue with Le's assertion that he "raised such complaints as recently as February 2015," and replies that the deposition testimony relied on by Le makes no reference to his opposing any perceived FLSA violation. Defendants also object to Plaintiff's evidence regarding the 2015 discussion under Federal Rule of Civil Procedure 37(c), contending that it should be excluded because Plaintiff never disclosed his discussions with Tom Anderson in February 2015 in responding to Defendants' Interrogatory No. 4 in their second set of interrogatories. Plaintiff did not respond to this objection by Defendant.[20]

---

[20] Defendants' Interrogatory No. 4 was not included in their summary judgment appendix, which includes only Defendants' Interrogatory Nos. 1-3, but it was attached to Defendants' prior motion to compel (Doc. 25), filed on December 9, 2016. This interrogatory asks Le to "[i]dentify each individual for whom or on whose behalf you opposed acts believed unlawful" and requests that Le identify the individual's name and the date the opposition occurred. In response, Le does not specifically name any persons or identify any times he opposed activity he believed was unlawful. Le, instead, generally refers to his responses to Defendants' First Request for Disclosures, his deposition testimony, and a January 26, 2016 letter from Le's counsel to defense counsel. Le's disclosures, deposition testimony, and the January 26, 2016 letter do not mention any discussion with Anderson that occurred as recently as February 2015. Defendants' motion to compel was filed timely but was denied as untimely apparently because Defendants' discovery requests that were the subject of the motion were not served before the deadline for completion of discovery, which the Scheduling Order (Doc. 9) defines as "mean[ing] that the discovery must be sent or done so that the answers or responses are produced on or before the deadline date herein set forth." Regardless, this objection is moot because the court determines that Le's evidence fails to raise a genuine dispute of material fact that he stepped outside of his role as CHRO in opposing the classification of Exeter underwriter employees.

The parties acknowledge that the *McDonnell Douglas* framework applies to Le's retaliation claim under the FLSA. The *McDonnell Douglas* framework applies in analyzing most claims for alleged violations of federal employment statutes, including FLSA retaliation claims when such claims are based on circumstantial evidence. *Starnes v. Wallace*, 849 F.3d 627, 631 (5th Cir. 2017) (citations omitted); *see also Hagan* 529 F.3d at 624 ("Although *McDonnell Douglas* was a Title VII case, the burden-shifting framework established therein has been adapted and applied to cases under the [ADEA] and the FLSA.") (footnotes omitted). Under this framework,

> [t]he first question is whether [the plaintiff] has made a prima facie showing of: (1) participation in a protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action. *Id.* If [he] has, the burden then shifts to [the employer] to articulate a legitimate, nonretaliatory reason for the adverse action. *Id.* Once it has done so, then the burden shifts back to [the plaintiff] to identify evidence from which a jury could conclude that [the employer's] proffered reason is a pretext for retaliation. *Id.*

*Starnes*, 849 F.3d at 631-32; *Hagan*, 529 F.3d at 624. "To engage in protected activity [for purposes of the FLSA], the plaintiff must make a 'complaint.'" *Starnes*, 849 F.3d at 632 (quoting *Hagan*, 529 F.3d at 626). For an employee's communication to qualify as a "complaint,"

> the "employer must have fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation" and the "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection."

*Starnes*, 849 F.3d at 632 (quoting *Lasater v. Tex. A & M Univ.-Commerce*, 495 F. App'x 458, 461 (5th Cir. 2012) (per curiam) (quoting *Kasten v. Saint Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334-35 (2011)). In addition, the court in *Starnes*, in discussing its prior opinion in *Hagan*, explained that:

> such an assertion of rights requires that an employee step outside of his normal job role and assert a right adverse to the company. *Hagan*, 529 F.3d at 627. Because a

manager's job duties often include "being mindful of the needs and concerns of both sides and appropriately expressing them" when it comes to pay issues, merely voicing such concerns does not constitute sufficient notice that the manager is asserting rights. *Id.* at 628.

*Starnes*, 849 F.3d at 632 (footnote omitted). This standard is sometimes referred to as the "manager rule." *Id.* at 632 n.4. As *Starnes* was decided by the Fifth Circuit on February 24, 2017, after Plaintiff filed his summary judgment response, and confirms the applicability of the manager rule to FLSA retaliations claims like the one asserted by Le, the court determines that the manager rule applies to his retaliation claim under the FLSA and addresses whether his evidence is sufficient to raise a genuine dispute of material fact that he stepped outside his normal job role as CHRO in asserting rights adverse to Exeter.

Plaintiff states as follows in his affidavit regarding his FLSA claim:

In December 2103, I presented to the Exeter Board of Directors an analysis of what other auto finance companies were doing to comply with the [FLSA] regarding the non-exempt status of underwriters. The presentation outlined multi-million dollar fines some auto finance companies had to pay by knowingly misclassifying its underwriters as exempt employees and emphasized the importance of Exeter needing to correct its own misclassification of employees. In early 2014, no changes were made to the misclassification and I was informed by Exeter management that Exeter decided to hold off on making any changes to the status of underwriters because [it] was the "peak season" for auto loans. According to Exeter management, changing employee status at that time would cause Exeter to incur significant expenses by having to pay overtime to its underwriters. I continued to raise my concerns about this compliance issue to Mr. Floyd, Mr. Richard Frunzi (EVP of Originations    the organization that underwriters reported up through), Mr. Walt Evans (Exeter's General Counsel, and later Tom Anderson (new CEO), in addition to those concerns previously raised to the Board of Directors. In October 2014, Exeter underwent a management overhaul, replacing Mr. Floyd as CEO with Tom Anderson. Tom Anderson ultimately decided in January 2015 to shut down all branches across the country and eliminate all underwriting positions in the field so that, according to him, the problem would "solve itself and go away." I raised several complaints to Tom Anderson about this issue as recently as February 2015, prior to my termination from Exeter.

Pl.'s Summ. J. Resp. App. 118-119. In the deposition testimony cited, Le states: "I brought it to "Blackstone's attention and the entire board of directors that we were in violation of misclassifying our underwriters in the company. So they were aware that we had this open-ended liability that needed to be addressed." *Id.* at 102. Regarding Anderson's decision to eliminate all under writing positions, Le testified:

> The branch restructuring process that we went through, we had made a commitment in writing to hundreds of employees what their severance would be. We reneged on that [in February 2016]. And I pushed back very hard to Tom Anderson on doing that. . . . I think we announced the RIF sometime in the middle of January. By the middle of February, the financials were starting to go south, [and] Tom had the opinion that people had checked out, so he wasn't prepared to pay what we had committed to. I said, Tom, we've already made the commitment.
>
> So he accelerated the termination of a big portion of our branch network. And I don't know if there [were] any WARN Acts that were violated, but I do know that there was — there were payments withheld from people. . . . I'm not a lawyer. I don't know if that crosses the line on any Title VII activity, but I am of the opinion it's unethical and illegal.

*Id.* at 108. Le further testified regarding promised severance as follows:

> Q. And what's illegal about saying, . . . I promise to pay you X amount of severance, but there no contract signed, and then saying, I looked at the financials and we can't afford to pay that much of a generous severance and I'm not going to pay it? What's illegal about that?
>
> A. That's not what happened. We gave each impacted employee a letter. We spelled out in detail what they're eligible for. We have financial spreadsheets telling each person what their dollar amount is. We didn't pay that out.
>
> Q. . . . [D]oes the letter say [Exeter is] contractually obligated to pay you that, and they sign on the dotted line and say, I've got a contract and I agree to do X, Y, Z in return, in consideration for the payment? Does it say that?
>
> A. I don't know what the definition of a contract is, but I know that we had every employee sign and acknowledge the letter. . . . I am of the opinion there was a breach of contract. A number of employees reached out to me for help after I was let go, and . . . there are e-mails . . . between Tom Anderson and myself with me laying out in

> very clear English what we were violating and him pushing back and saying, I don't care, I still want to do it.

*Id.* (objections omitted).

This evidence is insufficient to raise a genuine dispute of material fact that Le stepped outside of his role as CHRO when he notified Defendants regarding his vague "concerns" and "complaints" about a perceived company compliance issue involving the misclassification of a class of Exeter employees under the FLSA because, as previously noted, Le acknowledges that, "[i]n his capacity as CHRO, [h]e was tasked with implementing company policy and monitoring the company's compliance with the state and federal laws regulating its activity," Pl.'s Summ. J. Resp. Br. 18 & App. 118 (Le Aff. ¶ 4), and he testified his job involved investigating whether the termination of employees violated various employment statutes. Defs.' Summ. J. App. 197-98, 213-16. For the same reason, Le's evidence regarding unspecified "complaints" to Anderson about eliminating all underwriting positions and "pushing back" against Anderson's decision to not pay promised severance to employees who were let go does not raise a genuine dispute of material fact that Le stepped outside of his role as CHRO in asserting rights adverse to Exeter.[21] As the Fifth Circuit explained in *Starnes*, "[b]ecause a manager's job duties often include being mindful of the needs and concerns of both sides and appropriately expressing them when it comes to pay issues, merely voicing such concerns does not constitute sufficient notice that the manager is asserting rights." *Starnes*, 849 F.3d at 632 (citation, internal quotation marks, and footnote omitted). While Le contends that he stepped outside of his role as CHRO because "the evidence clearly shows that [he] went above his supervisors/managers' head to the Board when things were not getting done at the

---

[21] There is also no evidence that Le reasonably believed that Anderson's decision to not pay promised severance to employees was an FLSA violation. Instead, according to Le's own testimony, he believed this decision was immoral or an illegal breach of contract.

operation level," he cites to no evidence to support this assertion. Specifically, there is no evidence that his going to the Board of Directors regarding this or any other matter was outside of his duties as CHRO.

Moreover, even if the court were to consider Plaintiff's evidence of the 2013 presentation submitted in support of his unauthorized April 4, 2018 supplemental summary judgment response, it does not affect the court's resolution of Defendants' summary judgment on Plaintiff's FLSA retaliation claim. If anything, the evidence undermines his FLSA retaliation claim because it supports Defendants' argument that the December 2013 presentation was given by Le to the Board of Directors in his role as CHRO of Exeter, and not for purposes of asserting rights adverse to Exeter. Every page of the five-page Power Point presentation is marked "Attorney Client Privileged & Confidential," which indicates that this presentation was intended to provide legal or confidential advice to Exeter. *Id.* at 5-9. The title of the presentation is "Credit Manager Pay Classification." Pl.'s Supp. Summ. J. Resp. App. 5 (Doc. 82-1). This title indicates that the presentation was intended to focus on Exeter's classification of Credit Managers, not underwriters, as Le contends. Although the presentation refers to underwriters, it does so for purposes of conveying industry trends and the move by financial institutions toward classifying underwriters as nonexempt employees and explains that three of the financial institutions listed were sued in class actions involving exemption status of underwriters and two of these institutions agreed to settle the actions. Finally, the presentation sets forth the potential incremental overtime cost to Exeter; states that this overall cost amount would depend on whether it was "Actively Managed"; indicates that "[t]he status of Credit Managers is unclear under the law"; and explains that, whether Credit Managers are exempt depends on whether they satisfy the "Administrative Exception" requirements, and sets forth "arguments that Credit

Managers satisfy" this exemption exception.  *Id.* at 6-9.  In sum, there is nothing about this presentation that indicates Le was doing anything other than his job in providing advice to Exeter and its Board of Directors to ensure the "company's compliance with . . . federal laws regulating its activity."  Pl.'s Summ. J. Resp. Br. 18 & App. 118 (Le Aff. ¶ 4).  Defendants are, therefore, entitled to judgment as a matter of law on Le's FLSA retaliation claim.

### d.  FMLA

Defendants move for summary judgment on Plaintiff's FMLA claim, contending that there is no evidence Le opposed activity considered unlawful under the FMLA or that any opposition by him "impacted, in any way, the decision to terminate" his employment.  Defs.' Summ. J. Br. 13.  Defendants contend that Le's deposition testimony does not establish that he opposed unlawful activity under the FMLA.  *Id.* (citing Defs.' Summ. J. App. 85-86).

Plaintiff disagrees and responds as follows:

> It is undisputed that Exeter's management, while RM was on FMLA leave, attempted to terminate and/or demote RM immediately upon his return and openly discussed his medical conditions with other individuals. It is undisputed that Mr. Anderson then directed the termination of RM's wife, RM, who also worked for Exeter.
>
> It is also undisputed that Plaintiff opposed the firing of KG when KG requested time off for a medical procedure, over the instructions of Tom Anderson to do so. It is undisputed that KG requested leave and Exeter's CEO instructed [him] to terminate KG so that KG "could then have his surgery whenever he wants . . ." Plaintiff raised these objections to Tom Anderson (CEO and Board member). Although Defendants do not directly attack the "causal connection" element of [his] FLSA or FMLA claim, the temporal proximity between the opposition and firing could lead a reasonable fact finder to find a causal link.

Pl.'s Summ. J. Resp. 18 (citing Pl.'s Summ. J. App. 118, 120).

For support, Plaintiff relies on his affidavit.  The only reference to employee "RM," who is identified as "Robert McWhorter" in Plaintiff's summary judgment response appendix, is located

on pages 119 and 120 of Plaintiff's appendix, not page 118 cited by Plaintiff. Robert McWhorter's wife is identified as "Rosie McWhorter" in Plaintiff's affidavit. Plaintiff's reference to "KG" appears to refer to an employee identified in his affidavit as "KW Gibbons." The statements regarding KW Gibbons ("Gibbons") in Plaintiff's affidavit are located on page 121 of Plaintiff's summary judgment appendix, not page 120. Defendants contend that Plaintiff's affidavit includes no facts that would support a finding that he reasonably believed he was opposing an FMLA violation and, instead, simply sets forth words associated with this claim's elements.

"The FMLA requires a covered employer to allow an eligible employee up to twelve weeks of unpaid leave if the employee suffers from 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Caldwell v. KHOU TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citation omitted). "To ensure employees the right to take leave, the FMLA prohibits an employer from 'interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right' provided by the Act." *Id.* (quoting 29 U.S.C. § 2615(a)(1)). Additionally, after a qualifying absence, the employer must restore the employee to the same position or a position comparable to that held by the employee before the leave, § 2614(a)(1), and may not penalize an employee for exercising his or her FMLA rights. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (citing 29 U.S.C. § 2615(a)(1)-(2)), *abrogated on other grounds by Wheat v. Fla. Parish Juvenile Justice Com'n*, 811 F.3d 702 (5th Cir. 2016).

The traditional *McDonnell Douglas* framework applies to claims for retaliatory discharge under the FMLA. *Id*. at 705. Under this framework, the employee must first establish a *prima facie* case of retaliation by showing that: (1) [he] engaged in protected activity; (2) the employer took a materially adverse action against [him]; and (3) a causal link exists between [his] protected activity

and the adverse action. *Id.* (citations omitted). The Fifth Circuit has not yet determined whether the Supreme Court's holding in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), regarding the "heightened 'but for' causation standard required for Title VII retaliation claims applies with equal force to FMLA retaliation claims. *Wheat*, 811 F.3d at 706. If the employee *establishes* a prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action taken. *Hunt*, 277 F.3d at 768. Once the employer has done so, the burden shifts back to the employee to show "by a preponderance of the evidence that the [employer's] reason is a pretext for retaliation." *Id.*

Le states in his affidavit that, while Robert McWhorter was on FMLA leave, members of Exeter's management talked about terminating his employment when he returned from leave, and that Robert McWhorter complained to Exeter's Human Resources department about this FMLA violation. Le, however, does not contend in response to Defendants' summary judgment motion or state in his affidavit that he ever opposed any action by Exeter with respect to Robert McWhorter. Le, instead, contends in his summary judgment response and states in his affidavit that he "vehemently opposed" Rosie McWhorter's termination because he "informed Mr. Anderson that Exeter needed to go through the standard 'paired comparison' process for [her] reduction-in-force ("RIF"), [and] Mr. Anderson refused to allow it" and "instructed [him] to skip the standard RIF legal review process." Pl.'s Summ. J. Resp. App. 119, 120). Le states that he expressed this same concern to Walt Evans ("Evans"), another board of directors member, and Evans stated in response: "[O]ur new CEO [Anderson] appears to have a high tolerance for risk so I would do as he asked." *Id.* at 120. Bypassing a standard reduction-in-force legal review or process is not an FMLA

violation, and Le has not pointed to any other evidence that he reasonably believed this to be the case when he opposed Rosie McWhorter's termination.

Moreover, Defendants' evidence shows that Le testified in his deposition that Exeter's management was discussing demoting or firing Robert McWhorter because they believed he was using his FMLA leave to look for another job and asked Le to see whether he could verify whether Robert McWhorter had started employment with a competitor of Exeter before he quit. Le testified that validating Robert McWhorter's employment would require McWhorter's consent and use of his social security number. According to Le's deposition testimony, it was this request by Exeter, after Robert McWhorter left the company, that he disagreed with and recommended that Exeter not do it because he believed it would "put the company at risk" and felt it was "inappropriate or unethical or illegal," not management's discussion about possibly firing Robert McWhorter. Defs.' Summ. J. App. 85. Le also testified in his deposition that this request was the reason he went to Evans that elicited the response, "our new CEO [Anderson] appears to have a . . . higher tolerance for risk than our prior CEO, so . . . I would do as he asked." *Id.* Accordingly, Le's contradictory and conclusory statement in his affidavit that "I opposed such actions to Mr. Anderson and Mr. Evans" is misleading and also conflicts with and mischaracterizes his deposition testimony. " *Id.* at 119-120.

Le also acknowledged that, after Robert McWhorter left Exeter and before Rosie McWhorter's employment with Exeter was terminated, she was accessing Exeter's Human Resource's database using her husband's "sign-on information" and forwarding records concerning her husband via e-mail to him at his new job at Capital One. Le testified that he believed Robert McWhorter had a right to access Exeter's database to look at his records and disagreed that either Robert McWhorter or Rosie McWhorter were accessing Exeter's database to build a case against

Exeter.  Le testified that he believed that Exeter's actions with respect to Robert McWhorter and the firing of Rosie McWhorter violated the FMLA, and that he had discussions regarding this with Evans.  Le, however, conceded twice during his deposition that he and Evans ultimately agreed that "this is a little risky but we [were] willing to take on the risk" because he "fe[lt] like it was a team decision," and, for this reason, "we agreed to move forward with it."  *Id.* at 86-87.  This evidence regarding Le's "internal conversations" with Evans does not rise to the level of protected activity in the form of opposition to employment practices by Exeter that violated the FMLA and undermines his conclusory statement in his affidavit that he "vehemently opposed such actions."  *Id.* at 119.  Accordingly, the evidence with respect to the McWhorters does not support Le's contentions that he engaged in activity protected by the FMLA.

Regarding Gibbons, Le states in his affidavit as follows in support of his FMLA retaliation claim:

> In February 2015, Mr. Anderson instructed me to terminate Exeter's Credit Analyst, KW Gibbons. Mr. Gibbons requested time off so that he could undergo a medical procedure. The request was under review when Mr. Anderson told me that "HR is here to serve the business, not the other way around," or words to that effect. Mr. Anderson went on to state that[,] if an employee "wants time off, let him go and he can then have his surgery whenever he wants," or words to similar effect. I objected to Mr. Anderson regarding Mr. Gibbons' treatment by Exeter.

Pl.'s Summ. J. App. 121.  Defendants contend that Plaintiff's statement that he objected to Gibbons's "treatment by Exeter" is conclusory and insufficient to show that Le reasonably believed he was opposing an FMLA violation.  Defs.' Reply 7-8.  The court agrees.

To find that Le engaged in protected activity with respect to Gibbons, the court would have to make a number of impermissible inferences that are not supported by the threadbare, conclusory statements in Le's affidavit, including inferences that Gibbons was entitled to take leave under the

FMLA for the unidentified "medical procedure" or that Le believed this to be the case; that Anderson instructed Le to deny the FMLA request or fire Gibbons because he requested FMLA leave that he was entitled to take; and that Le refused to terminate Gibbons or opposed the request to fire him and did so because he believed that doing so violated the FMLA. Thus, the five sentences in Le's affidavit regarding Gibbons are simply insufficient to establish that he opposed an employment practice by Exeter that violated the FMLA or one that he reasonably believed violated the FMLA. Accordingly, the court determines that Le's evidence is insufficient to raise a genuine dispute of material fact that he engaged in protected activity under the FMLA with respect to Gibbons.

Because Plaintiff has not met his burden of establishing a *prima facie* case of FMLA retaliation, Defendants are entitled to judgment as a matter of law on Le's FMLA retaliation claim, and the court need not address the parties' contentions whether a causal link between exists between the protected activity that Le contends he engaged in and his discharge.

### e.     ADEA

Plaintiff did not respond to Defendants' summary judgment motion with respect to this claim. When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed waived or abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that plaintiff's failure to pursue her "retaliatory abandonment" claim beyond her complaint or in response to a motion to dismiss constituted abandonment) (citation omitted); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a plaintiff, "in his opposition to a motion for summary judgment cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue"). Accordingly, Plaintiff's ADEA claim

is deemed abandoned or waived, and Defendants are entitled to judgment as a matter of law on this claim.

### 2. Breach of Contract

Defendants move for summary judgment on Plaintiff's claims for breach the PIU Agreement and breach of a Severance and Non-Compete Agreement, which they believed to be the bases for all of Plaintiff's contract claims. In response, Plaintiff contends that he also has a contract claim based on an agreement to pay him a retention bonus. The court discusses the parties' contentions regarding each of these three contract claims separately and, for the reasons herein explained, determines that Defendants are entitled to judgment on all three contract claims.

### a. PIU Agreement

Defendants contend that they are entitled to summary judgment on Plaintiff's contract claim that is based on the written PIU Agreement that was executed by the parties. Defendants contend that Enzo exercised its call option in accordance with this agreement in determining the fair market value of Le's PIUs at the time of the call, and there is no evidence that, at the time of the call, the PIUs held any other value under the PIU Agreement than the $0 value determined by Enzo.

Plaintiff responds as follows:

> Enzo failed to follow the terms of the PIU Agreement by violating sections 4.1 and 4.3 of the agreement as it relates to implementing the Call Option and calculating the fair market value of said PIUs. The Board of Directors assigned a fair market value of $0.00 to Plaintiff's PIUs. P. App. 52-54. This determination was made despite testimony that an independent auditor, Duff & Phelps, valued the PIUs annually and assigned a different monetary value. P. App. 15, 114-15, (Evans 66:16-68:25) and (Nall 11:3-6, 29:12-32:6).

Pl.'s Summ. J. Resp. 20.[22]

---

[22] The deposition testimony for Nall that is cited by Plaintiff actually extends to page 116 of his appendix.

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys.*, 184 S.W.3d 760, 669-70 (Tex. App. Dallas 2005, pet. denied). The court determines as a matter of law what the contract requires of the parties. *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App. Houston [14th Dist.] 1996, writ denied). When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the issue of whether the facts show performance or breach is also decided as a matter of law. *Id.*

In responding to Defendants' summary judgment motion, Plaintiff does not argue that the PIU Agreement is ambiguous, and the court determines that it is not. Plaintiff relies on the March 9, 2015 resolution adopted by Enzo's Board of Managers and the "Call Notice" letter that Anderson sent him on March 10, 2015, indicating that Enzo was exercising its "Call Option" right under section 4.1 of the PIU Agreement to purchase 140,452 of his "Time-Based Profits Interest Units"; that, pursuant to section 4.3 of the PIU Agreement, the "Called Units" had a fair market value of at $0; and that, under section 4.5 of the PIU Agreement, he had forfeited to Enzo all PIUs held by him that were unearned. Pl.'s Summ. J. App. 52-54. As noted, Plaintiff contends that Enzo breached the PIU Agreement because the $0 value assigned to his earned PIUs differs from the value assigned to Enzo's PIUs by Duff & Phelps in various reports, and he asserts that Evans's and Nall's deposition testimony cited by him support this argument.

For the reasons already discussed at length, the court determines that there is insufficient evidence to raise a genuine dispute of material fact that Enzo violated the PIU Agreement by valuing Le's earned PIUs as $0. *See supra* at pp. 32-35. The deposition testimony of Evans and Nall does not establish that the value assigned to Le's PIUs was calculated in a manner other than that called for in the PIU agreement, and the court would reach the same conclusion, even if it considered Plaintiff's supplemental evidence of the Duff & Phelps's reports. Additionally, because the court has excluded Plaintiff's expert testimony regarding PIU damages, he cannot establish that he suffered any damages as a result of the alleged breach of the PIU Agreement. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's breach of contract claim based on the PIU Agreement.

### b. Retention Agreement

Defendants did not move for summary judgment on any new claim by Plaintiff based on breach of a retention agreement. This issue was raised by Plaintiff in response to Defendants' summary judgment motion. Specifically, Plaintiff asserted in response to Defendants' motion that "[they] fail to attack Plaintiff's breach of contract claim on the Retention Bonus. However, it is undisputed that Plaintiff accepted the offer of the Retention Bonus [sic] and Exeter failed to pay him as agreed upon." Pl.'s Summ. J. Resp. 20 (citing Pl.'s Summ. J. App. 120-21). In support of this claim, Plaintiff relies on his affidavit, in which he states as follows regarding the promised retention bonus:

> [I]n January 2015, Tom Anderson offered me a retention bonus and additional equity in Enzo . . . in exchange for my agreement to remain with Exeter and take on the additional tasks of handling the restructuring of the branches and RIF layoffs. Mr. Anderson communicated to me that I was part of a small group of critical talent that he and the Board of Directors wanted to retain to help move the business forward. Mr. Anderson indicated that written documentation was being prepared and that I would

receive the additional compensation and equity grant "soon." After the conversation, I sent [him] a "thank you" email recapping our conversation. I accepted the agreement and I was never provided neither the bonus nor the equity promised by Exeter's CEO.

Pl.'s Summ J. Resp. App. 121.

Defendants contend that they are entitled to judgment on this contract claim by Plaintiff because information regarding this claim was not previously disclosed. Specifically, Defendants argue that Plaintiff's evidence of damages for this claim should be excluded under Rule 37(c) for failure to make disclosures required under the court's Scheduling Order regarding Plaintiff's calculation of damages. Defs.' Summ. J. Reply (citing Defs.' Summ. J. App. 119, Pl.'s Supp. Disclosures, dated Nov. 4, 2016). Defendants assert that Plaintiff references his expert's report in his supplemental disclosures, but this report does not include any damages calculation for a retention bonus and makes no mention of a retention bonus. Defendants further assert that, even if the court considers Plaintiff's contentions and evidence regarding a retention bonus, his contract claim based on this theory fails, as "any purported agreement is so indefinite as to make it impossible . . . to fix the legal obligations and liabilities of the parties." Defs.' Summ. J. Reply 8 (quoting *Meru v. Huerta*, 136 S.W.3d 383, 391 (Tex. App.   Corpus Christi 2004, no pet)). In addition, Defendants argue that Plaintiff's contention that he is entitled to a retention bonus fails as "[he] was terminated, not retained as an employee." Defs.' Summ. J. Reply 8.

### i.     Exclusion of Evidence Under Rule 37(c)

Federal Rule of Civil Procedure 26(a) provides that "a party must, *without awaiting a discovery request*, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added). Parties are required to make this initial disclosure at or within fourteen days of the Rule 26(f) discovery

planning conference unless a different time is set by stipulation or court order." Fed. R. Civ. P. 26(a)(1)(C). The parties conducted their Rule 26(f) conference on February 24, 2016. *See* Joint Status Report (Doc. 8). Plaintiff's initial disclosures setting forth his damages computations were, therefore, due by March 9, 2016. "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct [his] disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Plaintiff alleges in his Complaint that Anderson approved a retention bonus for him but does not indicate whether this is the basis for his breach of contract claim. Plaintiff also indicated in the parties' February 24, 2016 Joint Status Report that Anderson had approved a retention bonus for him. *See* Joint Status Report 6. Thus, the promised retention bonus is not a new theory. Defendants correctly note, however, that Plaintiff's supplemental disclosures do not include any damages calculation for breach of a retention or bonus agreement. Plaintiff's First Supplemental Disclosures, instead, refer to his September 9, 2016 Designation of Expert Witness and Weisheit's report computing PIU damages. Defs.' Summ. J. App. 118-21. Neither these disclosures nor Weisheit's September 9, 2016 report mentions damages related to nonpayment of a retention bonus.

Sanctions for violations of Rule 26(a) are addressed in Rule 37(c), which provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified." *See* Fed. R. Civ. 37(c)(1). The purpose of this rule is to prevent an ambush, resulting in surprise or prejudice, of undisclosed or late disclosed evidence.

*See Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994) (finding the basic purpose of Rule 26 is "preventing prejudice and surprise"). The court applies a four-factor test to determine whether exclusion of evidence is appropriate under Rule 36(c)(1): (1) the party's explanation, if any, for its failure to disclose the information in a timely manner; (2) "the importance of the evidence"; (3) the potential prejudice to the opposing party if the evidence is admitted; and (4) the availability of a continuance to cure such prejudice. *See CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009) (noting that plaintiff's initial disclosures "failed to properly disclose the 'computations' for the various 'categories' of damages it now complain[ed] of" and affirming the district court's decision to exclude new evidence of damages under Rule 37(c)).

There is no indication that any of Plaintiff's disclosures, supplemental or otherwise, included a damages calculation for breach of a retention agreement. The issue regarding retention bonus damages was raised for the first time in Weisheit's Second Amended and Supplemental Expert Report, dated December 13, 2017, which was attached to a supplemental summary judgment response or surreply by Le filed on December 15, 2017, more than one year after Defendants moved for summary judgment. Weisheit concludes, without any explanation, that Le is entitled to $137,500 or 50% of his annual salary of $275,000 for the lost retention bonus. *See* Pl.'s Supp. Summ. J. Br. App. 6 (Doc. 78-1). Weisheit does not include any amount for promised additional equity referenced in Le's affidavit. Leave of court was not sought to file this supplemental response or surreply to Defendants' summary judgment motion, and Le's prior request for a continuance under Rule 56(d) was not sought to obtain evidence in support of his contract claim based on a retention agreement.

As previously explained, Weisheit's report was also amended without leave of court approximately fifteen months after expiration of the expert designation deadline in the court's

scheduling order. Weisheit states that the information in this report regarding a lost retention bonus and additional equity is based on Le's deposition testimony. Le, however, was deposed a year earlier on November 14, 2016. If the matters in Weisheit's report are based on Le's testimony, this information was known by Le all along and should have been included in his initial disclosures and provided to Weisheit before the September 9, 2016 expert designation deadline expired.

Le has not offered any justification for his failure to disclose timely his damages calculations for his contract claim based on a retention agreement. His disregard for the court's scheduling order and lengthy delay in disclosing his damages for this claim long after expiration of the disclosure and expert designation deadlines and approximately one year after Defendants moved for summary judgment is inexcusable. Without evidence of damages, this contract claim cannot survive, so it is clearly important to Plaintiff, but this, as explained, does not singularly override or excuse the untimely disclosure. *See Hamburger* , 361 F.3d at 883. The lateness of the disclosure would also require the court, out of fairness to the defense, to create a new briefing scheduling, reopen discovery and expert deadlines, and further delay the trial of this case, which is already more than three years old. Exclusion of Le's evidence of damages, including Weisheit's testimony, for his contract claim based on breach of a retention agreement is, therefore, appropriate and hereby **excluded.** Without evidence of damages, this breach of contract claim cannot survive. *Smith Int'l, Inc.*, 490 F.3d at 387 (explaining that damages sustained by the plaintiff as a result of the breach is an essential element of a breach of contract claim). Even if this evidence is not excluded, Plaintiff's contract claim based on a retention agreement still fails as a matter of law for indefiniteness as argued by Defendants.[23]

---

[23] In arguing that they are entitled to summary judgment on this claim, Defendants do not cite to any new evidence in their reply. Moreover, although Defendants did not anticipate that Plaintiff was asserting a claim based on a retention bonus and did not move initially for summary judgment on this claim, they were entitled to address in their reply the arguments and evidence regarding this claim that Plaintiff included in his summary judgment response. For

## ii.    Indefiniteness

To be enforceable, a contract must "be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (citation omitted). When a material or essential term is "open for future negotiation, there is no binding contract." *Id*. (citation omitted). Every "contract should be considered separately to determine its material terms." *Id.* (citation omitted). In determining whether an oral agreement is enforceable under Texas law, court looks to the parties' communications and the circumstances surrounding those communications. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.    Houston [1st Dist.] 2002, pet. denied) (citing *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.    San Antonio 1999, pet. denied)). The terms of the oral agreement "must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended." *Prime Prods., Inc.*, 97 S.W.3d at 636 (citing *Copeland*, 3 S.W.3d at 605). "[T]he terms of an oral contract must be clear, certain, and definite." *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.    Houston [1st Dist.] 1992, writ denied).

An oral contract is not enforceable if the terms are "so indefinite that it is impossible for a court to fix the legal obligations and liabilities of the parties." *Id*. (citing *Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940, 942 (1944); and *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.    San Antonio 1989, no writ). A lack of definiteness precluding the existence of an enforceable contract can "concern the time of performance, the price to be paid, the work to

---

these reasons, the court determines that it need not give Plaintiff an opportunity to respond to Defendants' contentions regarding this claim. The court also notes that it was unable to find any discussion of Defendants' contentions regarding this claim in any of the supplemental summary judgment responses that were subsequently filed by Plaintiff and reasonably infers from this that Plaintiff would have had nothing further to say regarding this claim, even if given the opportunity.

be done, the service to be rendered, or the property to be transferred." *Gannon*, 830 S.W.2d at 709

(citation omitted). An employee's compensation and duties are generally considered to be essential

terms of an employment contract. *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 433 (5th Cir. 2001)

(citing *Farrar v. Colorado Indep. Sch. Dist.*, 444 S.W.2d 204 (Tex. Civ. App.    Eastland 1969, writ

ref'd n.r.e.), and noting that "board minutes failed to set out terms of employment contract such as

'compensation, the duties to be performed, [and] the working hours'"; and *Martin v. Credit

Protection Ass'n*, 793 S.W.2d 667, 669 (Tex. 1990), and summarizing the court's holding that a

"covenant not to compete was not ancillary to an employment contract [as a matter of law] where

contract 'did not contain any terms or provisions usually associated with an employment contract

such as title, position, duration of employment, compensation, duties or responsibilities'").

Moreover, "[a] party may not recover damages for breach of contract if those damages are remote,

contingent, speculative, or conjectural." *CQ, Inc.,* 565 F.3d at 278 (quoting *City of Dallas v. Villages

of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.    Dallas 1996, no writ)). "Whether

an agreement is legally enforceable or binding is a question of law." *America's Favorite Chicken

Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.    San Antonio 1996, writ denied) (citation

omitted). Likewise, "whether an agreement fails for indefiniteness is a question of law" for the court

to decide. *Id.* (citation omitted).

The only summary judgment evidence relied on by Le to establish the existence of an oral

agreement to pay him a retention bonus and additional equity is his affidavit. The essence of this

contract claim is Exeter's verbal promise to compensate Le in return for his agreement to remain

with Exeter and take on "additional tasks" associated with restructuring the company's branches and

the RIF layoffs. The court, therefore, concludes that compensation by Exeter and the duties to be

performed by Le are essential terms to the agreement. These terms as summarized in Le's affidavit, however, are not expressed with "sufficient certainty so that there will be no doubt as to what the parties intended." *Prime Prods., Inc.*, 97 S.W.3d at 636 (citing *Copeland*, 3 S.W.3d at 605). Le's affidavit contains no information regarding the amount of the compensation to be paid him, whether in the form of a bonus or additional equity, or any information regarding the duties or "additional tasks" Le was expected to perform in exchange. The court, therefore, concludes that the agreement is not enforceable under Texas law. Additionally, Le's statement that written documentation regarding this oral agreement was being prepared indicates that these material or essential terms were left open and unresolved, and Le does not state that documentation of any kind was ever actually prepared. Thus, no binding contract was formed. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221 (citation omitted).

For all of these reasons, Defendants are entitled to judgment as a matter of law on Plaintiff's breach of contract claim based on an oral agreement to pay him a retention bonus and additional equity.

### c.      Severance Agreement

Regarding this claim, Defendants assert that "Exeter offered its key employees the opportunity to receive severance pay upon termination without cause, *if* the employee executed Exeter's Severance and Non-Compete Agreement"; and that Plaintiff was advised when he was hired that he would be eligible for severance under the terms of the Severance and Non-Compete Agreement when he received his July 25, 2013 offer letter," which states: "As a Key Employee, you *will qualify* for a **Severance and Non-Compete Agreement** that pays, *subject to certain terms and conditions*, an aggregate amount equal to 150% of the base salary and bonus paid to the Key

Employee during the one-year period immediately preceding termination without cause." Defs.' Summ. J. Br. 17 (quoting Defs.' Summ. J. App. 7) (emphasis added by Defendants). Defendants maintain that, when Le subsequently refused to execute the Severance and Non-Compete Agreement, Exeter was relieved of any obligation under that agreement to make a severance payment to him, and Le cannot now enforce the provisions of that agreement that are favorable to him without agreeing in return to be bound by the non-competition terms. Defendants further assert that the "offer letter specifically provided Plaintiff could *qualify* for severance under the Severance and Non-Compete Agreement    a specific document, the title of which is capitalized in the offer letter." Defs.' Summ. J. Br. 19 (citing *Lang v. MBank Dallas*, 756 S.W.2d 811, 812-13 (Tex. App.    Dallas, 1988, no writ), for the proposition that Le, unlike the plaintiff in *Lang*, was put on notice of a formal written severance agreement because the name of the agreement in the offer letter was capitalized, as opposed to all lower case letters). In addition, Defendants argue that, to qualify for a severance payment, Le had to execute the Severance and Non-Compete Agreement and comply with all terms and conditions of that agreement, not just the provisions he liked.

Plaintiff disagrees that the intention of the parties was that he would only be afforded an opportunity to qualify for severance and asserts that an e-mail from Exeter's CEO to him on July 18, 2013, and the subsequent letter offer, dated July 25, 2013, do not state that he would be required to execute a separate severance agreement to qualify for severance; rather, according to Le, the offer letter, which he refers to as the "Letter Agreement" was a binding contract that entitled to him receive a severance payment without executing the Severance and Non-Competition Agreement:

> It is undisputed that Exeter failed to pay Le the Severance Component and the Retention Bonus and that Enzo failed to pay Le the Profits Interest Component of his agreed[-]upon compensation. [P. App. 116-120]. Defendants argue that Plaintiff is precluded from claiming the Severance Component because Plaintiff was only

afforded an "opportunity" to receive severance under the Letter Agreement, and that was contingent upon execution of the New Severance Agreement. Floyd represented to Plaintiff that he would receive a "Standard severance and non-compete agreement: 150% of last 12 months' base salary plus bonus payable over 18 months," (P. App. 50-51) and Floyd reiterated that Plaintiff would qualify for that Severance Component in the Letter Agreement (P. App. 42-43). At no point did Floyd represent, in the Letter Agreement or elsewhere, that Le would be required to execute a separate New Severance Agreement prior to receiving his Severance Component. P. App. 117. If there was any ambiguity as to the interpretation of that language, such language would be construed against the drafter (in this case Exeter).

Pl.'s Summ. J. Resp. 19 (citations to Defs.' Br. and footnote omitted).

In an affidavit, Le similarly states, "At no point, prior to my employment with Exeter, did Mr. Floyd ever indicate to me that I would be required to execute a separate agreement with the additional, undisclosed terms, such as an arbitration provision, non-solicitation provision and a full release of any future claims, prior to qualifying for the 18-month severance." Pl.'s Summ. J. Resp. App. 118. Le also states that Floyd made "representations" to him during his recruitment, including "representations regarding my severance from Exeter should I be terminated at a future date from Exeter without cause. [He] stated that upon my employment, I would be eligible for Exeter's 18-month severance package." *Id.* Le does not indicate whether these representations were verbal representations that were made in addition to what was represented in Floyd's July 18, 2013 e-mail and July 25, 2013 offer letter that Le contends support his position that the offer letter constitutes an enforceable contract entitling him to severance without any further action by the parties other than his acceptance.

It is undisputed that Le refused to execute the Severance and Non-Compete Agreement that was provided to him on December 6, 2013, and Le does not contend that he is entitled to severance under that agreement. Accordingly, resolution of Defendants' summary judgment motion on this claim requires the court to determine whether, as Le contends, the July 25, 2013 letter offer

constitutes a binding agreement that obligated Exeter to pay him severance upon his acceptance of the offer without requiring something additional, such as executing a separate agreement that includes a non-compete provision or other terms and conditions not referenced in the offer letter.

After meeting with Floyd, Le sent an e-mail to Floyd on July 17, 2013, stating: "I [] appreciate the confidence you and the leadership team are showing by extending me an offer to join Exeter. I'm very excited about the opportunity and eager to *finalize the details* so we can start the onboarding process. . . . Would you please send me the legal document outlining the transactional payout details you referenced? *Also, . . . it would be helpful to see the written offer as well*." Pl.'s Summ. J. Resp. App. 51 (emphasis added). This e-mail by Le indicates that, regardless of what may have been discussed during his face-to-face meeting with Floyd, Le recognized that the details of any offer or agreement regarding his employment with Exeter and compensation package had not been finalized. Floyd responded by e-mail the next day stating, and outlining Exeter's offer:

> Binh,
>
> Here's what I can do:
>
> Title: EVP & CHRO
>
> Base Salary: $265,000
>
> Bonus Target: 50%   Any bonus awarded by the board for 2013 will be paid as if employed all of 2013, i.e., 100%of any bonus awarded for FY 2013
>
> Signing Bonus: $100,000   Payable 50% August 1, 2013 and 50% payable August 1, 2014
>
> Participation in Executive Team profits Interest pool
>
> **Standard severance and non-compete agreement**: 150% of last 12 months' base salary plus bonus payable over 18 months
>
> I will put this in the form of a formal offer but wanted to get the outline in front of you today. I'll have Walt send you the outline of the profits Interest structure, then we can have a more detailed follow-up discussion about what the upside could be

given certain exit values. . . . I hope the comp structure outlined above meets your needs and we can move forward on to finalizing your start date soon.

*Id.* at 50. The July 25, 2013 formal offer letter included additional information regarding each of the forgoing matters, but it also indicated that certain aspects of the compensation package being offered were subject to other agreements, programs, and terms and conditions not included or detailed in the offer letter. For example, the offer letter indicates that the 50% bonus would be issued "according to a bonus program approved by the Compensation Committee and based upon company and individual performance." *Id.* at 42. PIUs were "subject to vesting, performance and other terms and conditions set forth in a management [PIU] agreement." *Id.* Eligibility for health, dental, and life insurance coverage and a 401(k) plan was "subject to plan terms" and "applicable waiting periods." *Id.* Regarding severance, the offer letter states: "As a Key Employee, you will qualify for a **Severance and Non-Compete Agreement** that pays, *subject to certain terms and conditions*, an aggregate amount equal to 150% of the base salary and bonus paid to the Key Employee during the one-year period immediately preceding termination without cause." *Id.* On July 26, 2013, Le signed the offer letter, indicating his acceptance of the "provisions of this offer of employment." *Id*. at 43.

Floyd's e-mail and offer letter both reference severance in the context of a severance *and non-compete agreement.* In other words, Floyd's written correspondence makes clear that Le would qualify for an *agreement* that included both severance *and non-compete* provisions, and that Le would be paid the stated severance under the agreement, *subject to certain terms and conditions*. Le's acknowledges that "Floyd represented . . . he would receive a "Standard severance and non-compete agreement," Pl.'s Summ. J. Resp. 19, but contends that this language should be construed to mean that he would qualify to receive severance or the "Severance Component" of Exeter's offer, if accepted by him. His interpretation, however, ignores the "non-compete" and

"agreement" language in Floyd's e-mail and offer letter. His contention that he was never told that his qualifying for severance would require him to execute a separate agreement or agree to "additional, undisclosed terms, such as an arbitration provision, *non-solicitation provision* and a full release of any future claims" also ignores express language in the offer letter that says severance under a "Severance *and Non-Compete Agreement*" would be paid "*subject to certain terms and conditions*." Pl.'s Summ. J. Resp. App. 42.

As previously noted, the issue of whether an agreement is legally enforceable and fails for indefiniteness is a question of law. *America's Favorite Chicken Co.*, 929 S.W.2d at 622 (citation omitted). "[T]o be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co.*, 847 S.W.2d at 221 (citing *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966)). A court may not create a contract where none exists by interpolating or eliminating material terms. *Dahlberg v. Holden*, 238 S.W.2d 699, 701 (1951). Moreover, Texas courts follow the general rule that "contracting parties' agreement [to] agree upon the terms of a contract, if they can [at a later date], cannot be made the basis of a cause of action." *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 242 (Tex. 2016) (quoting *Radford v. McNeny*, 104 S.W.2d 472, 474 (Comm'n App. 1937)) (internal quotation marks omitted). The court in *Radford* explained the reason for the rule regarding agreements to contract in the future as follows:

> [**U]nless an agreement to make a future contract be definite and certain upon all the subjects to be embraced, it is nugatory**. A contract between two persons, upon a valid consideration, that they will at some specified time in the future, at the election of one of them, enter into a particular contract, specifying its terms, is undoubtedly binding, and, upon a breach thereof, the party having the election or option may recover as damages what such particular contract to be entered into would have been worth to him, if made. **But an agreement that they will in the future make such contract as they may then agree upon amounts to nothing. An agreement to . . . agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action.** There would be no way by which the court could

determine what sort of a contract . . . would result. . . , no rule by which the court could ascertain whether any, or, if so, what damages might follow a refusal to enter into such future contract. So, to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations. * * * Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties, but, where a preliminary contract leaves [open] certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon.

*Radford*, 104 S.W.2d at 474-76. Thus, parties "may agree on some of the contractual terms, understanding them to be an agreement, and leave other contract terms to be made later. It is only when an essential term is left open for future negotiation that there is nothing more than an unenforceable agreement to agree." *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App. San Antonio 2002, pet. denied) (citing *T.O. Stanley Boot Co.*, 847 S.W.2d at 221) (internal citations omitted). It, therefore, follows that "[a] party cannot accept an offer to form a contract unless its terms are reasonably certain." *Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 766 67, 2004 WL 309292 (Tex. App. El Paso 2004, no pet.); *Camden Fire Ins. Co. v. Hill*, 276 S.W. 887, 891-92 (Tex. Comm'n App. 1925) (concluding that no contract was ever formed because "Hill's so-called 'contract,' expressly made conditional in the beginning, remained contingent and incomplete to the end. The pleadings show only an offer to make a contract so far as Hill and Denny were concerned, and an acceptance in fact by the company. The proof shows the offer to make the contract, and failure to complete it, and expressly negatives acceptance in fact. . . . the proof shows the minds of the parties never met in a present agreement of insurance.").

"An agreement that does not create any reciprocal duties is fatally defective." *D&R Constructors, Inc. v. Texas Gulf Energy, Inc.*, 01-15-00604-CV, 2016 WL 4536959, at *12 (Tex. App. Houston [1st Dist.] Aug. 30, 2016, pet. denied) (citing *Fiduciary Fin. Servs. of Sw., Inc. v.*

*Corilant Fin., L.P.*, 376 S.W.3d 253, 257-58 (Tex. App.    Dallas 2012, pet. denied) ("[T]he [letter of intent] creates no specific duties to be performed by Mr. Welch in return for his $250,000 salary. This provision clearly contemplates a future agreement as it states he 'will receive' an agreement. Further, requiring future negotiation indicates that the parties are only agreeing to make a future contract. An agreement leaving material terms to be agreed upon later is not definite and specific as to material and essential terms and is, therefore, unenforceable. The trial court has no authority to ask the jury to supply an essential term in the contract that the parties were unable to complete by mutual agreement.") (citations omitted).  In construing an agreement, courts may consider evidence of circumstances surrounding its execution to determine "the parties' intent as expressed in the agreement, but [they] must determine the parties' expressed intent" but may not consider extrinsic evidence for purposes of showing what "the parties probably meant, or could have meant, [or] something other than what their agreement stated." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (citation omitted).

Here, Floyd's offer letter includes the amount of severance to be paid but clearly indicates that any such payment would be made pursuant to an agreement to pay severance *subject to certain terms and conditions* that are not included in the offer letter.  The title of the agreement (Severance and Non-Compete Agreement) indicates the parties' intent to condition severance on noncompetition but does not include any details regarding Le's non-compete obligations.  Thus, while the offer letter clearly makes payment of severance contingent on Le's satisfying noncompetition and other terms and conditions, it does not indicate what these terms and conditions will be.  As Exeter's duty in the offer letter to pay severance is contingent on unspecified terms and conditions to be included in a future Severance and Non-Compete Agreement, the court concludes that the offer letter, with respect

to severance, is nothing more than an "unenforceable agreement to agree," *Musallam v. Ali*, 560 S.W.3d 636, 639 (Tex. 2018), because it is not sufficiently definite for the court to determine the circumstances under which Exeter undertook as the promisor to pay severance. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221. Accordingly, the offer letter is unenforceable and cannot form the basis for Le's contract claim to recover severance, and Defendants are entitled to judgment as a matter of law on this claim.

### 3. Quantum Meruit

Defendants contend that Plaintiff's quantum meruit claim fails as a matter of law because, under Texas law, he cannot recover in quantum meruit for severance pay that is governed by an express contract. In addition, Defendants assert that Plaintiff cannot recover under a theory of quantum meruit because he caused the severance agreement to fail by refusing to execute it. Defs.' Summ. J. Br. 20 (citing *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988), for the proposition that a "plaintiff cannot recover under quantum meruit when he caused the agreement to fail").

Plaintiff responds that this argument:

> ignores the oral agreements reached between the parties and . . . agreement on other unpaid components of compensation such as the Retention Bonus. . . . [T]he various oral agreements made by Floyd and Plaintiff during the courtship process arise to the level of a quantum meruit claim. Further, no writing evidences the agreement between the parties as to the Retention Bonus.

Pl.'s Summ. J. Resp. 20. For support, both parties rely on *Heldenfels Brothers, Incorporated v. City of Corpus Christi*, 832 S.W.2d 39 (Tex. 1992).

As explained by the court in *Heldenfels*, quantum meruit is an equitable theory of recovery based on an implied agreement to pay for benefits received. *Id.* at 41. "'The purpose of this common law doctrine is to prevent a party from being 'unjustly enriched' by 'retain[ing] the benefits of the

. . . performance without paying anything in return.'" *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018) (quoting *Truly*, 744 S.W.2d at 938). The right to recover under a theory of quantum meruit is independent of any contract, *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990), because "[r]ecovery on an express contract and on quantum meruit are inconsistent." *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964). The existence of a valid, express contract that "covers the subject matter of the parties' dispute, therefore, generally precludes recovery under a "quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). To recover based on a theory of quantum meruit, the plaintiff must prove:

> (1) valuable services were rendered or materials furnished;
>
> (2) for the person sought to be charged;
>
> (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and
>
> (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged.

*Hill*, 544 S.W.3d at 732-33 (citing *Vortt Expl. Co.*, 787 S.W.2d at 944). "The measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed and the materials furnished." *Hill*, 544 S.W.3d at 733 (citation omitted). Evidence of the reasonable value of services or work performed is, therefore, required to recover based on a theory of quantum meruit. *M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 625 (Tex. App. Houston [1st Dist.] 1987, no writ); *see also Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. Civ. App. Austin 1979, no writ) (distinguishing proof required for contract damages versus quantum meruit damages); *Four Points Bus., Inc. v. Rojas*, 2013 WL 4676314, *4 (Tex. App. Houston [1st Dist.] 2013, no pet. hist.).

Summary judgment based on Defendants' argument regarding severance is not appropriate because the court has determined that no valid written severance agreement exists, and Plaintiff is entitled to pursue alternative legal theories. Additionally, Defendants did not address in their reply Plaintiff's contention that his quantum meruit claim is also based on a retention bonus.[24] The court, nevertheless, has concerns regarding the viability of Plaintiff's quantum meruit claim and, in particular, whether he can satisfy the first element of his quantum meruit claim — valuable services were rendered or materials furnished — or establish the reasonable value of those services or materials. It appears he is seeking to hold Defendants to an alleged promise to pay severance while avoiding, for example, a reciprocal noncompetition duty that can be reasonably inferred from Floyd's e-mail and the letter offer. Le also appears to be seeking to recover a retention bonus, even though there is no indication he performed any "additional tasks of handling the restructuring of the branches and RIF layoffs" between January 2015 and February 23, 2015, or did anything other than what he was already being compensated to do under his annual salary as Exeter's CHRO during this time. Pl.'s Summ J. Resp. App. 121. Moreover, because it agreed with Defendants that Plaintiff is precluded from presenting any evidence of damages regarding the unpaid retention and additional equity for failure to disclose it, the court questions whether Plaintiff can establish the reasonable value of any work performed by him, even if he can establish that he partially performed.

Accordingly, the court will deny Defendants' summary judgment motion as to Plaintiff's quantum meruit claim, but it believes that further briefing regarding this claim may resolve it or, at a minimum, provide the court with a better understanding of the parties' positions of what remains of this claim for trial. Accordingly, any response by Plaintiff to this order and *sua sponte* motion by

---

[24] Le does not identify any other "oral agreements" other than the retention and severance agreements, so the court's analysis focuses on these alleged agreements.

the court shall be filed by **April 14, 2019**, by **5 p.m.**, and any reply by Defendants shall be filed by **April 28, 2019**, by **5 p.m.**  Plaintiff's response and Defendants' reply shall not exceed **seven pages** in length exclusive of signature and certificate of service pages, and citations to evidence **must be limited** to the evidence in the existing summary judgment record, that is, the evidence previously submitted by the parties in support of and in opposition to Defendants' summary judgment motion, not including any supplemental materials filed by either party after Defendants filed their January 20, 2017 reply in support of the summary judgment motion.

### 4.    Fraud

Defendants contend that they are entitled to summary judgment on all of Plaintiff's fraud claims.

### a.    Value of PIUs

Defendants argue that none of the representations that form the bases of this fraud claim based on the PIU value constitute actionable fraud and, instead, amount to nothing more than vague statements of opinion, probability, proposals, or future expectations that do not constitute actionable fraud, and any reliance by Le on such indefinite statements is not justified under Texas law. Defendants assert that Le recognizes that statements by "Mr. Frunzi and Mr. Wardle" about the company's financial condition were these gentlemen's "opinion," which does not rise to the level of actionable fraud.  Defs.' Summ. J. Br. 23.  Defendants contend that there is no evidence that Exeter's representations were false when made and made with the intent to deceive Le.  In addition, Defendants assert that the evidence in this case establishes that Plaintiff did not rely on statements by Floyd or information provided to him regarding the potential PIU value during his recruitment before joining Exeter.

Plaintiff responds as follows regarding his fraud claim based on value of the PIUs:

> Defendants argue that Floyd's []representations regarding the PIUs were not something Plaintiff "could legitimately rely upon" because (1) Plaintiff acknowledged the risk associated with the PIUs, (2) the Profits Interest Spreadsheet is only an "example" only "based on current financials," and (3) Plaintiff, himself, valued the PIUs at zero. However, . . . Floyd represented to Plaintiff that the company was on track to hit its financial target. P. App. 79-80, 87 (Le 36:23-37:2, 37:3-20, 78:25-79:21). . . . Floyd presented Plaintiff with the Profits Interest Spreadsheet, which represents to be "based on current financial models." [see Profits Interest Spreadsheet] . . . Floyd told Plaintiff to "trust the process" and that Plaintiff would have all his questions answered after he joined Exeter. P. App. 84 (Le 53:17-54:9). . . . [A]s soon as Plaintiff joined the company and sat in on the financial review meetings, none of those statements were correct. P. App. 88 (Le 100:6-25). Floyd did not know how the PIU program worked, yet he still held out to Plaintiff what "current financials" would earn Plaintiff during his recruitment. P. App. 82-83 (Le 44:16-23, 52:17-53:16). When Walt Evans testified, he even stated that he did not believe anybody could value the PIUs. P. App. 17 (Evans 110:23-111:4). So at the very least, Floyd "made the representation recklessly, as a positive assertion, and without knowledge of its truth."

Pl.'s Summ. J. Resp. 22.

> To establish a claim for fraud under Texas law, the plaintiff must show:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011)

(quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per

curiam)).

Instead of coming forward with evidence that Floyd or others at Exeter knowingly made false

representations, Le argues that the evidence relied on by him establishes that "Floyd made the

representation [regarding the PIUs and the company's current financials] "recklessly, as a positive

assertion, and without knowledge of its truth." "If the plaintiff proves the defendant's recklessness in making a positive assertion, then he is not required to prove that the defendant knew the representation was false when he made it." *J. L. Williams & Co., Inc. v. Robert E. McKee, Inc.*, 612 S.W.2d 649, 651 (Tex. Civ. App. Dallas 1981, writ ref'd n.r.e.). Le, however, fails to address Defendants argument regarding reliance, and he points to no evidence to rebut the evidence cited by Defendants to establish that he recognized there was a lot of risk with the PIUs and, thus, did not act in reliance on any such representations. *See* Defs.' Summ. J. Mot. 21-23. As a result, Le has failed to raise a genuine dispute of material fact that he acted in reliance on the representations that form the basis for this fraud claim based on the value of PIUs.

### b. Severance

Defendants argue that Floyd's representations regarding severance cannot support a claim by Le based on fraud because the offer letter that Floyd provided to Le in July 2013 regarding his eligibility for severance clearly indicated that his qualifying for a Severance and Non-Compete Agreement was subject to certain terms and conditions.

Le disagrees and argues in response as follows regarding the "Severance Component":

Floyd stated that upon [his] employment, he would be eligible for Exeter's 18-month severance package and [he] would be entitled to receive it should he be terminated without cause. P. App. 121. At no point, prior to [his] employment with Exeter, did Mr. Floyd ever indicate to him that [he] would be required to execute a separate agreement with additional, undisclosed terms, such as an arbitration provision, a non-solicitation provision and waiver of rights, prior to qualifying for the 18-month severance. P. App. 117.

*Id.* at 22-23. Le contends that Exeter, therefore, is liable for common law fraud, as well as fraud by nondisclosure and fraudulent inducement.

The court's prior determination that the offer letter, with respect to severance or "Severance Component, or what Le refers to as the "Letter Agreement," is an "unenforceable agreement to agree" precludes, as a matter of law, the fraud claims asserted by Le, as he is attempting to enforce an otherwise unenforceable contract and recover the benefit of an unenforceable bargain. *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001). Because "[f]raudulent inducement . . . arises only in the context of a contract and requires the existence of a contract," the court's prior ruling also forecloses any fraudulent inducement claim by Le based on an unenforceable severance agreement, and it is undisputed that Le refused to execute or be bound by the written Severance and Non-Compete Agreement offered. *Id.* Moreover, there is no evidence that Floyd's representations regarding severance were knowingly false or made recklessly without knowledge of the truth of the matters asserted.

### c.    Financial Services Market

In response to Defendants' summary judgment motion, Le also contends that he has a fraud claim based on "financial services market" representations:

> Exeter's representations regarding the financial services market, generally, w[ere] also fraudulent, as Plaintiff learned upon his employment, which is evidenced by the firing of Exeter's CFO shortly thereafter. Defendants' argument that none of these statements were "intended to deceive him," is also clearly misplaced, as Floyd clearly made such misrepresentations (including presenting Plaintiff with the fraudulent Profit Interest Spreadsheet) during the courtship of Plaintiff.

Pl.'s Summ. J. Resp. 23.

Defendants respond that this claim fails for the reasons set forth in its motion. Defendants argue that Plaintiff failed to provide any evidence to support this argument, there is no evidence any such statements were false or made recklessly, and Plaintiff does not establish that any statement was made with intent to deceive him.

The factual basis for this claim is not entirely clear from the scant argument made by Le, and he does not point to any evidence, new or otherwise, to support his assertion regarding this claim. As Le asserts that this fraud claim relates to the representations made to him during his recruitment, including those pertaining to the value of PIUs, it fails for the same reason as his fraud claim based on the value of PIUs because, as correctly noted by Defendants, Le submitted no evidence in support of this claim.

Accordingly, for all of these reasons, Defendants are entitled to judgment as a matter of law on Le's fraud claims.

### 5. Unjust Enrichment and Money Had and Received (Severance)

Defendants contend that Plaintiff's unjust enrichment claim fails because they did not obtain a benefit from him by fraud, duress, or taking advantage of him. In this regard, Defendants assert:

> Plaintiff was offered severance and he rejected it    at least twice. In this regard, the offer letter provided Plaintiff would qualify for severance under the company's Severance and Non-compete Agreement. Plaintiff, however, refused to execute the agreement referenced in the offer and is, therefore, not entitled to any severance payment. There is simply no evidence Defendants obtained a benefit from Plaintiff by fraud, duress, or the taking of an undue advantage. Consequently, he cannot recover severance under the theory of unjust enrichment.

Defs.' Summ. J. Br. 24.  Defendant argue that Plaintiff's claim for money had and received fails for similar reasons:

> There is simply no equitable basis to award severance to Plaintiff because[,] had Plaintiff executed the Severance and Non-compete Agreement, he would have received the severance payment referenced in the offer letter. Plaintiff chose not to sign the agreement he was advised of at the time he was hired.

*Id.*  Regarding unjust enrichment, Plaintiff responds:

> Defendants assert that Plaintiff's unjust enrichment claim fails because they did not obtain a benefit from Plaintiff by "fraud, duress, or taking advantage of him." *See* Motion at pgs. 23-24. Defendants claim that Plaintiff "rejected" the offer of severance. *See* Motion at pg. 24. Nothing could be further from the truth. For the

reasons set forth immediately above, Defendants absolutely obtained a benefit by
fraud and were thus unjust enriched.

Pl.'s Summ. J. Resp. 23 & n.44. (incorporating his "fraud argument herein in support [of] his claim

for unjust enrichment").  Regarding his claim based on money had and received, Plaintiff asserts:

> Defendants argue there exists "no equitable basis to award severance to Plaintiff"
> because Plaintiff would have received the severance had he executed the untimely
> presented Severance and Non-compete Agreement. *See* Motion at pgs. 24-25. As an
> initial matter, Plaintiff did execute an agreement under which he was entitled to the
> Severance Component: the Letter Agreement. But further, for the reasons set forth
> fully herein, Plaintiff is entitled to the money in equity, as well as at law, based on
> the circumstances and facts upon which Defendants induced Plaintiff to join Exeter
> as CHRO.

Pl.'s Summ. J. Resp. 23.

Unjust enrichment is based on the equitable principle "that one who receives benefits unjustly

should make restitution for those benefits." *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265,

270 (Tex. App.  San Antonio 2004, pet. denied).  "Unjust enrichment occurs when a [defendant] has

wrongfully secured a benefit or has passively received one which it would be unconscionable to

retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.   Houston [1st Dist.] 2013,

no pet.).  "A [defendant] is unjustly enriched when [it] obtains a benefit from another by fraud,

duress, or the taking of an undue advantage." *Id.* Unjust enrichment, however, is "not a proper

remedy . . . merely because it might appear expedient or generally fair that some recompense be

afforded for an unfortunate loss or because the benefits to the [party] sought to be charged amount

to a windfall."  *Id.* at 112 (citing *Heldenfels Bros.*, 832 S.W.2d at 42).  "Money had and received is

an equitable action that may be maintained to prevent unjust enrichment when one person obtains

money which in equity and good conscience belongs to another."  *H.E.B., L.L.C. v. Ardinger*, 369

S.W.3d 496, 507 (Tex. App.   Fort Worth 2012, no pet.).

While Le maintains, with respect to severance, that Defendants obtained a benefit by fraud and were, therefore, unjustly enriched, he fails to point to any evidence of fraud. Likewise, he does not identify any evidence that Defendants were unjustly enriched because they secured a benefit from such conduct, and Le's conclusory arguments regarding these matters are insufficient to raise a genuine dispute of material fact that Defendants were unjustly enriched. As there is no evidence Defendants were unjustly enriched, Le's claims based on the equitable theories of unjust enrichment and money had and received both fail as a matter of law, and Defendants are entitled to judgment on these claims.

### 6. Lennox Damages Based on Fraudulent Inducement

Defendants seek summary judgment on Plaintiff's claim to recover Lennox damages totaling approximately $5 million, that is, damages allegedly sustained by him for having been fraudulently induced to leave his former employer Lennox to join Exeter. Plaintiff contends that his claim for Lennox damages is moot because he is no longer seeking such damages and his amended expert report removed these damages. Defendants reply that the evidence clearly establishes that Le was not induced to leave Lennox and walk away from the money he has sought in this litigation and only elected to abandon this claim for these damages after he was caught in a lie when his "Lennox boss testified that he was terminated for cause." Defs.' Summ. J. Reply 10. As Plaintiff has withdrawn his fraudulent inducement claim to recover Lennox Damages, and has failed to raise a genuine dispute of material fact regarding this claim, Defendants are entitled to judgment, as a matter of law, on this claim, which will be dismissed with prejudice.

### C. Objections to Summary Judgment Evidence

Both parties have asserted a number of summary judgment objections. The court has only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure

and the summary judgment standard herein enunciated. Accordingly, the objections are **overruled as moot**, except to the extent specifically addressed and ruled upon in this opinion.

## VII. Outstanding Discovery Motions (Docs. 63, 83)

It appears that the court's rulings regarding the parties' other motions moots Plaintiff's Second Motion to Compel and Motion to De-Designate "Highly Confidential Documents." Accordingly, the court **denies as moot** these motions.

## VIII. Conclusion

For the reasons herein explained, the court determines that no genuine dispute of material fact exists as to any of the elements of Plaintiff's claims on which Defendants moved for summary judgment, except for his quantum meruit claim. The court, therefore, **denies** Defendants' Motion for Summary Judgment (Doc. 27) with respect to Plaintiff's quantum meruit claim, **grants** the motion in all other respects, and **dismisses with prejudice** all claims asserted by Plaintiff in this action, except for his quantum meruit claim. The court also **grants** Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert (Doc. 28); **overrules as moot**, except to the extent specifically addressed and ruled upon in this opinion, Plaintiff's Objection to Defendants' Summary Judgment Evidence and Motion to Strike (Doc. 31); **denies** Plaintiff's Motion for Continuance (Doc. 35); **overrules as moot**, except to the extent specifically addressed and ruled upon in this opinion, Defendants' Objections to Plaintiff's Summary Judgment Evidence (Doc. 39); **grants in part and denies in part** Plaintiff's Motion for Clarification on Discovery Deadline, or in the Alternative, Motion for Extension of the Same (Doc. 57); **denies as moot** Plaintiff's Motion to De-Designate "Highly Confidential" Documents in Defendants' Productions (Doc. 63); **denies as moot** Plaintiff's

Second Motion to Compel (Doc. 83); and **denies as moot** Plaintiff's Motion to Set Trial Date and Enter Scheduling Order (Doc. 86).

Further, for the reasons explained, the court believes that additional briefing regarding Plaintiff's quantum meruit claim may resolve it or, at a minimum, provide the court with a better understanding of the parties' positions of what remains of this claim for trial. Accordingly, any response by Plaintiff to this order and *sua sponte* motion by the court shall be filed by **April 14, 2019**, by **5 p.m.**, and any reply by Defendants shall be filed by **April 28, 2019**, by **5 p.m.** The parties are not necessarily limited to addressing the concerns expressed by the court but must comply with the page limitations imposed. Plaintiff's response and Defendants' reply shall not exceed **seven pages** in length exclusive of signature and certificate of service pages, and citations to evidence **must be limited** to the evidence in the existing summary judgment record, that is, the evidence previously submitted by the parties in support of and in opposition to Defendants' summary judgment motion, not including any supplemental materials filed by either party after Defendants filed their January 20, 2017 reply in support of the summary judgment motion.

**It is so ordered** this 31st day of March, 2019.

Sam A. Lindsay
United States District Judge